**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

YOEL ABRAHAM,

          Defendant.

20 Cr. 411 (RA)

**SENTENCING MEMORANDUM OF YOEL ABRAHAM**

Justine Harris
Noam Biale
Neesha Chhina
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
JHarris@shertremonte.com
NBiale@shertremonte.com
NChhina@shertremonte.com

*Attorneys for Yoel Abraham*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

I.      Yoel Grows Up in an Unusually Strict Religious Environment ............................ 2

II.     Yoel Experiences Financial Hardship at a Young Age .......................................... 4

III.    Yoel Attends Parochial School, Without Access Even to the Limited
        Secular Education Enjoyed by His Peers ................................................................ 5

IV.     Yoel Allows His Siblings to "Skip" Him in Marriage ............................................ 7

V.      After Finishing Yeshiva and With No Marriage Prospects, Yoel Focuses
        on Work ................................................................................................................... 9

VI.     Yoel's Ongoing Commitment to His Community .................................................. 10

PROCEDURAL BACKGROUND ................................................................................... 13

I.      Guilty Plea .............................................................................................................. 13

II.     PSR and Outstanding Objections ........................................................................... 13

ARGUMENT ................................................................................................................... 14

I.      The Court Should Consider the Effective Guidelines
        Range to Be 18–24 Months .................................................................................... 14

        A.      The Loss Amount Calculation Should Not Include Payments
                Made by Amazon for Overshipped Products .............................................. 16

        B.      The Loss Amount Calculation Should Consider Only Losses
                Attributable to Yoel for Substituted Products and Units, Which
                Is at Most $1.2 Million .............................................................................. 21

        C.      There is No Evidence of Loss for Purported Counterfeit
                Goods .......................................................................................................... 22

        D.      Whatever Metric Is Used, a Credit Against the Loss Amount Should
                Be Applied for Products Sold by Amazon .................................................. 23

        E.      The Sophisticated Means Enhancement Should Not Apply ...................... 23

II.     The § 3553(a) Factors Warrant a Non-Custodial Sentence .................................. 25

A.    Legal Standard .......................................................... 25

B.    The Government's Intended Loss Figure Vastly Overstates
       Yoel's Culpability................................................................... 25

C.    Given Yoel's Substantial Efforts to Make Amends and to
       Rehabilitate, a Custodial Sentence is Not Necessary to Achieve
       the Statutory Purposes of Sentencing ...................................... 28

          i.    Yoel Is Committed to Understanding the Root Causes of
                His Criminal Conduct and Growing ................................ 28

          ii.    Yoel Has Expressed Profound Regret for His Conduct to
                Friends and Family ...................................................... 31

          iii.    Yoel Has Embarked on a Path of Spiritual Growth and
                Maturation................................................................. 31

          iv.    Yoel's Rehabilitative Efforts Merit a Substantial Variance ......... 33

D.    Alternatives to Incarceration Are Sufficient to Achieve
       Deterrence, Reflect the Seriousness of the Offense and Impose
       Just Punishment ............................................................ 34

E.    Yoel's History of Good Deeds and Contributions to the Community
       Also Militate in Favor of a Non-Custodial Sentence................................ 37

CONCLUSION.................................................................................. 41

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Ciminelli v. United States*,
   598 U.S. 306 (2023) ................................................................ 19

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................... 25, 34, 35

*Kimbrough v. United States*,
   552 U.S. 85  (2007) ..................................................... 27

*Kelly v. United States*,
   590 U.S. 391 (2020) ................................................. 19, 20

*Neder v. United States*,
   527 U.S. 1 (1999) ................................................... 16

*Parietti v. United States*,
   No. 16-CR-373 (PAE), 2022 WL 3139623 (S.D.N.Y. Aug. 5, 2022) ................ 17

*Pepper v. United States*,
   562 U.S. 476 (2011) ................................................. 25

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) .............................. 25, 37

*United States v. Bryson*,
   163 F.3d 742 (2d Cir. 1998) .................................... 33

*United States v. Butler*,
   264 F.R.D. 37 (E.D.N.Y. 2010) .................................. 33

*United States v. Connolly*,
   24 F.4th 821 (2d Cir. 2022) ............................. 16, 17, 18

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) ............................... 26, 27

*United States v. Johnson*,
   245 F. Supp. 3d 393 (E.D.N.Y. 2017) ......................... 34

*United States v. Johnson*,
   No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ............ 26

*United States v. Khalid,*
   No. 09-CR-734, 2011 WL 6967993 (E.D.N.Y. Dec. 13, 2011) ............................................ 36

*United States v. King,*
   No. 12-CR-390, 2013 WL 3466553 (E.D.N.Y. 2013)....................................................... 34, 35

*United States v. Neiman,*
   828 F. Supp. 254 (S.D.N.Y. 1993) ...................................................................... 28, 41

*United States v. Rosado,*
   254 F. Supp. 2d 316 (S.D.N.Y. 2003) ........................................................................ 33

*United States v. Rubin,*
   558 F. Supp. 2d 411 (E.D.N.Y. 2008) ........................................................................ 22

*United States v. Scott,*
   No. 06-CR-988-LTS-1, 2021 WL 5989797 (S.D.N.Y. Dec. 17, 2021)................................... 41

*United States v. Shellef,*
   570 F.3d 82 (2d Cir. 2007) ............................................................................... 19

*United States v. Singh,*
   877 F.3d 107 (2d Cir. 2017) .............................................................................. 25

*United States v. Studley,*
   47 F.3d 569 (2d Cir. 1995) ............................................................................ 21, 22

*United States v. Toback,*
   No. 01 CR. 410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14, 2005)....................................... 37

**Statutes**

18 U.S.C. § 371 ........................................................................................... 13, 15

18 U.S.C. § 1343 ............................................................................................. 13

18 U.S.C. § 1349 ............................................................................................. 13

18 U.S.C. § 1957 ......................................................................................... 13, 15

18 U.S.C. § 3553 ..................................................................................... 25, 26, 27, 37

**Rules**

U.S.S.G. § 2B1.1 ........................................................................................ passim

U.S.S.G. § 2S1.1 ......................................................................................... 13, 15

U.S.S.G. § 3E1.1 ......................................................................................... 14, 15

U.S.S.G. § 4C1.1 ............................................................................................................ 14, 15

**Other Authorities**

Bill Heltzel, *Four Rockland brothers accused of biking Amazon out of $19M*, Westfair Business
  Journal (Aug. 25, 2020), https://westfaironline.com/courts/four-rockland-brothers-accused-of-
  bilking-amazon-of-19m/ ............................................................................................ 37

Daniel Nagin and Greg Pogansky, *Integrating Celerity, Impulsivity, and Extralegal Sanction
  Threats into a Model of General Deterrence: Theory and Evidence, Criminology*, 39(4) (2001)
  ................................................................................................................................ 36

Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of "Intended Loss" in the U.S.*
  Sentencing Guidelines for Fraud, 81 Mo. L. Rev. 715 (2016) ................................. 26

Leticia Miranda, *America's Orthodox Jews Are Selling A Ton Of The Products You Buy On
  Amazon*, Buzzfeed (September 4, 2019),
  https://www.buzzfeednews.com/article/leticiamiranda/amazon-orthodox-jews ...................... 9

Louise Matsakis, *How Four Brothers Allegedly Fleeced $19 Million From Amazon*, Wired (Aug.
  20, 2020, 4:29 PM), https://www.wired.com/story/how-four-brothers-allegedly-fleeced-19-
  million-amazon/ ........................................................................................................ 37

Martin Heubel, *The Complete Guide to Amazon Chargebacks in 2024*, Consulterce.com (Mar.
  24, 2024), https://consulterce.com/amazon-chargebacks/#overage-po-units ........................... 19

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006) ................... 36

Sarah Wallace, *Four Rockland County Brothers Arrested in $19M Fraud Scheme Targeting
  Amazon*: Sources, NBC New York (Aug. 19, 2020, 11:03 PM),
  https://www.nbcnewyork.com/news/local/crime-and-courts/four-rockland-county-brothers-
  arrested-in-19m-fraud-schem ................................................................................... 37

Stephanie Pagones, *Brothers defrauded Amazon out of $19M through bogus invoices: DOJ*,
  FOXBuisness (Aug. 20, 2020, 5:50 PM ), https://www.foxbusiness.com/lifestyle/brothers-
  arrested-amazon-indictment-fraud-invoices ............................................................ 37

U.S. Dep't of Justice, Nat'l Institute of Justice, *Five Things About Deterrence* (Dec. 15, 2017),
  https://www.nij.gov/five-things/pages/deterrence.aspx ........................................... 36

United States Sentencing Commission, *Amendments to the Sentencing Guidelines*, at 79 (Apr.
  27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-
  friendly-amendments/202305_RF.pdf ..................................................................... 34

## PRELIMINARY STATEMENT

Yoel Abraham,[1] by and through his undersigned attorneys, Sher Tremonte LLP, respectfully submits this memorandum in anticipation of his sentencing, which is scheduled for May 31, 2024. Yoel admitted and accepted responsibility for all of the conduct set forth in the Indictment. He comes before the Court profoundly remorseful and deeply ashamed. He has undertaken significant efforts to understand the root causes of his behavior and to address them. Since committing the offense in his twenties, he has matured and made real efforts to rehabilitate and re-orient his thinking and life choices. He pled guilty to the Indictment, rather than pursuant to a plea agreement, because of a fundamental legal dispute with the government as to whether certain conduct constitutes fraud under the relevant federal statutes. He does not dispute the facts—rather, he allocuted to all of them. Nonetheless, because of the core legal dispute, the parties have varying estimates of the correct Sentencing Guidelines calculation. According to the government and the Probation Department, the applicable Guidelines are 57 to 71 months, while Yoel maintains that the Court should consider the effective Guidelines range to be 18 to 24 months.

Whatever the correct Guidelines range is, this is a case that calls for the Court's exercise of mercy; a sentence of imprisonment is not warranted. Yoel is a first-time offender, a pillar of support for his family and community, and is working hard to start a second act that will be productive and law-abiding. In addition, he has already and will continue to face significant punishment, in the form of severe financial penalties, as well as the stigma of a felony conviction. Moreover, he has spent nearly four years dealing with the stress and anxiety caused by his pending criminal case, based on conduct that occurred over a relatively short period of time nearly six years

---

[1] Because Mr. Abraham's brothers, Heshl Abraham, Zishe Abraham and Shmuel Abraham are co-defendants in this proceeding, to avoid ambiguity, we refer to Mr. Abraham as "Yoel" throughout this memorandum.

ago. For the reasons set forth in more detail below, we respectfully request that the Court impose a sentence of time served, to be followed by one year of supervised release with a community service component.

**FACTUAL BACKGROUND[2]**

### I.    Yoel Grows Up in an Unusually Strict Religious Environment

Yoel was born in Mount Pleasant, New York on June 13, 1992. He was raised by his father, Rabbi Moishe Abraham, and his mother, Rachel Abraham—both children of Holocaust survivors—in Monsey, New York. Yoel is the seventh of eleven children of the marriage. He shares a close bond with his siblings, who praise his "good heart" and affectionately describe him as a "warm, loving, caring, and sharing brother" and person of "exceptional character, kindness and compassion." Ex. A, Ltr. of Yenty Tannenbaum; Ltr. of Miriam Liberman; Ltr. of Nuchem Abraham.

With a familial lineage comprised of rabbis and Jewish scholars, religion was the defining feature in the Abraham household. Yoel's maternal great-grandfather was Refuel Blum, the first Kasho Rebbe, who established a Hasidic community before World War II in eastern Slovakia (at the time part of Hungary). After surviving the Holocaust, Yoel's great-grandfather moved to New York where he founded a congregation and reestablished the yeshiva he led in Slovakia. Yoel's maternal grandfather, Eleizar Chaim Blum, was transported with his brother at age six on the

---

[2]     The following facts are drawn from counsel's interviews with Yoel; letters from his family, friends, and colleagues, attached as **Exhibit A**; the Probation Department's Presentence Investigation Report ("PSR"); our objections to the PSR, attached as **Exhibit B**; the Letter of Rabbi Yossi Bryski on behalf of the Aleph Institute, with appendices, attached as **Exhibit C**; and the Neuropsychological Evaluation of Yoel conducted by Dr. K. Drorit Gaines, with appendices, attached as **Exhibit D**. We also attach to the submission a letter from Yoel, as **Exhibit E**; a copy of a certificate Yoel obtained upon completion of a "Build Your Self-Esteem" course as **Exhibit F**; our subpoena to Amazon as **Exhibit G**; a copy of Amazon's policies relating to chargebacks as **Exhibit H**; and a copy of Homeland Security Investigation Report dated March 3, 2020 as **Exhibit I**.

Kastner Transport, a train that carried 1,600 Jewish refugees from Hungary to Switzerland, ultimately saving them, but through an arduous journey that included a stop of several months in a camp at Bergen-Belsen. After immigrating to the United States, he succeeded his father as the leader of the Kasho community in New York. Yoel's father similarly dedicated himself to religious pursuits. He worked as a principal of a yeshiva and eventually assumed the position as Rabbi of the congregation. Yoel's mother was a homemaker.

Yoel's parents were especially devout, even for Hasidic Jews. They "felt that it was necessary for the children to be educated in the Hasidic concepts and way of life in a strict manner." Ex. D, Appx. B at 3. Accordingly, much of Yoel's childhood was characterized by stringent "prohibitions and restrictions encompassing nearly the entire human experience," including the incorporation of additional restrictions "that were above and beyond what is already a strict Hasidic lifestyle." *Id.* at 19. At home, the family spoke exclusively Yiddish. English-language reading materials and music were prohibited. *Id.*, Appx. B at 2–3. The children's diet was highly controlled; they were forbidden from consuming almost anything prepared outside of the home— even if it adhered to kosher standards—and never permitted snacks or candies. *Id.* at 5, 7. To dissuade him from consuming these foods, Yoel's parents would peddle myths such as there being "squirrel blood [i]n Coca Cola" or "cow feathers in the milk." *Id.* at 7. There was no internet in the house, and Yoel's parents did not permit the use of any technology, including computers and smart phones. *Id.*, Appx. B at 3. His mother opposed driving, and the children were not allowed to ride bikes. *Id.* at 7. Nor could they interact freely with other children in the neighborhood, as Yoel's parents perceived others as negative influences, despite their shared Hasidic identity. Prohibitions permeated Yoel's life even during moments of celebration—his sister, Yenty Tannenbaum,

remembers their parents forbidding them from receiving Hanukkah gifts from their grandmother, unlike the rest of their cousins, as it was "not a Jewish thing to give presents." *Id.*, Appx. B at 1.

Yoel suffocated under the weight of these extreme and omnipresent restrictions, often challenging the ideas and concepts purported to support them. *Id.*, Appx. B at 3. Yoel's mother was "not warm" or affectionate with her children, either verbally or physically, rarely hugging the kids or telling them she loved them; instead, she focused on enforcing the family's strict lifestyle. *Id.* at 19–20; *see also id.*, Appx. B at 2, 5. Yoel was "always thinking," in the words of his sister Yenty, and "had his word in all the discussions." *Id.*, Appx. B at 2. As a result, he was frequently in conflict with his parents, particularly his mother, who "r[a]n the house" and set the rules. *Id.*, Appx. B at 3. The dynamic between Yoel and his parents "contributed to [Yoel's] feelings of alienation from adults who are authority figures" outside of the home. *Id.* at 19.

## II.    Yoel Experiences Financial Hardship at a Young Age

The Abrahams struggled to make ends meet. "Having grown up in a large family"—with ten siblings and only one working parent—"financial hardships were a constant challenge for [Yoel] and the entire family." Ex. A, Ltr. of Jacob Blum. The family home was 1,272 square feet, with three bedrooms and one and a half bathrooms. PSR ¶ 73. The basement of the home was filled with clothes donated from others, which the kids would wear in lieu of new clothing. Ex. D at 5. When reflecting on his childhood, Yoel explains: "[W]e grew up very poor. We didn't have a lot. We were struggling . . . I was not upset . . . Nothing I could do." *Id.* at 5.

The experience of childhood poverty permanently shaped Yoel. As his sister, Miriam Liberman, describes, Yoel "felt different than all his other friends, [and] this situation affected him," causing him to "want[] to have a lot of money when he was older" to break free from the constraints imposed by financial scarcity. Ex. A, Ltr. of Miriam Liberman. Yoel's friend, Margarita Zaslavskaya, observes how Yoel's desire "to overcome financial struggles faced during

his upbringing drives his commitment to provide more for his family and fuels his desire to make a positive impact on their lives and those who have supported them." *Id.*, Ltr. of Margarita Zaslavskaya. Yoel strived to alleviate the financial pressures on his family—a goal that would prove challenging, particularly given his limited access to secular education.

### III. Yoel Attends Parochial School, Without Access Even to the Limited Secular Education Enjoyed by His Peers

Yoel's parents believed that men should not work, but instead should devote their time to religious study and prayer. Yoel attended a *cheder* and then yeshiva, where his education centered on study of the Torah and Talmud. All classes were taught in Yiddish. Although there was minimal time reserved for secular classes—namely, English and math, taught during the last hour of the day—Yoel's parents did not permit him and his siblings to attend those classes, requiring them instead to return home early. Ex. D at 8; *see also id.*, Appx. B at 3. Yoel taught himself English over the years and, consequently, still has some difficultly reading and writing.

Yoel was "shy" and "very quiet" as a child. *Id.*, Appx. B at 2, 5. His early school days in the *cheder* were challenging. Yoel was removed from his first school, after he and his siblings were bullied for their extreme practices, which caused them to stand out even amongst their Hasidic peers. *Id.* at 7. Yoel again had to be taken out of his *cheder* at seven years old, after suffering extreme physical abuse at the hands of his principal. *Id.* This was particularly painful, as the *cheder* he attended shared the same building as his grandfather's synagogue—during the week, it operated as a school and, on Shabbat it operated as a synagogue, where Yoel's grandfather was Rabbi. *Id.* at 4. Every weekend, Yoel would join his father in prayer for Shabbat ceremonies at the synagogue. *Id.*

One weekend, the portion of the building used for the school had been vandalized. The next day, when Yoel came to school, he was wrongfully accused of being the vandal because he

had been seen in the building during Shabbat—his accusers did not know he came for prayers. *Id.* The punishment that followed was severe and traumatizing. Yoel was called into the principal's office, where the principal attempted to coerce a confession from Yoel by relentlessly striking him with a stick wrapped in electric tape. *Id.* The beating was done with such force that, at one point, the stick broke. But this did not deter Yoel's principal, who replaced the broken stick and continued with the assault, which lasted all day, demanding repeatedly that Yoel confess or endure further beating. When the assault finally had finished, leaving Yoel with bruises all over his body, the principal then paraded Yoel through each classroom, escalating the abuse by engaging in a campaign to publicly humiliate and shame him in front of his teachers and peers. *Id.* Despite Yoel's cries for help, and insistence on his innocence, no one intervened to stop this abuse. When he got home from school that day, his father recalled seeing "red and blue marks" all over his body: "It was a very bad thing. We took pictures. It was a terrible, terrible thing." *Id.*, Appx. B at 4. His parents then took Yoel to different Rabbis to show them what had occurred—this added another layer of shame, as Yoel had to undress in front of each of them to show his wounds. Yoel was hopeful that some justice would ensue, but instead "nothing happened"—the police were never called, and the principal remained in a position of authority. *Id.* at 4–5. "Things continued as normal" in the *cheder* and Yoel spent the rest of his school year at home. *Id.* at 4–5. Because of this, he had to repeat a year of education. *Id.* at 7. This incident—and perhaps most of all the lack of accountability for his abuser—had a profound effect on Yoel.

Despite these challenges, Yoel was inherently curious and remained dedicated to his studies. At age thirteen, he began studying in yeshivas. This required him to be on a demanding schedule: he would rise at 6:15 am and study until going to bed at 10:30 pm. His education was "heavily structured using critical thinking, debate, integration, and reliance on several sources."

*Id.* at 17. This rigorous environment permitted Yoel an opportunity to develop strong analytical skills, though divorced from the context of secular education. *Id.* Yoel's brother, Fishl Abraham, observed him to be a "deep thinker, and creative person." Ex. A, Ltr. of Fishl Abraham. Yoel went "above and beyond of what was expected of him" as a student, taking on the personal challenge of studying "all 2,711 pages of the Talmud as a teenager (something that many adults never accomplish)" in his spare time—with one page studied a day, this journey takes seven years and five months to complete. *Id.* Despite this significant accomplishment, Yoel "remained humble," and "refrained from boasting" to others. *Id.* Yoel continued to study in yeshiva until the age of twenty-one.

## IV.    Yoel Allows His Siblings to "Skip" Him in Marriage

Typically, boys in Yoel's community study in yeshiva until they are married, which normally occurs between the ages of eighteen and twenty. Ex. D., Appx. B at 4; *see also id.* at 2 (Yoel's sister, Yenty observing: "(There are) no more boys in yeshiva at 22, too old. Everyone is starting to get married at 18."). Marriages are arranged by parents through professional matchmakers or familial connections, and "tradition dictates that children marry in order of age." Ex. A, Ltr. of Fishl Abraham. When it came time for Yoel to marry, he expressed to his parents a desire for a "more open" partner, someone who did not follow all the rigid prohibitions he grew up with. Ex. D at 6. As Yoel's father now reflects: "[Yoel] understood we wanted to bring him a girl like us. He was scared of that." *Id.*, Appx. B at 4. Yoel's parents were unwilling to match him with someone who did not meet their strict criteria. Instead, they told Yoel he would have to find such a partner on his own—something they knew would be nearly impossible given that, traditionally, men in the Hasidic community do not directly approach women. *Id.* at 6.

Yoel thus entered early adulthood without any prospects for a life partner, an unusual position among his peers. Although he had yet to marry, Yoel learned that a potential match was

being proposed for his younger sister, Yenty. Yoel did not want Yenty to have to wait for him to be married before having the ability to build a family of her own. As Yenty recollects: "Yoel came over to me one day with his heartwarming face and selflessly tells me, my dear sister you shouldn't wait in line for me to get married, you shouldn't put your life on hold . . . I give you my permission to skip me and move forward in life and get married." Ex. A, Ltr. of Yenty Tannenbaum. In granting his sister permission to "skip" him in marriage, Yoel "set aside his own sense of honor and emotions, prioritizing his sister's happiness over his own." *Id.*, Ltr. of Fishl Abraham. Shortly thereafter, she was engaged, eventually marrying and becoming a mother to four children. Yoel's younger brother subsequently followed suit, also "skipping" Yoel to marry and start a family of his own. Yoel's older sister, Miriam Liberman, describes Yoel's attitude during this time: "[H]e was happy for them . . . I know it's very painful for him to be in such a situation, but he came and participated in the engagements and weddings with a smile all the time, I'm sure this also affected him, I feel very bad for him that everyone is moving on in life and he is still not married." *Id.*, Ltr. of Miriam Liberman.

To this day, Yoel remains unmarried. Deviating from the norm in his community and permitting his siblings to "skip" him in marriage carried a stigma—rumors swirled around Yoel, with people wondering if there was something wrong with him that would explain his lack of match. Though he now tells the matchmaker to contact him directly, rather than his parents, he receives few calls. Ex. D at 6. The uncertainty and shame relating to his criminal case has only exacerbated his difficulty in finding a partner, further impeding his ability to build a family of his own. For Yoel, this has been the harshest consequence of his poor decisions. "[A]lthough [Yoel] holds [] perspectives that are modern, he also continues to hold by his family's religious philosophies and customs," including that he "prioritizes marriage and holds it as the highest of

values." Ex. D at 20. Accordingly, "[h]is inability to succeed in this area caused him anxiety and depression." *Id.*; *see also id.*, Appx. B at 2 (sister Yenty observing that Yoel is "desperate to get married and he loves kids"); Ex. A, Ltr. of Israel Rottenberg ("This hardship has affected him by always feeling different among his family, neighborhood and friends.").

## V.    After Finishing Yeshiva and With No Marriage Prospects, Yoel Focuses on Work

After graduating from yeshiva, and without the viable option of getting married and focusing on raising a family, Yoel felt lost. He decided to channel his energy into work to build a better life than he knew growing up. This proved challenging, however, as he did not have the skills or training for many jobs. *See, e.g.*, Ex. D, Appx. B at 4 (Yoel's father admitting that Yoel was expected to "go out to the world . . . to make a living" but did not have the skills to do so with the education he received), *id.*, Appx. B at 1 (Yoel's sister, Yenty, observing how her brothers "didn't have the tools" to know "where to step out" once they finished yeshiva). Yoel lacked a high school diploma and, when he attempted to take his GED, failed the examination. *Id.* at 8. College was thus not an option. No one in his family had learned a technical trade, so he did not consider this path. Instead, Yoel "resorted to self-educating, learning from other sources such as the Web . . . and people in his environment" about potential business pursuits. *Id.* at 17. Through this path of self-teaching, Yoel learned of opportunities to enter electronic commerce—a common practice among young men in the Hasidic community given the low barriers to entry, particularly the lack of need for formal education or training.[3] In 2013, at merely twenty-one years old, Yoel

---

[3]    *See* Leticia Miranda, *America's Orthodox Jews Are Selling A Ton Of The Products You Buy On Amazon*, Buzzfeed (September 4, 2019), https://www.buzzfeednews.com/article/leticiamiranda/amazon-orthodox-jews ("With the expansion of third-party marketplaces online, the bar to entry into the retail business is lower than ever—which means Orthodox Jews . . . many of whom lack formal degrees, have found careers that balance their religious lives with the modern marketplace, navigating the pull of inner spirituality while accepting the push into electronic commerce.").

founded YSA Sales, initially struggling to sell kitchen supplies and utensils directly to customers on Amazon and eBay. Between 2014 and 2016 he completed some online self-improvement courses, including some in sales, communication, and motivational skills. Yoel's business was initially limited to online retail sales until 2017, when he received an invitation from Amazon to apply to become a vendor, meaning he could sell products wholesale to Amazon.[4] This marked a turning point in his business, as he no longer had to make sales directly to customers. Yoel threw himself into his business, often working grueling fifteen-hour days. He expanded his product range beyond kitchen supplies to also include hardware, and health and beauty products. In 2018, Yoel began shipping full cases of goods to Amazon, rather than break up his products from the original packaging, pursuant to purchase orders issued by Amazon, and Amazon paid for the goods it received, pursuant to accurate invoices issued by Yoel. *See* PSR ¶ 27. At the time, Amazon's vendor policies seemed to contemplate that vendors would overship products, as it had procedures in place to recoup payments made for unwanted goods. *See* Ex. H. And, as time progressed, Yoel began to ship goods in larger quantities. A few months later, and just weeks before Amazon shut down his vendor accounts in September 2018, Yoel made the serious error in judgment of substituting products with other goods of lesser value for inflated prices. Yoel deeply regrets this decision.

## VI.    Yoel's Ongoing Commitment to His Community

As Yoel's brother, Nuchem observes, Yoel "deeply regrets his involvement in the conduct that led to this case and is committed to making amends and starting a new life. He has taken steps to improve himself and contribute positively to society." Ex. A, Ltr. of Nuchem Abraham. After shutting down his online wholesale business, Yoel redirected his focus to an entirely new

---

[4]    Amazon's "third-party sellers make up 58% of all sales on the site" and, by one estimate, "Orthodox Jewish-owned business make up 15% of marketplace sellers." Miranda, *supra* note 5.

industry—real estate. He briefly ventured into commercial real estate, investing in an office building in New Jersey. However, due to the COVID-19 pandemic, the building lost tenants and the investment was no longer sustainable. As a result, Yoel sold the property, which was under water and in foreclosure, for a nominal value. Yoel was unable to recover any of his investment in the building from this sale. In 2021, for over six months, "Yoel devoted his full time to volunteering" with Congregation Barditchev, his father's synagogue, "managing the construction of the top floor" office to create a rental space, with the goal of generating "a steady income for the struggling congregation." Ex. A, Ltr. of Fishl Abraham. "Yoel meticulously oversaw every aspect of the project, ensuring it adhered to building codes and served the congregation effectively. His motivation stemmed from deep respect and love for the struggling congregation and his father as rabbi, who was undergoing medical heart procedures at the time." *Id.* Near the end of 2021, Yoel decided to open his home to other members of the community, creating a small business out of renting out his home for the weekends. Yoel understands that families adhering to a kosher diet desire spaces for gathering within walking distance of the synagogue (given the prohibition of driving on Shabbat), and that many lack the physical space to accommodate large gatherings. Accordingly, he opens his home to these families, to create a space where they can gather with extended relatives to celebrate Shabbat and high holidays. In exchange for the space, these families make financial contributions to help cover associated household expenses. In the summer of 2023, Yoel decided to seek gainful employment by joining Chicago Property Management, a management services company that serves low-income communities. Yoel works full time with CPM, 40 hours a week, earning $20 per hour. In his words: "Doing the property management, you get a satisfaction from helping people. Especially people that are like me, not having a lot [growing up]. The little things that make someone else happy. It makes a difference." Ex. D at 8.

Yoel remains committed to his goal of maintaining a stable and fulfilling job and making positive contributions to his community. To that end, he has been volunteering with *Bikur Cholim*, where he delivers kosher meals to hospital-bound observant Jews who cannot be with loved ones during Shabbat and high holidays. *See* Ex. A, Ltr. of Aron Reiner. Aron Reiner, the Executive Director of *Bikur Cholim* characterizes Yoel as a "vital part of the organization" and remarks that his "dedication and care for others are truly exemplary." *Id.* Others also comment on Yoel's charitable spirit. Meyer Tauber, for example, describes how Yoel was "instrumental" in helping host the Menorah celebration at a local community hospital this past Hanukkah, helping with arrangements and "inject[ing] kindness and love to the doctors, nurses, patients and their families." *Id.*, Ltr. of Meyer Tuber. Yoel also volunteers with his brother, Nuchem, at an emergency services organization in Rockland County that helps people with a variety of needs including search and rescues, emergency roadside assistance, elderly/disabled assistance, community safety awareness and events, among other things. *Id.*, Ltr. of Nuchem Abraham. Mark Meyer Appel, President of the Bridge Multicultural and Advocacy Organization, further describes how Yoel volunteers to assist with clothing and food pantry drives for new migrants in New York. *Id.*, Ltr. of Mark Meyer Appel. He notes that, "Yoel is a kind man and works very well with all our volunteers. His commitment and hard work at the center help us to fulfill our community needs." *Id*.

Yoel is "actively work[ing] towards building a new a positive future for himself," with a focus on "making positive changes and contributing meaningfully to society." *Id.*, Ltr. of Joseph Landau; Ltr. of Meyer Tauber. His actions reflect this "genuine commitment to rehabilitation and personal growth." *Id.*, Ltr. of Jacob Abraham.

## PROCEDURAL BACKGROUND

### I.    Guilty Plea

On October 26, 2023, Yoel entered a guilty plea to Counts One through Three of the Indictment, for wire fraud, conspiracy to commit wire fraud, and engaging in monetary transactions involving wire fraud, in violation of 18 U.S.C. §§ 1349, 1343 and 1957, respectively. ECF 152. Yoel's plea was not entered pursuant to a plea agreement. At the time of the guilty plea, defense counsel previewed for the Court that, while Yoel accepts responsibility for all of the factual underpinnings of the offense conduct, legal and factual questions remained to be resolved with respect to the appropriate enhancement under § 2B1.1 of the Sentencing Guidelines. *Id.*

### II.    PSR and Outstanding Objections

On February 14, 2024, the Probation Department issued the PSR and sentencing recommendation.  The Probation Department found that the Guidelines range was 57 to 71 months based on a total offense level of 25 and a Criminal History Category of I, using the following calculations:

- Counts One through Three are grouped together and, pursuant to U.S.S.G. §§ 2B1.1(a)(1) and 2S1.1(a)(1), the base offense level is 7 (Yoel's three co-defendants pled guilty to 18 U.S.C. § 371 pursuant to a plea agreement and base offense levels of 6);

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), the offense level is increased by 20 levels because Yoel is responsible for a total *intended* loss from the offense of $22,173,851.28;

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(c), the offense level is increased by 2 levels because the offense involved sophisticated means, namely, the creating of vendor accounts with Amazon using fake aliases the use of VPNs/VPSs to mitigate detection by Amazon;

- Pursuant to U.S.S.G. § 2S1.1(b)(2)(A), because he pled guilty without a plea agreement dismissing the other counts in the indictment, the offense level is increased by 1 level because Yoel was convicted under 18 U.S.C. § 1957;

13

- Pursuant to U.S.S.G. § 4C1.1(a) and (b), a 2-level reduction is warranted because Yoel is a Zero-Point Offender;

- Pursuant to U.S.S.G. § 3E1.1(a), a 2-level reduction is warranted as Yoel has clearly demonstrated acceptance of responsibility;

- An additional 1-level reduction is warranted pursuant to U.S.S.G. § 3E1.1(b) because Yoel gave timely notice of intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and enabling the Court to allocate its resources efficiently.

The Probation Department recommend that the Court impose a sentence at the bottom of its Guidelines range—a 57-month term of imprisonment plus three years of supervised release on each count, to run concurrently. Our objections to the PSR are set forth in Exhibit B, attached.[5]

**ARGUMENT**

## I.    The Court Should Consider the Effective Guidelines Range to Be 18–24 Months

The Guidelines calculation set forth in the PSR is erroneous, as it is inaccurately based on an intended loss figure that derives from the overshipping conduct, which is not part of the relevant conduct because it does not constitute a federal crime. It also includes a sophisticated means enhancement that is unsupported by the record. Thus, the correct Guidelines calculation is as follows:

- Counts One through Three are grouped together and, pursuant to U.S.S.G. §§ 2B1.1(a)(1) and 2S1.1(a)(1), the base offense level is 7;

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), the offense level is increased by 14 levels because Yoel is responsible for a total loss of $1,223,135.73 from the unit and product substitutions;[6]

---

[5]    The final PSR included a number of new factual inaccuracies that Yoel did not have the opportunity to object to prior to the report being issued. While our objections to those errors are detailed in Exhibit B, it is worth noting that Yoel worked with a tax lawyer and accountant to file his tax returns from 2019 to 2023, and thus is now current with his filings.

[6]    As will be described more fully below, this is almost certainly an overestimate of Amazon's loss attributable to Yoel; we use it here because it is the highest estimate that has a basis in the

- Pursuant to U.S.S.G. § 2S1.1(b)(2)(A), the offense level is increased by 1 level because Yoel was convicted under 18 U.S.C. § 1957;

- Pursuant to U.S.S.G. § 4C1.1(a) and (b), a 2-level reduction is warranted because Yoel is a Zero-Point Offender;

- Pursuant to U.S.S.G. § 3E1.1(a), a 2-level reduction is warranted as Yoel has clearly demonstrated acceptance of responsibility;

- An additional 1-level reduction is warranted pursuant to U.S.S.G. § 3E1.1(b) because Yoel gave timely notice of intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and enabling the Court to allocate its resources efficiently.

Accordingly, the total offense level is 17, yielding a Guidelines range of 24 to 30 months. We note that this range is, for merely technical reasons, two points higher simply because Yoel pled guilty to the Indictment. In the plea agreement offered to his brothers, the base offense level was 6 (based on pleas to 18 U.S.C. § 371), rather than 7. Yoel received an additional point for a conviction under 18 U.S.C. § 1957, a count that was dropped in connection with the pleas of his co-defendants. We of course ascribe no fault to the government or to Yoel's brothers in negotiating plea agreements with lower Guidelines ranges; however, because there is no difference in culpability between pleading to an agreement and pleading to the Indictment (indeed, the latter usually entails accepting responsibility for a broader range of conduct), the Court should consider a total offense level of 15 (and corresponding Guidelines range of 18 to 24 months) as a starting point. The arguments in support of our Guidelines calculation are set forth below.

---

discovery. Moreover, for purposes of restitution, this number may be substantially reduced as it does not account for products ordered and/or received by Amazon that it did not make payment for; nor does it consider any profit earned by Amazon from the sale of these products.

**A.    The Loss Amount Calculation Should Not Include Payments Made by Amazon for Overshipped Products**

In determining the appropriate loss amount calculation, the Court should exclude payments made by Amazon for overshipped products as these payments were not part of a scheme to defraud. That is because, although the Abraham brothers billed Amazon for products in quantities beyond what it ordered (as Yoel admitted), they did not make false statements or otherwise employ deception in such billing. Rather, Yoel and his brothers *accurately* invoiced Amazon for the products they sent. *See* PSR ¶ 17.

"[T]o come within the federal fraud statutes, a 'scheme to defraud' must have employed a falsehood that was 'material.'" *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022) (quoting *Neder v. United States*, 527 U.S. 1, 20 (1999)). "[S]chemes to defraud" violating the federal fraud statutes "are often characterized by false statements . . . To convict an accused of a wire fraud 'scheme to defraud,' however, the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception, such as a half-truth." *Id.* at 833–34 (internal quotation marks and citations omitted). Here, the government cannot demonstrate any such misrepresentations or material deception with respect to the overshipping of products. No such misrepresentations occurred. Rather, prior to any payment, Amazon received an invoice describing the quantity of products shipped and delivered pursuant to each purchase order. The invoices for payment for the shipped products accurately reflected the quantity of products that Amazon received. *See* PSR ¶ 27 ("The ABRAHAM Brothers then invoiced Amazon *for those goods in the quantities they shipped* and subsequently received payment *for the submitted invoices* to Amazon . . ." (emphasis added)). There is no evidence of misstatements with respect to the quantity of, or payment for, the overshipped products. Instead, it is undisputed that Yoel would confirm a purchase order listing certain goods at stated prices, and then would ship and accurately

16

invoice Amazon for excessive quantities of these goods at that price. In other words, in overshipping, the defendants notified Amazon of the quantity of products actually shipped, and expressly invoiced Amazon for those quantities. Accordingly, these payments were not made pursuant to a material misrepresentation or scheme to fraud.

The Second Circuit's decision in *United States v. Connolly*, vacating wire fraud convictions for failing to include misstatements or falsehoods, is instructive. The *Connolly* defendants were charged with wire fraud and wire fraud conspiracy for manipulating the LIBOR interest rate submitted for their employer, Deutsche Bank, to favor some of the bank's financial investments. *See Connolly*, 24 F. 4th at 824. In its LIBOR submissions, Deutsche Bank was required only to provide an interest rate at which Deutsche Bank could borrow money. The defendants had manipulated the LIBOR submissions in the bank's favor, but the submissions still technically answered the question posed to Deutsche Bank, so the defendants' self-dealing did not constitute a misstatement and could not support a wire fraud conviction. Vacating the wire fraud convictions, the Second Circuit held: "The government failed to produce any evidence that any [Deutsche Bank] LIBOR submissions that were influenced by the bank's derivatives traders were not rates at which [Deutsche Bank] could request, receive offers, and accept loans," and thus "failed to show that any of the trader-influenced submissions were false, fraudulent, or misleading," as required for a wire fraud charge. *Id.* at 842–43.

The Second Circuit condemned the morality of the defendant's conduct—the self-dealing "may have violated any reasonable notion of fairness"—but more than questionable ethics is required for criminal fraud. *Id*. at 843. The Circuit was unequivocal that it must "reverse" the defendants' fraud convictions "given that the government failed to present evidence to show falsity in the trader-influenced submissions." *Id*.; *see also Parietti v. United States*, No. 16-CR-373

(PAE), 2022 WL 3139623, at *1 (S.D.N.Y. Aug. 5, 2022) (discussing that *Connolly* "overturned the convictions . . . finding the evidence insufficient as a matter of law to establish that the statements that DB made to the BBA were false, fraudulent, and misleading. The Circuit held that although the defendants' practices might have been unfair or dishonest, they did not violate the anti-fraud statutes." (citations omitted)).

Similarly, here, while the overshipped products may have exceeded—even vastly exceeded—the quantity Amazon requested in its purchase orders, this sharp business practice did not amount to federal fraud. The "federal fraud statutes are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices." *Connolly*, 24 F.4th at 834. Without a false, fraudulent, or misleading statement, the overshipping conduct does not violate the wire fraud statute. *Connolly* thus forecloses wire fraud liability for the overshipping allegations. Because the invoices that the Abraham brothers submitted to Amazon for shipping and payment *accurately reflected* the quantity and price of the overshipped products, the government cannot identify any misstatement made to Amazon regarding the overshipment. The government will likely cite crude WhatsApp messages between the Abrahams to suggest intent to mislead or bad faith. But these communications, crass though they may be, do not establish any false representation to Amazon, and in the absence of such a misrepresentation, are insufficient to establish a scheme to fraud. Without being induced by falsity, payments made by Amazon for overshipped products cannot be considered part of the loss attributable to the scheme.

Further, it is evident that Amazon was *aware* of the practice of overshipping and had policies in place to issue "chargebacks" for overshipped products. Chargebacks work by charging a percentage of the price Amazon would ordinarily pay to the vendor for products that do not comply with Amazon's requirements, including, as relevant here, for items shipped in excess of

the units specified in a purchase order ("PO"). *See* Amazon Vendor Central, *About overage PO units*, attached as Ex. H (last visited Sept. 7, 2020) ("If you send us more items than you confirmed in a PO, you will be assessed for a chargeback based on the 'overage percentage' determined from your ten most recent 'overage POs.'"). The Internet abounds with articles detailing Amazon's chargeback policies and how to avoid and contest chargebacks. *See, e.g.*, Martin Heubel, *The Complete Guide to Amazon Chargebacks in 2024*, Consulterce.com (Mar. 24, 2024), https://consulterce.com/amazon-chargebacks/#overage-po-units. Accordingly, Amazon cannot claim that it was unaware of or had no ability to detect overshipping. To the contrary, Amazon has established policies concerning overshipping that include its keeping possession of the overshipped goods—for resale—and charging a fee to the vendor. Ex. H.

Even if there were a misrepresentation here, there is no evidence that Amazon was deprived of property with respect to overshipped goods. As the Supreme Court has explained, for federal fraud, "the Government had to show not only that [the defendants] engaged in deception, but that an object of their fraud was 'property.'" *Kelly v. United States*, 590 U.S. 391, 398 (2020) ("The wire fraud statute thus prohibits only deceptive "schemes to deprive [the victim of] money or property.") (internal quotation marks, citations and modifications omitted); *accord Ciminelli v. United States*, 598 U.S. 306, 312–16 (2023) (holding that wire fraud statute "reaches only traditional property interests"; "The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest."). In the overshipping transactions, Amazon "received exactly what [it] paid for," critically undermining the wire fraud charges. *United States v. Shellef*, 570 F.3d 82, 109 (2d Cir. 2007) (vacating wire fraud conviction where defendant entered into sales transaction by misrepresentation, but victim nonetheless received economic benefit of sale transaction) (quotation marks and citations omitted). There is no

evidence that the overshipping transactions deprived Amazon of any property at all: Amazon sent the defendants money and received in kind goods that it could likely sell for more than what it paid. Indeed, in its chargeback policy, Amazon does not dispute that it resells the excess items; instead it states, "If you send us excess inventory, it takes up valuable storage space and may lead to overstock of a product, *resulting in longer sales cycles*." Ex. H (emphasis added). In other words, overshipping is an anticipated part of Amazon's cost of doing business—a cost it externalizes to its vendors—and any costs to Amazon are incidental. Thus, overshipping does not result in a deprivation of property as the object of any fraud. *See Kelly*, 590 U.S. at 402 ("[A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme.").

Even if the Court were to consider the value of overshipped products, the figures provided by the government and Probation are vastly exaggerated.  The PSR and government propose using intended loss as the relevant metric for Yoel (while using a completely different metric—gain— for the other defendants), which they estimate at $22,173,851.28—the gross value of the overshipped products attributable to Yoel. But the notion that Yoel intended any loss is without basis. Amazon's chargeback policies, referenced above, made clear that Amazon accepted and paid for overshipped goods because they would ultimately sell them—and typically at a profit. Indeed, that is precisely what Amazon did: it sold the vast majority of the products it received from the Abraham brothers. It also issued repeated chargebacks, offsetting amounts due to Yoel by amounts that Amazon claimed it was owed back. As will be discussed further below, credits against loss are difficult to calculate, as Amazon does not (or claims not to) keep records regarding resales of overshipped items and did not produce such records in response to a subpoena from the defendants, which sought this precise information. *See* Ex. G. However, our calculations based on

the spreadsheets provided in the government's discovery indicate that Amazon appears to have resold at least $18,318,174.29 of Yoel's overshipped items, indicating that $3,855,676.99 of Yoel's "overshipped" goods remained in Amazon's inventory. For the reasons stated, however, this amount should not be included in the calculation of loss under § 2B1.1, as overshipping is not part of offense or relevant conduct.

### B.    The Loss Amount Calculation Should Consider Only Losses Attributable to Yoel for Substituted Products and Units, Which Is at Most $1.2 Million

As Yoel admitted in his guilty plea, he did engage in a limited set of transactions toward the end of his tenure as an Amazon vendor in which, beyond overshipping quantities of product that Amazon ordered, he made changes in the vendor system to substitute the product (*i.e.*, supplying fifty toothbrushes for a purchase order of fifty sets of high-end headphones) or units of a given product (*i.e.*, charging for fifty packets of 100 toothbrushes and sending Amazon fifty single toothbrushes)—conduct that occurred over several weeks in 2018 before the Abraham brothers' accounts were closed that November. Based on the government's discovery, we estimate that the total loss amount for both product and unit substitutions attributable to Yoel is at most $1,223,135.73.[7]

Moreover, because the Abrahams kept their business entities entirely separate, "work[ed] independently," and did not "pool profits and resources," it is appropriate to hold Yoel responsible only for the loss attributable to his own acts. *United States v. Studley*, 47 F.3d 569, 575 (2d Cir.

---

[7]    The discovery contains two different spreadsheets with purchase orders in which substitution occurred. One of those spreadsheets totals $1,223,135.73, while the other totals $974,960.16. We are conservatively using the higher number. Because Amazon did not provide information about its resale of the Abrahams' products in response to our subpoena, we cannot calculate the appropriate credit against loss for the substituted products. The actual loss amount, however, is plainly lower than either of the numbers indicated in the discovery since Amazon resold most of the products it received.

1995). As the Second Circuit held in *Studley*, "the fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation;" rather, to be included in the calculation, the conduct must have been in furtherance of jointly undertaken criminal activity. *Id.* Here, Yoel's objective was to earn money for his own businesses—he had no interest in his brothers' entities and took no steps to further a larger operation. Indeed, in the context of plea negotiations, the government has taken the position that each brother should be held responsible only for his own gain; there is no meaningful reason why the Court should do otherwise for Yoel, and thus should consider only the loss attributable to him.[8]

## C.    There is No Evidence of Loss for Purported Counterfeit Goods

In its Victim Impact Letter, Amazon attributes "$676,000 in losses due to confirmed counterfeit Gillette razor blades that Defendants sold to Amazon." Amazon Ltr. at 7. This is false and the Court should decline to include this value in the loss calculation. Discovery produced by the government confirms that these products were not in fact counterfeit goods. Indeed, the Department of Homeland Security, upon referral from Amazon, "met with . . . representatives from Proctor & Gamble, to authenticate [the] Gillette razors . . . [and] determined that all the razors were genuine product but were not intended for the U.S. market." Ex. I at 2. Moreover, Yoel did

---

[8]    Amazon's Victim Impact Letter presents a wildly different loss calculation: $14,292,004.67. This number has no basis in the discovery. Nor did Amazon, or the government, provide records that would support that figure in response to the defendants' subpoena. *See* Ex. G. Despite its claim of incurring in excess of $66,500 in responding to the subpoena, Amazon in fact did not provide documents in response to most of defendants' requests and instead produced only two spreadsheets, neither of which show data supporting Amazon's inflated loss number. In any event, Amazon is not the prosecutor of this case, and has a limited role as a victim. *See United States v. Rubin*, 558 F. Supp. 2d 411, 417–18 (E.D.N.Y. 2008) ("Although the [Crime Victims Rights Act] is meant to be liberally construed within the confines of the rights guaranteed, there is absolutely no suggestion in the statutory language that victims have a right independent of the government to prosecute a crime . . ."). Accordingly, Amazon's right to be heard does not require the Court to defer to assertions it makes that have no basis in the record. The Court should therefore reject Amazon's loss figure for substituted products.

not have knowledge of any issues relating to these products—they were shipped directly from his supplier to Amazon. Given the foregoing, there is no basis to include this value in the calculation of total loss.

> ### D.    Whatever Metric Is Used, a Credit Against the Loss Amount Should Be Applied for Products Sold by Amazon

Amazon states in its Victim Impact Letter that once it discovered defendants' conduct, it immediately "quarantined all products traceable to them across many different warehouses throughout the United States."  Amazon Ltr. at 5 (footnote omitted).  Amazon also represents that it received 1,412,344 units from the defendants and that it currently has in its warehouses approximately 200,000 units of products that the defendants shipped to Amazon. *Id.* at 5–6. Accordingly, Amazon appears to have sold approximately 1,212,344 units that it received from the Abraham brothers. We requested by subpoena that Amazon supply "[a]ll records of total sales and profits for all products sold by Amazon ordered from [the defendants]" during the relevant period. *See* Ex. G. Amazon claimed to have no such records. Accordingly, it is impossible to know at what profit Amazon sold the 1,212,344 units it received from the defendants—it is possible, in fact, that Amazon actually *made money* from sales of the Abrahams' products (especially given that many of the products Amazon received it never paid for). But given that the number of units sold represents 85 percent of all goods Amazon did receive, *at a minimum* any loss should be discounted by 85 percent.

> ### E.    The Sophisticated Means Enhancement Should Not Apply

The PSR erroneously applies the sophisticated means enhancement based on a misunderstanding of the evidence. For the sophisticated means enhancement to apply, it is not enough for the government to show that the offense merely involved "sophisticated means"—*i.e.*, "especially complex or especially intricate offense conduct pertaining to the execution or

concealment of an offense." U.S.S.G. § 2B1.1, application n. 9(B). Rather, the Guidelines require the additional showing that "the defendant *intentionally engaged in or caused* the conduct constituting sophisticated means." *Id.* § 2B1.1(b)(10) (emphasis added). Here, there is no basis for applying the enhancement. As an initial matter, there was no effort to conceal the identities associated with the vendor accounts. Although the offense involved more than one vendor account, all accounts were linked to the defendants' true names and addresses—there was no effort undertaken to conceal their identities and no use of fake aliases. Indeed, the government admits that Yoel used his true name on the vendor accounts.

In addition, while the government cites statements in text messages made by Yoel's co-defendants suggesting the use of virtual private networks ("VPNs") to evade detection from Amazon, there is no evidence that the defendants in fact engaged in any of the discussed conduct.[9] Indeed, the government impliedly admits the same. PSR at 32. Such evidence does not exist because these communications occurred during a period *after* the defendants' Amazon vendor accounts had already been shut down. The enhancement is inapplicable for merely contemplated conduct that never occurred.

Finally, the government has suggested that merely accessing Amazon's vendor platform and making changes—something every vendor using Amazon's system is required to do upon request—constitutes sophisticated means. Accepting the government's premise would defy the Guidelines requirement that that the enhancement apply only to "especially complex or especially intricate" offense conduct. U.S.S.G. § 2B1.1, application n. 9(B). Accordingly, the sophisticated means enhancement does not apply.

---

[9]     Although there is evidence to suggest use of VPNs with *seller* accounts, there is no such evidence with the *vendor* accounts at issue in the scheme.

## II.    The § 3553(a) Factors Warrant a Non-Custodial Sentence

Irrespective of the Guidelines range used as a starting point, we respectfully submit that a sentence of time served, plus three years of supervised release with community service, is sufficient, but not greater than necessary pursuant to 18 U.S.C. § 3553(a).

### A.    Legal Standard

District courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)). While the Guidelines are the "starting point and the initial benchmark," the court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Rather, the sentencing court must make an "individualized assessment" of the sentence warranted by § 3553(a) "based on the facts presented." *Id*. at 50. The Supreme Court has "emphasized that highly relevant—if not *essential*—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 48 (emphasis added; citations, alterations and quotation marks omitted). "In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks and citation omitted).

### B.    The Government's Intended Loss Figure Vastly Overstates Yoel's Culpability

This case presents a stark mismatch between the intended loss figure that the government argues drives the Guidelines range and Yoel's actual conduct and culpability. As a general matter, courts in this District have widely criticized the loss table for fraud as a poor proxy for individual culpability and unsupported by empirical data. *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d

506, 509 (S.D.N.Y. 2006) ("[T]he Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."); *see also United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) ("Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission."); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3–4 (E.D.N.Y. Apr. 27, 2018) ("[T]he Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."). Intended loss has been particularly condemned as a "fatally flawed proxy for culpability," generating sentencing recommendations "that many judges consider disproportionately harsh" and thus "resulting in high rates of below-Guidelines sentences." Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of "Intended Loss" in the U.S. Sentencing Guidelines for Fraud*, 81 Mo. L. Rev. 715, 718 (2016). The loss Guideline's "flaws are magnified where, as here, the entire loss amount consists of intended loss." *Corsey*, 723 F.3d at 378–379 (Underhill, J., concurring) ("Although the District Court used the intended loss amount correctly for purposes of calculating the Sentencing Guidelines range, the Court erred by failing to dramatically discount that calculation when weighing the section 3553(a) factors against the totality of the circumstances of this case."). As the Supreme Court noted in *Kimbrough v. United States*, where the Sentencing Commission is not "exercis[ing] its characteristic institutional role" by "tak[ing] account of empirical data and national experience," the Guidelines are much more

likely to "yield[] a sentence greater than necessary to achieve § 3553(a)'s purposes." 552 U.S. 85 109–110 (2007) (internal quotations marks and citations omitted). That is the case here.

Thus, even assuming, *arguendo*, that the Court accepts the government's and the Probation Department's higher calculation of loss, the Court should not base its assessment of Yoel's culpability by primarily considering the loss amount and related Guidelines range. Rather, the Court should afford greater weight to the circumstances of the offense, Yoel's history and characteristics, and his ongoing efforts at rehabilitation. *See Corsey*, 723 F.3d at 380 (Underhill, J., concurring) (low marginal utility of Guidelines in high intended loss cases should prompt greater reliance on § 3553(a) factors).

Employing intended loss here is especially problematic because it will produce an unwarranted disparity in the Guidelines calculation between Yoel and his brothers by virtue of their pleading to agreements that use each brother's individual gain as the metric for increasing the offense level under U.S.S.G. § 2B1.1, while attributing an intended loss amount of $22,173,851.28—based on all four brothers' charges to Amazon—to Yoel alone. To be sure, the government is free to negotiate terms with individual defendants and to offer benefits for pleading to an agreement. And Yoel admits that his gain was on the higher end of his brothers. But the government's intended loss figure inflates any difference between the brothers far beyond reality and produces an unwarranted disparity.

That disparity—greater than a trial penalty—cannot be justified by the distinction between pleading to an agreement with the government and pleading open. Yoel fully accepted responsibility for his conduct—including overshipping. He was unable to come to agreement with the government because he wanted a legal ruling from the Court on whether overshipping without any false statements constitutes federal wire fraud, an issue that presents a substantial legal

question not previously addressed by this Circuit. But he accepted all the facts as alleged in the Indictment and pled to the full range of conduct. Accordingly, even beyond the general problems with using loss as a proxy for culpability, in this case there is reason to view that approach with extreme skepticism.

### C.    Given Yoel's Substantial Efforts to Make Amends and to Rehabilitate, a Custodial Sentence is Not Necessary to Achieve the Statutory Purposes of Sentencing

Putting aside the distortions of the loss Guideline, Yoel's history and characteristics demonstrate that a custodial sentence is not warranted here. Yoel poses no risk of reoffending. He is deeply ashamed of the profound error of judgment that brings him before the Court, and his first step in maturing and learning from his experience has been to turn inward and try to understand what led him to take advantage of Amazon's platform in a way that he recognizes was dishonest and wrongful. He has expressed remorse to many in his community and has turned to spiritual leaders for guidance and support. Moreover, the arrest and prosecution have prompted Yoel to make some long-needed changes in his life, on both a personal and professional level. He is "genuinely committed to rehabilitation and is taking steps to ensure that he learns from this experience." Ex. A, Ltr. of Joseph Landau. Accordingly, Yoel should be permitted "a sentence that allows him to continue on his path of growth and redemption," rather than one that derails from it. *Id.*, Ltr. of Nuchem Abraham; *see also United States v. Neiman*, 828 F. Supp. 254, 255 (S.D.N.Y. 1993).

> i.    Yoel Is Committed to Understanding the Root Causes of His Criminal Conduct and Growing

In connection with sentencing, Yoel sat for two days to tell his life story to, and be evaluated by, Dr. Katy D. Gaines. Dr. Gaines's report helps to contextualize the offense within the circumstances of his upbringing. *See generally* Ex. D. Indeed, with her help, and the help of his

treating therapist, Yoel has come to understand the extent to which he felt trapped by his family's poverty and the weight of his parents' strict religious adherence. While those sentiments in no way excuse his conduct, it is significant that he now has insight into how these emotions have contributed to his poor choices. During his evaluation with Dr. Gaines, Yoel reflected on how his background shaped his conduct, saying he was motivated by a "desire to have a future. You never having money. Desire to succeed. You think you figured out the thing, like, you finally get a break in life. It's not justified. I reflect on it a lot." Ex. D at 8. So, while the government will undoubtedly argue that what motivated Yoel and his brothers was greed, it is important to understand his drive to acquire wealth within the context of his mitigating personal history.

Yoel's actions were further "driven by lack of proper education and understanding rather than malicious intent." Ex. A, Ltr. of Moishy Fekete; *see also id.*, Ltr. of Moses Gross ("[T]he mistakes Yoel has made were born of misunderstanding rather than malice or ill intent."). This lack of education was compounded by what appears to be an ███████████████, as Dr. Gaines's evaluation of Yoel "███████████████████████████████████ ███████████████████████████████████████████" Ex. D at 21. Indeed, Yoel, the second youngest of the four brothers, was only twenty-one when he started his e-commerce business; even his text messages reflect impulsive and thoughtless behavior patterns associated with adolescent and immature thinking. Dr. Gaines opines that Yoel's lack of secular education forced him to rely on self-teaching through informal sources to gain knowledge and skills. Ex. D at 17. Though this reflects Yoel's initiative and generally inquisitive mind, self-teaching can have "several shortcomings," including "inaccuracies, partiality, skewed exposure, and misinformation." *Id.* at 18. In her psychological evaluation of Yoel, Dr. Gaines concludes that "the shortcomings of being self-taught likely contributed to Mr. Abraham's lack of appreciation

for legal boundaries." *Id.* at 21. Yoel, too, appreciates this. As he stated to Dr. Gaines, "In the future—I [would] rather make less, but do it right. Don't get caught up in the excitement of making money. In the long run you will make more doing things right than trying to grab things fast. There are no shortcuts in life." *Id.* at 8.

Yoel has taken these insights to heart. Yoel's life is no longer driven by a frenetic compulsion to make money or overcome the deprivations of his past. He finds his job, for which he is paid $800 per week, rewarding. In his spare time, he turns his attention toward his community and service to others. He now understands the ways in which he would benefit from enhanced secular education, and he began taking online GED courses in early 2024, with the goal of eventually obtaining his high school equivalency. "Though this represents only the beginning of his process of formal education, he hopes that by becoming more familiar with topics like mathematics, history, and business, he will be able to better integrate into society." Ex. C at 5. Focusing on education, as well as weekly mental health treatment, Yoel is striving to ensure that he will never make the same mistakes again. In short, he is determined to emerge from this experience a changed person. "[I]t is evident that is he is deeply affected, seeking only to move forward with a fresh start and positive goals for the future." *Id.*, Ltr. of Jacob Blum; *see also id.*, Ltr. of Jacob Reichman ("It is humbling to see how regretful [Yoel] is and how he is committed to build a solid life going forward.").

Finally, Yoel is also addressing his underlying mental health challenges in a more sustained way. As noted, and as recommended, by Dr. Gaines, he has been working with a therapist in weekly individual sessions to address underlying issues stemming from his childhood and develop coping skills to improve his emotional management and communication. *See* Ex. E at 4. In Yoel's own words, through therapy he hopes to "gain a better understanding of [himself] and any

30

shortcomings that may cloud [his] judgment in the future." *Id.* He has also invested in his mental health by completing a Build Your Self-Esteem course, designed to address feelings of despair, humiliation, anger, guilt, and isolation to ultimately help boost self-esteem, control emotions, and manage anxiety. *See* Ex. F.

ii.    Yoel Has Expressed Profound Regret for His Conduct to Friends and Family

To his friends and family, Yoel has expressed his "profound remorse for the mistake he has made" and "deep[] regret[] [for] his actions and their consequences." Ex. A, Ltr. of Moses Gross; *see also* Ltr. of Naftali Unger; Ltr. of Moishy Fekete; Ltr. of Margarita Zaslavskaya; Ltr. of Joseph Landau; Ltr. of Aron Reiner; Ltr. of Meyer Tauber; Ltr. of Jacob Reichman. It is apparent to others that "[Yoel] is carrying a heavy burden" of shame. *Id.*, Ltr. of Melvin Szwerin. His neighbor, Saul Reich, describes Yoel's regret as "real and deep" and notes that Yoel has expressed "countless times his remorse for the situation in which he finds himself, as well has deep desire to move past these events and to start a new life on the honest path." *Id.*, Ltr. of Saul Reich. Going forward, he is "determined to conduct himself lawfully and with the utmost integrity." *Id.*, Ltr. of Margarita Zaslavskaya. As Rabbi Halberstam attests, Yoel "will never repeat his misdeeds again." *Id.*, Ltr. of Rabbi Yechiel Halberstam.

iii.    Yoel Has Embarked On a Path of Spiritual Growth and Maturation

Yoel has also sought to make amends with the support of his religious leaders. He has met weekly with Rabbi Teitelbaum since 2020, attends nightly lectures on Jewish law, and has begun a sustained rehabilitation program under the supervision of Rabbi Bryski and the Aleph Institute. Rabbi Teitelbaum attests that "Yoel is genuinely remorseful" for his actions and is "determined to never engage in such conduct or anything similar again." Ex. A, Ltr. of Rabbi Teitelbaum. Yoel turned to Rabbi Teitelbaum for guidance after his indictment, and the two began working together

to study *teshuva* (repentance). Ex. C at 4. They studied "the 3 most important components of *teshuva*": *charutah* (remorse), *vidi* (confession), and *azivas ha'chette* (abandonment of sin). Ex. A, Ltr. of Rabbi Teitelbaum In his work with Rabbi Teitelbaum, Yoel has been engaged with these concepts to achieve "a total new path of life." *Id.* Through these sessions, Rabbi Teitelbaum has "come to know [Yoel] as a genuinely kind and righteous person committed to learn from his past not to repeat anything remotely close to a gray area when it comes to the law." *Id.* Yoel has also developed a sense of "responsibility to caution and encourage whomever [he] may have influence over not to fall through the trap" that he did, taking shortcuts to make quick money. *Id.* He now understands that his poor choices have had severe consequences, including increased difficulty in finding a partner and building a family. "In a way, this has been quite a punishment for him, being stigmatized in the community as a criminal, with a direct adverse effect on his ability to find the right partner in life." *Id.* A non-custodial sentence, while not eliminating the stigma of a felony conviction, would permit Yoel the opportunity to continue his search for a partner and the chance to build a family of his own. *See, e.g.*, Ex. A, Ltr. of Fishl Abraham ("[H]e only has one wish and desire: to look toward a righteous future in which he continues to grow and contributes positively to society and starts a family of his own."); *see also id.,* Ltr. of Miriam Liberman; Ltr. of Yenty Tannanbaum; Ltr. of Melvin Szwerin; Ltr. of Hersh Apel.

Naftali Unger, who delivers the nightly lectures, also attests to Yoel's focus on self-improvement: "[Yoel] attends with consistency and without fail, a true attestation of his dedication to what is important in life." Ex. A, Ltr. of Naftali Unger. His progress is also evident in the work he has done with the Aleph Institute. Under Rabbi Bryski's guidance, Yoel had been attending a weekly online "Crime and Consequences" course that discusses Jewish teachings relating to criminal conduct, sentencing, deterrence, and rehabilitation with a focus on "monitor[ing] the

individual's progress as they come to realize the massive and damaging impact their actions have had on society." Ex. C at 3. In his attached letter, Rabbi Bryski, who has observed Yoel closely through this work, describes how Yoel has "used the incredibly painful experience initiated by his criminal conduct to better himself, and the impact has been profound." Ex. C at 2.

iv.    <u>Yoel's Rehabilitative Efforts Merit a Substantial Variance</u>

Yoel's extraordinary efforts at rehabilitation warrant a substantial variance. "It is well-established in this Circuit that the power to depart may be based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior." *United States v. Rosado*, 254 F. Supp. 2d 316, 321 (S.D.N.Y. 2003) (internal quotations, alterations and citations omitted). "Extraordinary rehabilitation . . . is not narrowly defined or limited to cases of defendants overcoming their drug addiction." *United States v. Bryson*, 163 F.3d 742, 747 (2d Cir. 1998). Since his arrest, Yoel has taken meaningful steps to invest in his career, education, mental health, and to address the underlying causes of his poor decision making. He has shown an "earnest desire to move beyond this phase of his life" and has made significant "efforts toward building a new future for himself," as "reflected in his actions and daily conduct." Ex. A, Ltr. of Meyer Tauber. Yoel is dedicated to continuing to build upon this foundation and, as he describes, "determined to remain and productive member of society and to continue making a positive impact." Ex. E. These efforts provide the Court with real assurance that Yoel presents a very low risk of recidivism.

Yoel's likelihood of reoffending is further lowered by his strong community and familial support and his record of compliance with pretrial reporting. *See United States v. Butler*, 264 F.R.D. 37, 38 (E.D.N.Y. 2010) (explaining downward variance in part by stating that the defendant's "strong supportive network of extended family, friends, teachers, and potential employers, as well as [his] positive reaction to supervision since his arrest, indicate a high

33

probability of rehabilitation"); *United States v. King*, No. 12-CR-390, 2013 WL 3466553, at *2 (E.D.N.Y. 2013) ("It is unlikely defendant will engage in further criminal activity in light of his family circumstances and acceptance of responsibility."). This network of family and community will help to ensure that Yoel stays on the right path.

Finally, even without considering Yoel's personal path to repentance, "[a]s a first time offender, it is highly unlikely that he will again violate the laws of the United States." *United States v. Johnson*, 245 F. Supp. 3d 393, 397 (E.D.N.Y. 2017) (specific deterrence achieved by sentence of time-served). The Sentencing Commission has acknowledged that, based on recidivism data, "offenders with zero criminal history points have considerably lower recidivism rates than other offender." United States Sentencing Commission, *Amendments to the Sentencing Guidelines*, at 79 (Apr. 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf. Yoel's risk of reoffending is particularly minimal given that, at the time of his arrest, he had not been engaged in the offense conduct for nearly two years. Indeed, he had shifted his focus away from the e-commerce industry to an entirely new line of work. His ongoing lawful and gainful employment in property management services warrants a finding that specific deterrence can be achieved without the need for a carceral sentence.

In short, on the particular facts of this case, a sentence of incarceration would be greater than necessary to achieve specific deterrence.

### D.    Alternatives to Incarceration Are Sufficient to Achieve Deterrence, Reflect the Seriousness of the Offense and Impose Just Punishment

A non-custodial sentence, coupled with financial penalties and restorative community service, are adequate to ensure that Yoel is punished for his offense. First*,* imposing a sentence of three years' supervised release is "not merely letting an offender off easy." *Gall v. United States*,

552 U.S. 38, 48 n.4 (2007) (internal quotations and citation omitted). Rather, as the Supreme Court has recognized, supervised release would subject Yoel to "substantial restrictions on freedom" that are effective to deter and punish. *Id.* at 48; *see also King*, 2013 WL 3466553, at *2 ("Specific deterrence has been substantially achieved through the restrictions imposed by supervised release."). Indeed, it is significant in this regard that he has already been on pretrial supervision for close to four years.

Second, there are significant financial penalties associated with his conviction. Yoel will be subject to a substantial restitution order, as well as forfeiture. Over $1.9 million in assets were frozen at the time of his arrest, he has a variety of past due debts, and his home is currently in foreclosure. PSR ¶¶ 105-106; Ex. B at 8. To the extent that punishment is a way of imposing suffering on the wrongdoer or ensuring that there is a consequence for bad actions, the enormous financial obligations that will follow Yoel for years into the future represent just that sort of consequence. Simply put, life has been incredibly challenging for Yoel, and rebuilding his financial life, and re-establishing economic stability, is a cornerstone of his rehabilitation. The fact that he has secured steady and rewarding employment is an important first step in the right direction.

Third, the Court can impose conditions on any term of supervised release to ensure that Yoel continues to make active amends through community service. Following his arrest, Yoel began working with a non-profit community-based organization, the Aleph Institute, which offers support and programming for individuals embroiled in the criminal justice system. In its attached letter, Aleph has identified an individualized set of rehabilitative programming as appropriate alternatives to incarceration. These programs include community service, spiritual counseling, and

35

educational opportunities. Should the Court deem it appropriate, Aleph is willing to oversee Yoel's participation in such programming as a condition of his supervised release. Ex. C at 3.

Finally, a sentence of time served, with supervised release, would also meet the goal of general deterrence. Numerous studies, including those conducted by the Department of Justice, have found that "punishment certainty is far more consistently found to deter crime than punishment severity." Daniel Nagin and Greg Pogansky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence, Criminology*, 39(4) (2001); *accord* U.S. Dep't of Justice, Nat'l Institute of Justice, *Five Things About Deterrence* (Dec. 15, 2017), https://www.nij.gov/five-things/pages/deterrence.aspx ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (while the certainty of being caught and punished has a deterrent effect, research shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"). Yoel was apprehended and charged for his fraudulent business practices, pled guilty to three federal felonies, and will pay a significant financial penalty. Indeed, his business and financial future have been utterly destroyed and he may never recover fully from his involvement in this case. These penalties, plus the lengthy supervision he has already endured and will continue to face, send a strong message that engagement in fraudulent business practices carries serious consequences. *See United States v. Khalid*, No. 09-CR-734, 2011 WL 6967993, at *2 (E.D.N.Y. Dec. 13, 2011) (noncustodial sentence satisfied goal of general deterrence by sending "a clear message that any involvement in [the criminal conduct] will result in a substantial fine

and lengthy government supervision"). The force of this message is heightened given the substantial publicity surrounding these proceedings.[10]

### E. Yoel's History of Good Deeds and Contributions to the Community Also Militate in Favor of a Non-Custodial Sentence

Yoel's numerous supporters are uniform in praising his kind and charitable spirit, highlighting the myriad ways in which he goes above and beyond the call of duty to help others. His crime is serious; yet, we respectfully submit that Yoel's compelling personal history and his record of good deeds merit leniency in this case. While good deeds do not negate bad ones, "weighing the good with the bad" was "plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *Adelson*, 441 F. Supp. 2d at 513-14 (citing 18 U.S.C.§ 3553(a)(1) and considering defendant's "numerous acts of compassion and generosity . . . acts of kindness . . . [and] integrity"); *United States v. Toback*, No. 01 CR. 410 (RWS), 2005 WL 992004, at *5 (S.D.N.Y. Apr. 14, 2005) (non-Guideline sentence of time served warranted where letters from supporters spoke to the defendant's "outstanding and reliable character" and "his devotion to his family"). Here, Yoel has done much good that merits the Court's mercy.

---

[10]    *See, e.g.*, Stephanie Pagones, *Brothers defrauded Amazon out of $19M through bogus invoices: DOJ*, FOXBuisness (Aug. 20, 2020, 5:50 PM ), https://www.foxbusiness.com/lifestyle/brothers-arrested-amazon-indictment-fraud-invoices; Sarah Wallace, *Four Rockland County Brothers Arrested in $19M Fraud Scheme Targeting Amazon: Sources*, NBC New York (Aug. 19, 2020, 11:03 PM), https://www.nbcnewyork.com/news/local/crime-and-courts/four-rockland-county-brothers-arrested-in-19m-fraud-scheme-targeting-amazon-source/2576060/; Louise Matsakis, *How Four Brothers Allegedly Fleeced $19 Million From Amazon*, Wired (Aug. 20, 2020, 4:29 PM), https://www.wired.com/story/how-four-brothers-allegedly-fleeced-19-million-amazon/; Bill Heltzel, *Four Rockland brothers accused of biking Amazon out of $19M*, Westfair Business Journal (Aug. 25, 2020), https://westfaironline.com/courts/four-rockland-brothers-accused-of-bilking-amazon-of-19m/

First, though he has not yet had the opportunity to have children of his own, Yoel is a "devoted family person who cares deeply about others." Ex. A, Ltr. of Benzion Lebovitz. Yoel's older brother, Nuchem, describes Yoel's "ability to empathize with others and offer support" as "a testament to his strong character," noting that Yoel has helped him "multiple times . . . in business and in personal life." *Id.*, Ltr. of Nuchem Abraham. Yoel's youngest brother, Jacob, describes Yoel as his "guiding light, mentor, and steadfast supporter" and an "instrumental" figure in his personal and professional development. *Id.*, Ltr. of Jacob Abraham. Yoel has "been a beacon of support in [Jacob's] educational pursuits," even "directly contributing to [Jacob's] school tuition" to "ensure[] that [he] had the opportunity to pursue [his] dreams." *Id.* Yoel has also "instilled in [Jacob] the importance of giving back," inspiring him to be charitable and to use his resources to help others. *Id.* Yoel's "teachings on the importance of compassion and community" have indelibly "shaped [Jacob's] perspective on success and fulfillment." *Id.* Jacob attests to Yoel's "kindness, dependability, and unwavering dedication" to his family, describing him as "a pillar of support during challenging times and a source of joy during moments of celebration." *Id.*

Many of Yoel's family members repeat the sentiment that he is a "pillar" of the family, "[k]nown for his dependability" and generous spirit. *Id.*, Ltr. of Jacob Blum. Perhaps because he does not have a family of his own, Yoel is often the one that everyone turns to when they need a favor or support. Yoel's eldest brother, Fishl, remarks how Yoel is "always giving and never asking for anything in return," going "above and beyond the call of duty" to be there for his family. *Id.*, Ltr. of Fishl Abraham. Fishl recalls that Yoel would "routinely" offer him financial support to help "buy groceries, clothing, and get through [] harder times" when his family expenses were higher than he could manage on his own. *Id.* Yoel's younger sister, Yenty, similarly notes how she can count on Yoel to "help[] out in [her] life with anything and everything." *Id.*, Ltr. of Yenty

Tannenbaum. Yoel offers this help with a "positive" energy, "kind heart" and "major love"—infecting others with his "most happy and contagious smile." *Id.* Yoel's eldest sister, Miriam, highlights the small, but meaningful, ways in which Yoel displays his "very good and warm heart." *Id.*, Ltr. of Miriam Liberman. For example, she describes how Yoel offers to drive family members anytime someone needs a ride, attends hospital visits with family, took care of her when she was sick with COVID, and brings thoughtful gifts for her daughters. *Id.* "Yoel is always ready to do favors for everyone no matter what, and he does it so gladly and happily." *Id.* Yoel's "love for [his] family is evident in his actions, always prioritizing [their] well-being," even at the expense of his own. *Id.*, Ltr. of Jacob Abraham. Yoel's integral and meaningful role in his family weighs in favor of leniency.

Yoel's kindness extends beyond his family to his broader community. He commits his time to volunteering with community organizations, including The Bridge and *Bikur Cholim*. Ex. C at 4–5; Ex. A, Ltr. of  Mark Meyer Appel; Ltr. of Aron Reiner. There, he offers his time to help new migrants get acclimated to New York with food and clothing, and delivers meals to patients in hospitals in rehabilitation centers. He also played an integral role in overseeing the renovations of his father's synagogue—a project which required him to volunteer his time full-time for six months. His efforts have not gone unnoticed.  As one of his friends commented, "Yoel can always be counted on to assist those in need," caring for all members of his community, including the "elderly and infirm, young and old." Ex. A., Ltr. of Benzion Lebovitz. He is praised as an "upstanding member" of his congregation whose "contribution to [the] community has been invaluable." *Id.*, Ltr. of Feigy Reichman. Many of his supporters remark at Yoel's generosity and "willingness to help others." *Id.*, Ltr. of Moses Gross ("He has often been a pillar of support within our community, offering assistance whenever and wherever it is needed"); *see also id.*, Ltr. of

Joseph Landau (praising Yoel's "commitment to helping others" and "understanding of the importance of community and mutual support"); Ltr. of Naftali Unger (Yoel "will go to the ends of the earth to do a favor for another" and "can be depended upon to always be there"); Ltr. of Saul Reich (Yoel is "a deeply good person who will go out of his way to do a favor for another"); Ltr. of Margarita Zaslavskaya (describing Yoel as the "type of person who puts others before himself"); Ltr. of Meyer Tauber ("I have witnessed him demonstrate remarkable kindness and understanding to others. I have seen first hand him helping out fellow neighbors and community members in need.").

Though Yoel longs to start a family, he is fortunate to live in a community where he is able to open his home to others, "host[ing] many guests" and "invit[ing] lonely individuals in the neighborhood to join him for meals." *Id.,* Ltr of Jacob Reichman; *see also id.*, Ltr. of Israel Rottenberg ("Whenever anyone in the community needs extra beds to host some guests, he is the first to offer up his home for use to total strangers."); Ltr. of Meyer Tauber ("He has opened his personal home for families that don't have [any] where to stay, he hosts every single week people in dire need and graciously accommodates them."). During the COVID-19 pandemic, when he could not bring people into his home, Yoel frequently "r[a]n errands for neighbors," helping to alleviate challenges for other and his own loneliness, at a time where so many "were all so lost and vulnerable." *Id.*, Ltr. of Jacob Reichman.

There is no doubt that if he were incarcerated, Yoel's "absence would leave a significant void in [his] community." *Id.*, Ltr. of Meyer Tauber; *see also id.*, Ltr. of Israel Rottenberg; Ltr. of Jacob Abraham; Ltr. of Joseph Landau; Ltr. of Margarita Zaslavskaya; Ltr. of Miriam Liberman; Ltr. of Moishy Fekete; Ltr. of Moses Goss; Ltr. of Nuchem Abrahm; Ltr. of Sual Reich. He is an active member of his synagogue, taking it upon himself particularly to assist the elder members of

the congregation, "looking out and anticipating their needs," placing "his comfort second" to their own. *Id.*, Ltr. of Shiye Freund. Shiye Freund, a Trustee of Yoel's congregation, describes how Yoel's absence would be "devasting" to the community and leave it "reeling from loss." *Id.*, Ltr. of Shiye Freund. These strong ties to family and community, and positive impact on the lives of others, support the sufficiency of a non-custodial sentence. *See United States v. Scott*, No. 06-CR-988-LTS-1, 2021 WL 5989797, at *4 (S.D.N.Y. Dec. 17, 2021).

## CONCLUSION

Yoel is "genuinely committed to making positive changes" and should be permitted to "continue his journey towards personal development." Ex. A, Ltr. of Feigy Reichman. Because Yoel "appears to be turning his life around, and would face a setback in his rehabilitation if imprisoned," *United States v. Neiman*, 828 F. Supp. 254, 255 (S.D.N.Y. 1993), a sentence of time served, followed by three years of supervised release with a community service component, is sufficient and not greater than necessary to meet the goals of sentencing.


Dated: New York, New York               SHER TREMONTE LLP
      May 21, 2024

                                    By:  */s/ Justine Harris*
                                          Justine Harris
                                          Noam Biale
                                          Neesha Chhina
                                        90 Broad Street, 23rd Floor
                                        New York, New York 10004
                                        Tel: 212.202.2600
                                        jharris@shertremonte.com
                                        nbiale@shertremonte.com
                                        nchhina@shertremonte.com


                                        *Attorneys for Yoel Abraham*