O951ABRS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          20 Cr. 411 (RA)

YOEL ABRAHAM,

                Defendant.              Sentencing
------------------------------x

                                        New York, N.Y.
                                        September 5, 2024
                                        2:24 p.m.


Before:

                    HON. RONNIE ABRAMS,

                                        District Judge


                        APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:  JILAN J. KAMAL, ESQ.
        Assistant United States Attorney

SHER TREMONTE LLP
        Attorneys for Defendant
BY:  JUSTINE A. HARRIS, ESQ.
        NOAM K. BIALE, ESQ.
BY:  NEESHA CHHINA, ESQ.


ALSO PRESENT:  ADAM SGRO, ESQ.
                Davis Wright Tremaine
                Attorney Representative for Victims

ALSO PRESENT:  LUCY GAVIN, Paralegal Specialist, USAO
                SAMANTHA LUEVANOS, Paralegal, Sher Tremonte LLP

O951ABRS

1                (Case called)

2                THE DEPUTY CLERK:  Counsel, please state your names

3    for the record.

4                MS. KAMAL:  Good afternoon, your Honor.  Jilan Kamal

5    on behalf the United States.  Joining me here in a moment is

6    likely going to be paralegal Lucy Gavin from the U.S.

7    Attorney's Office.  And I would also like to note that an

8    attorney for the victim, Adam Sgro from Davis Wright Tremaine,

9    is also here and seated in the well.

10               THE COURT:  Okay.  And does the representative of the

11   victim intend to speak today?

12               MS. KAMAL:  If required, but I don't——a victim impact

13   statement has already been submitted.

14               THE COURT:  Which I have reviewed.  Thank you.

15               MS. KAMAL:  So to the extent necessary, he's here to

16   answer questions.

17               THE COURT:  And I'm not sure who——and why don't I get

18   defense appearances first.  Thanks.

19               MS. HARRIS:  Good afternoon, your Honor.  Justine

20   Harris, Noam Biale, Neesha Chhina and Samantha Luevanos from my

21   firm are here.  Samantha Luevanos is a paralegal in our office,

22   and Neesha Chhina is an associate.

23               THE COURT:  Welcome to you all.

24               Good afternoon, Mr. Abraham.

25               I got the cases that were just emailed or filed today,

O951ABRS

 1    so I have those.  I'm going to read what else I have today.

 2    But do I understand that someone needed to use the AV during

 3    the sentencing?  And just tell me, you know, what we're going

 4    to look at.

 5              MS. HARRIS:  Sure.  Your Honor, we had prepared very

 6    few, select slides.  Most of them are just exhibits that we've

 7    given your Honor already, and demonstrably might be easier to

 8    walk through them visually like that.  There are about two or

 9    three slides I think that have some of the math that we go

10    through in our letters.

11              THE COURT:  Okay.

12              MS. HARRIS:  I'm only going to pull them up if

13    appropriate and if needed and in response to the questions, so

14    I'm not doing a whole presentation, beginning soup to nuts, of

15    PowerPoint.

16              THE COURT:  No.  I understand.  Thank you.

17              MS. KAMAL:  Just briefly, your Honor.

18              THE COURT:  Yes.

19              MS. KAMAL:  Similarly, the government has brought the

20    exhibits.  As the Court is aware, many of them are voluminous.

21    They're in Excel.  To the extent it's helpful to the Court, the

22    government has them available and can put them up on the AV as

23    needed.

24              THE COURT:  You can do that, but I also was planning

25    to do it on my computer if you needed to, but if you have it

O951ABRS

1 available and you want to use it during your argument, that's

2 fine too.  But I've obviously reviewed all the submissions.

3 I'll just note what I have received for the record.

4   So I have the presentence investigation report revised

5 as of February 14th of this year; Mr. Abraham's sentencing

6 memorandum dated May 21st, with accompanying exhibits; the

7 government's sentencing memorandum dated May 27th, with the

8 victim impact statement; and then I have a host of supplemental

9 sentencing letters, in addition to the ones I noted from today,

10 with each side submitting a new case.  The government also had

11 submitted sentencing letters on June 5th, June 18th, and

12 July 2nd; and Mr. Abraham submitted letters on June 14th,

13 June 17th, July 10th, and August 26th.  So just let me know if

14 I'm missing anything.  I know part of this was in response to

15 questions I asked, but we have an extensive amount of briefing

16 in this case.

17   Mr. Abraham, of course, pled guilty in October to

18 conspiring to commit wire fraud, wire fraud, and violating

19 Count Three, which was monetary transactions involving crime

20 proceeds.

21   Okay.  So why don't we get started.  And why don't we

22 start by discussing the presentence report, which of course was

23 prepared by the United States Probation Office.

24   Ms. Harris, have you reviewed the presentence report

25 and discussed it with your client?  I know you've reviewed it

O951ABRS

1    because I've seen all of your objections, but have you

2    discussed it with your client?

3              MS. HARRIS:  We have, your Honor.

4              THE COURT:  Okay.  All right.  And I'm going to go

5    through the objections that I understand you have.

6              MS. HARRIS:  That's fine, your Honor.  And I defer,

7    you know, entirely to the Court, obviously, in terms of

8    preference of order, and I know this is the traditional place

9    to start.

10             THE COURT:  Yes.

11             MS. HARRIS:  Obviously there are some objections that

12   I have, you know, lots to say about, and I don't want to hijack

13   and divert proceedings.  I was going to tell the Court——again,

14   I defer to the Court entirely, but——if it made sense to proceed

15   through some of the bigger legal issues or questions and then

16   come back to the objections.

17             THE COURT:  I'll tell you what I had planned to

18   do——although I can switch it up for sure——is I had intended to

19   go through specific objections but reserve ruling on some of

20   the bigger issues that will be dictated by how I rule on the

21   guidelines issues you've raised.  So I was going to go through

22   those, reserve ruling on those, talk about the guidelines, and

23   then if I need to take a break before I rule, I may take a

24   short break, but that was how I was going to proceed.  But if

25   you feel, with respect to any of the objections that you have,

O951ABRS

1   that you think you want to save them for the guidelines

2   section, just let me know, okay?

3           But let me just ask Mr. Abraham, have you had enough

4   time and opportunity to review the presentence report?

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  Okay.  And did you discuss it with your

7   attorneys?

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  Okay.  And does the government have any

10  objections to the presentence report?

11          MS. KAMAL:  No, your Honor.

12          THE COURT:  Okay.  All right.  So why don't we start

13  with the objections, in the way that I just discussed.

14          So I think the first remaining objection is

15  paragraph 17.  And so you'll tell me if that's wrong.  So with

16  regard to paragraph 17, I understand that defendant disputes

17  whether overshipping constitutes fraud.  That is one of the

18  ones that I intend to rule on when determining the guidelines

19  range and loss amount.  So why don't we come back to that one.

20          With respect to paragraph 18, as I understand it, the

21  defendant is arguing that paragraph 18 incorrectly states that

22  Amazon does not maintain the goods at issue in their warehouses

23  and thus it only purchases these goods in small quantities.  I

24  mean, my inclination was just to say Amazon maintained some of

25  the goods at issue in its warehouses.  Does that solve the

O951ABRS

1    problem?

2         MS. KAMAL:  I think the issue here, your Honor, is

3    just that it's attempting to generalize about a wide variety of

4    products and practices, so to the extent——I think the Court's

5    revision seems accurate, but the only part that I would strike

6    is that "some of the goods at issue here."  It's difficult for

7    the government to parse and for the victim to parse how many of

8    those items were typically warehoused versus kept in small

9    quantities.  So it is accurate to say that Amazon, you know,

10   bought small amounts of goods and typically did not warehouse

11   them for lower-sales-volume items, but the extent to which that

12   applies here can't really be addressed.

13        MS. HARRIS:  So I think your Honor's compromise is

14   appropriate.  I think in the government's letter Amazon admits

15   that at least as of today, or as of some recent date, 200,000

16   units were still remaining in its warehouses, so I think it's

17   true to say that, as your Honor suggested, some of the items

18   involved in these transactions were maintained in the

19   warehouse.  I think there's not a——I don't think there's

20   evidence here one way or the other about the general practices

21   of Amazon, and we object to a characterization that as to all

22   vendor orders, they were not kept in warehouses.  So that's

23   all.

24        THE COURT:  Is it accurate if we were just to change

25   the second line to, "Certain consumer goods sold on Amazon have

O951ABRS

1    modest sales volumes and thus Amazon does not maintain all

2    those goods at their warehouses"?  Is that accurate?

3              MS. KAMAL:  I think that is accurate, your Honor.

4              THE COURT:  Okay.

5              MS. KAMAL:  The government's concern here──

6              THE COURT:  Yes.

7              MS. KAMAL:  ──is simply that the defense is relying

8    upon warehousing practices to make an argument about what

9    Amazon may or may not have kept in──may or may not still have

10   in its custody.  And that here is problematic because the goods

11   that Amazon typically ordered from the defendant were in small

12   quantities, were meant to be in small quantities, and Amazon

13   was often tricked into holding onto them.  And so I am

14   simply──I think the Court's compromise just now is appropriate,

15   but I am loath for the Court to draw from that any specific

16   inferences regarding the meaning of "goods still in Amazon's

17   possession."

18             THE COURT:  Okay.  Understood.

19             And are you okay with that, Ms. Harris?

20             MS. HARRIS:  I'm okay with that compromise.  To the

21   extent this has implications to our other arguments, because it

22   does, you know, echo in some of the policies that Amazon issues

23   about overages and chargebacks and using up warehouse space, we

24   can revisit the significance of that issue, but I think it's

25   fair to say that some were kept in warehouses and some were

O951ABRS

1  not.

2         THE COURT:  All right.  So that's paragraph 18.  One

3  down.

4         I think the next one is paragraph 27.

5         And so it's my understanding that the defense

6  objection, or view, is that, "Paragraph 27 is incorrect insofar

7  as it assumes that the Abraham brothers received payments for

8  all invoices submitted to Amazon, when in fact many of those

9  invoices were never paid.  The probation department made no

10  changes to this paragraph in response to our objection, despite

11  the government's admission that Amazon did cease making

12  payments."

13         I mean, does either party object to the following

14  being added:  "Amazon did not pay every invoice that the

15  Abraham brothers submitted"?

16         MS. KAMAL:  No objection.

17         THE COURT:  Okay.

18         MS. HARRIS:  No objection.

19         THE COURT:  Okay.  So that's paragraph 27.

20         Then on paragraph 34, my understanding is that the

21  defense objection is that paragraph 34 refers to Amazon's

22  typical practice of assuming that an overshipped invoice is in

23  error and requesting clarification.  In this case Amazon did

24  not do so and instead requested more items.  The government did

25  not respond to this objection, but nevertheless, the probation

O951ABRS

1    department kept the language unchanged.

2            Would the parties object to the following being added:

3    "Yoel Abraham received several purchase orders from Amazon even

4    after he had overshipped items on previous purchase orders"?

5            MS. KAMAL:  No objection.

6            MS. HARRIS:  No objection.

7            THE COURT:  Okay.  So that's what I'll do on 34.

8            On 39, the defense objection is that it incorrectly

9    characterizes a discussion in the Abraham brothers' WhatsApp

10   group as plans to evade detection by Amazon when during this

11   period the brothers' accounts were already shut down.  The

12   government suggested the brothers did not yet know their

13   accounts had been shut down, and the probation department

14   accepted the government's position.  It's still unclear to me,

15   though, what's inaccurate about paragraph 39.

16           MS. HARRIS:  Right, your Honor.  I guess it's just the

17   implication of the timing.  At that point in time, the accounts

18   had been shut down, and so they were——whatever they were

19   talking about wasn't to evade detection because they had been

20   detected, so to speak.  And so, look, it's——the conversation is

21   what it is.  We're not seeking to strike the conversation.  But

22   simply we would propose that the first sentence be deleted, and

23   "they also discuss new ways to evade detection and how," just

24   the characterization by the probation department in those two

25   sentences.  We're fine with those WhatsApp chats being reported

O951ABRS

1  and summarized, but just simply the characterization, we object

2  to.

3  　　　　　THE COURT:  All right.  The government's position?

4  　　　　　MS. KAMAL:  Briefly?

5  　　　　　THE COURT:  Yes.

6  　　　　　MS. KAMAL:  The Court already has additional context

7  around these WhatsApp chats.  It is clear that the defendants

8  repeatedly and continuously discussed how to overship and how

9  to get away with it with one another throughout this WhatsApp

10  chain.

11  　　　　　THE COURT:  Yes.  I agree.  I'm going to overrule the

12  objection.

13  　　　　　All right.  Moving on to paragraph 40.  The defense

14  position is that paragraph 40 suggests that Mr. Abraham used

15  VPSs and VPNs to advance the fraud scheme.  And then the

16  submission states that for the reasons detailed, we object to

17  the suggestion.

18  　　　　　In its response, the government tacitly admitted that

19  Mr. Abraham did not use VPS, VPNs, but instead said how he was

20  aware of how Amazon might be able to track and detect vendor

21  accounts linked by cookies or IP addresses.

22  　　　　　I mean, I don't read paragraph 40 to make the

23  suggestion that Abraham used VPNs.  I mean, is the government

24  arguing that they used VPNs?

25  　　　　　MS. KAMAL:  The government's position is that the

O951ABRS

1    paragraph is accurate.  At least one of the defendants——and

2    these paragraphs are all taken from the indictment, as I'm sure

3    the Court is aware.  This characterizes the conduct of the

4    defendants.  With respect to the use of VPNs in an attempt to

5    evade the linking of the accounts, Mr. Abraham made the

6    comments set forth here in paragraph 40.  And the government

7    submits that the paragraph is entirely accurate.  To the extent

8    that the defense wants to try to foreclose implications

9    thereof, they are not in this paragraph.  So that can be

10   addressed later in argument.

11          THE COURT:  I have to say, I agree with the

12   government.  Okay.  So that objection is overruled.

13          Then we're at paragraph 41.  And the defense has

14   argued that 41 contains a misleading figure for gain; the

15   $9,033,745 value is not what Mr. Abraham received from

16   fraudulently induced payments pursuant to this scheme——that's

17   the defense position——rather, it's the total amount he received

18   overall.  How about we just edit this to say, "Yoel Abraham

19   received a total of $9,042,537.02 from Amazon," period?  And

20   that figure is based on Government Exhibit 5.

21          MS. HARRIS:  Just striking the last part of that

22   phrase, right, is that——yeah, the last sentence.

23          THE COURT:  Yes, striking the last sentence, and

24   instead putting in the figure that's close but a little bit

25   different; that's based on Government Exhibit 5.

O951ABRS

1          MS. HARRIS:  I believe that's right, your Honor.  We

2    have no objection to that change.

3          THE COURT:  Any objection from the government?

4          MS. KAMAL:  What the Court stated is accurate.  The

5    government would simply request, though, that once a

6    determination is made about the amount that was received in

7    fraudulent payments, that it be added.

8          THE COURT:  Okay.  All right.

9          43.  I'll just cut that off now.  With regard to

10   paragraphs 43, 46, and 54, I'm going to rule on those when I

11   rule on the intended loss argument.

12          And then——

13          MS. HARRIS:  Your Honor, I apologize.  Just in terms

14   of the payments, I note that there's one——and I think we note

15   this somewhere in one of our submissions.  The payments

16   received, that there's some conflict in the government's

17   discovery.  There's one in the spreadsheets shows payments

18   received closer to $8 million.  Again, that could be

19   like——happy to write and propose that footnote to that

20   paragraph, and I think it's only relevant, obviously, to

21   forfeiture issues and to loss issues, so that sort of

22   mathematical discrepancy we can address at a later date, but I

23   wanted to——

24          THE COURT:  But to be clear, are you disputing that he

25   received a total of the $9,042,537.02 from Amazon?

O951ABRS

1          MS. HARRIS:  I think there is——we don't know that

2     there's contradictory evidence.  There's one spreadsheet that

3     says 9 million and there's one spreadsheet that says 8 million.

4          THE COURT:  Why don't I come back to this.

5          Paragraphs 44 and 45 relate to sophisticated means.

6     I'm going to get to that when we talk about the guidelines.

7          Again, with respect to 110, I understand that the

8     defendant disputes the guidelines range.

9          With respect to paragraph 107, the defense position is

10    that it incorrectly states that Mr. Abraham has not filed

11    federal income tax returns for the years 2017, 2019-2022.  And

12    then it indicates that he has worked with an accountant and tax

13    lawyer to file his tax returns, and is now current.

14          So why don't we do this.  Why don't we change the

15    paragraph to say, "Mr. Abraham was directed to submit copies of

16    his federal income tax returns for the last three years of

17    filed returns.  Although he did not submit a copy of his 2018

18    federal income tax return and at the time had not filed federal

19    income tax returns for years 2017, 2019-2022, he claims that he

20    has now worked with an accountant and tax lawyer to file his

21    tax returns and is current with his filings."

22          MS. HARRIS:  That's fine, your Honor.  I can

23    represent, I talked to that tax lawyer, who has also made that

24    representation to us.

25          THE COURT:  Okay.  Any objection?

O951ABRS

1          MS. HARRIS:  And 2017 was also filed, your Honor.

2          THE COURT:  Okay.

3          MS. KAMAL:  Respectfully, your Honor, the government

4    takes the position that any confirmation that he is in fact

5    current and has made filings should be provided to probation

6    before it is reflected in the report.

7          THE COURT:  That's fine.  I mean, look, the reason

8    that I said he claims is for that reason.  I'm just stating

9    what his position is.  So——

10          MS. KAMAL:  Agreed, your Honor, and the government

11    would simply say——

12          THE COURT:  I understand.

13          MS. KAMAL:  ——he's claimed many things.

14          THE COURT:  I appreciate that.  I don't think the

15    lawyers would do that, but I understand.

16          MS. KAMAL:  And I agree, your Honor.  I'm not

17    suggesting that the tax lawyer would misrepresent this.

18          THE COURT:  I'm just saying that that's his position

19    is sufficient for now——or is sufficient for me, I should say.

20          Paragraph 100, from defendant's position, is

21    incorrectly premised on the belief that Golf Course, LLC owns

22    20 Golf Course Drive.  It does not.  So what are you proposing

23    with respect to 100?

24          MS. HARRIS:  I think the issue is, your Honor, there

25    was Golf Course, LLC, and my client——I'll have to confer with

O951ABRS

1    him just in case I get it wrong, but——is basically just the

2    bank——the entity that has the bank account that funds that are

3    paid, so sort of rental or fees paid or contributions paid in

4    connection with the families that use his home are paid into an

5    account.  So the probation department here makes it seem that

6    there are assets or liabilities, and it's unclear, and that

7    perhaps the LLC holds the property, but all it is is a bank

8    account.  There's nothing to give other than the bank account

9    information, which we gave to probation.  So it just suggested

10   that there was something we were withholding or that

11   Mr. Abraham was withholding in connection with Golf Course,

12   LLC, and we were just clarifying in our objection that Golf

13   Course, LLC is a bank account into which he receives the rental

14   income, you know, and which is appropriate to keep it

15   segregated from other funds, and that's it.  That's all it is.

16             THE COURT:  So why don't we just add a line to that

17   effect, that it's Mr. Abraham's position that, or Mr. Abraham

18   asserts that Golf Course, LLC is——now I'm just going to look at

19   the transcript of what you just said.

20             MS. HARRIS:  Sorry.

21             THE COURT:  No, no.  It's okay.

22             ——is a bank account into which he receives the rental

23   income.  I mean, if you want to change that language, but I'm

24   happy to add a line in to state that that's what he's

25   asserting.

O951ABRS

1          MS. HARRIS:  Yeah, and that the house, which we've

2     provided documents about, is owned in Mr. Abraham's personal

3     name.  There are no assets and liabilities.  Like it's, you

4     know——Golf Course, LLC has no assets other than the bank

5     account described and known to the probation office.  But your

6     statement is fine, Judge.  And I just wanted to give context.

7          THE COURT:  Okay.  So I'll just add in one line at the

8     end of the paragraph to the effect of what I stated.

9          Okay.  Now paragraph 102.  I'm not going to read the

10    whole thing, but it relates to the loan structure for the

11    property in Saddle, New Jersey, Upper Saddle, New Jersey.  What

12    I would propose here——and then I'll hear you out——is striking

13    the language, "That same day, it appears two separate mortgage

14    modification agreements were filed, each including a refinance

15    mortgage loan from Sterling National Bank in the amount of

16    $12,600,000 and $15,592,802," so deleting that sentence, but

17    adding a sentence that reads, "Mr. Abraham bought the property

18    with an existing $15,592,802 mortgage on it, with a loan

19    assumption agreement to pay down the existing loan to

20    $12,600,000, which he did at the closing."  Does that work?

21          MS. HARRIS:  Yeah, that works, your Honor.

22          THE COURT:  Okay.  All right.  So that——all right.

23          Then with respect to paragraph 104——

24          MS. HARRIS:  Oh, your Honor, just——at the end of

25    paragraph 102——

O951ABRS

1          THE COURT:  Yes.

2          MS. HARRIS:  ——we actually, in our objections, make

3     clear that we did advise the probation department that

4     Mr. Abraham does not have any ownership interest or

5     relationship with Mountainview Holdings, 10 Mountainview

6     Holdings, LLC.

7          THE COURT:  Okay.  So I'm going to add a line that

8     says, "Mr. Abraham represents that he does not have any

9     ownership interest or relationship with Mountainview, with 10

10    Mountainview Holdings, LLC.

11         MS. HARRIS:  Thank you.

12         THE COURT:  And then I'm going to make the other

13    change I mentioned.

14         And then with respect to paragraph 104, is the dispute

15    the same?  Is the dispute with regard to the following

16    sentence, "Available information suggests that at the very

17    least, Viewstar, LLC obtained two mortgages," of the amounts

18    that I just read, "for a total of $12,192,802 from Sterling

19    National Bank, and possibly a third mortgage," and then it goes

20    on.  Is that, I mean——

21         MS. HARRIS:  Yeah, exactly, and there's a sentence

22    referring to quote-unquote excess mortgage amount.

23         THE COURT:  Why don't we strike that sentence above

24    and instead add a sentence that reads, "Mr. Abraham, through

25    Viewstar, LLC, bought the property with an existing $15,592,802

O951ABRS

1   mortgage on it, with a loan assumption agreement to pay down

2   the existing loan to $12,600,000.  He also took out an

3   additional loan from the seller of $4.2 million."

4          MS. HARRIS:  That's fine, your Honor.  I would just

5   ask that the next sentence that starts, "It is unlikely," that

6   the excess mortgage amount be stricken as well since there is

7   no proof of an excess mortgage amount.

8          THE COURT:  Okay.  All right.  I'll take that out.

9          Just the next sentence.

10         MS. HARRIS:  Correct.

11         THE COURT:  Okay.  All right.  And then paragraph 105.

12  From the defense perspective, this incorrectly suggests that

13  Mr. Abraham did not indicate how he covers a monthly shortfall

14  of $3,697.43, which does not include mortgage payments and

15  arrears.  What about taking out the first sentence and instead

16  saying, "Mr. Abraham has a monthly shortfall of $3,697.43,

17  which includes mortgage payments in arrears totaling

18  $135,511.74"?

19         MS. HARRIS:  That's correct, Judge.

20         THE COURT:  Okay.  So that's what we'll do.

21         All right.  And I think all the other objections, as I

22  understand it, were ones that related to guidelines issues.

23  And I'll then therefore rule on them later.

24         Is there anything else I'm missing, any kind of

25  smaller items?  Line items?

O951ABRS

1          Okay.  All right.  So with those amendments, I'm going
2    to adopt the factual findings in the report.  The presentence
3    report will be made part of the record in this matter and
4    placed under seal.  If an appeal is taken, counsel on appeal
5    may have access to the sealed report without further
6    application to the Court.

7          It's possible that I'll make further factual findings
8    today, but that is my ruling as of now.

9          So Mr. Abraham, when you pled guilty, we discussed the
10   federal sentencing guidelines.  The guidelines are contained in
11   a book that looks like this, for all of you that are here.  The
12   guidelines are a set of rules that are published by United
13   States Sentencing Commission and they're designed to guide
14   judges when they impose sentence.  At one time the guidelines
15   were mandatory, meaning judges were required to follow them.
16   The guidelines are no longer mandatory, so judges are not
17   required to follow them, but they are required to properly
18   calculate the guidelines and to consider the guidelines.

19         So I have a couple questions that I want to ask at the
20   outset, and then I want to hear you out on guidelines issues,
21   and then, as I said earlier, then maybe we'll take a break.

22         So as an initial matter, I have a question for the
23   government.  So in Exhibit 6A——I don't know if you need a
24   minute to get that out——under the column Amount Amazon Paid
25   Defendants, some of the entries had two line items.  And I just

1    want to clarify that the top line item refers to the amount the

2    defendant invoiced Amazon, and the second line refers to what

3    Amazon actually paid the defendant.

4         MS. KAMAL:  Correct, your Honor.

5         THE COURT:  Okay.  And when there's only one line

6    item, is the amount invoiced and the amount paid the same?

7         MS. KAMAL:  Yes, your Honor.

8         THE COURT:  Okay.  Thank you.

9         So next, for the government, can you respond to

10   defendant's argument that nearly $800,000 of transactions were

11   included in Exhibit 7A even though the purchase listing was

12   changed before Amazon issued the purchase order?

13        MS. KAMAL:  I can address that, your Honor.  It may be

14   something that is also addressed at a later point in time, to

15   the extent we get in front of a magistrate on these issues.

16        THE COURT:  Okay.

17        MS. KAMAL:  But my understanding is the following:

18   The defendants were able to manipulate the purchase order

19   system in various different ways and at various different

20   times, and some of that is reflected in the WhatsApp messages

21   that the government submitted.

22        So for instance, sometimes the fraud was as simple as

23   confirming a purchase order, changing some of the terms,

24   changing some of the information relating to the listing

25   thereafter, and shipping goods that conformed to the modified

O951ABRS

1    listing.  Sometimes the fraud consisted of resubmitting old

2    purchase orders or submitting goods pursuant to

3    already-fulfilled purchase orders, and in those instances, what

4    the dates would reflect in the underlying Amazon records is

5    that a purchase order was issued on date one, right, it would

6    be confirmed on date two, it would be shipped, in compliance,

7    on date three.  And then it would be modified on date four.

8    And then on date five, another shipment, an overshipment of

9    those goods would be submitted by the defendant, meaning that

10   after having sent in a conforming shipment in response to a

11   purchase order, the defendant would then edit the product page

12   after he had already fulfilled the purchase order, and send in

13   an overshipment of modified either goods in terms of units or

14   price or what have you, and that is what the government submits

15   occurred in those instances, in the instance that the defense

16   has pointed to.

17            THE COURT:  Okay.  Can you respond to the defendant's

18   argument that entries No. 2 and 30 should not be included.

19   That was in the July 10th letter.

20            MS. KAMAL:  If I may have a moment, your Honor.

21            THE COURT:  Yes.  For sure.

22            MS. KAMAL:  I'm sorry, your Honor.  I'm looking at

23   their July 10 submission and I'm not finding the precise

24   argument you'd like me to respond to.

25            THE COURT:  11-12.  And let me get it out as well,

O951ABRS

1    because this is just from my notes.

2            So they address item 30 at the bottom of page 11 of

3    that July 10th letter, but let me just——so it's——the last full

4    paragraph addresses No. 2, and then the next paragraph after

5    that at the bottom of 11 addresses item 30 on 6A.

6            MS. KAMAL:  Your Honor, I had reviewed all the

7    listings in 6A.  I reviewed it with counsel for Amazon.  It is

8    not clear to me what defense counsel is referring to here.

9    Often, in some of the spreadsheets, the confusion that can

10   arise is that the same item will be——the same item will be

11   ordered multiple times, and as I just described for the Court a

12   moment ago, one purchase order for a particular product could

13   then be satisfied more than once and multiple times.  So with

14   respect to this specific example, which I can review for the

15   Court at a break if it would like, my recollection here is that

16   there were multiple orders for this particular item and this

17   purchase order and when the spreadsheets are sorted by purchase

18   order and by product, the resulting overshipment is——can be

19   seen.

20           THE COURT:  All right.

21           MS. KAMAL:  I'm happy to review that again at the

22   break, your Honor, if helpful.

23           THE COURT:  All right.  One other question for the

24   government.  And then I have a few questions for the defense,

25   and then I'll hear you, generally, or if you want to respond to

O951ABRS

1    the questions I've asked.  I just want to get a better handle

2    on the length of time Mr. Abraham was engaged in this conduct.

3    So in one of your submissions, you state that Mr. Abraham's

4    text messages with his co-defendants made clear that he engaged

5    in this conduct for six years, and that the indictment charges

6    conduct for three years.  2017-2019.  Exhibit 4A, however,

7    largely seems to rely on conduct occurring in 2017 and 2018.  I

8    mean, my understanding is that the 6-year period comes from one

9    of the text messages, which is——which reads that "Amazon didn't

10   change today.  They keep changing for the past six years that

11   I'm doing it.  So far we figured out some good shit.  I'm not

12   worried."

13         So I just wanted to get any more color you can provide

14   on how long he was engaged in this conduct.

15         MS. KAMAL:  Certainly, your Honor.  The conduct

16   reflected in the indictment is just a slice of the misconduct

17   and, frankly, fraud that the defendant has engaged in against

18   Amazon.  So he first opened vendor accounts and seller accounts

19   for Amazon either beginning I believe in 2015 or '16.  Those

20   earlier vendor and seller accounts were shut down by Amazon

21   before the time of the charged period in the indictment, either

22   for counterfeit or for other suspected fraud.  So the defendant

23   had been a seller or an online retailer for that entire 6-year

24   period.  For the specific mix, let's call it, of deceptive

25   practices charged in the indictment, the government focused on

O951ABRS

1    particular vendor accounts and particular transactions.  And

2    the government would submit here that this is why the

3    defendant's own words in the WhatsApp chain with his close——I

4    mean, his co-conspirators and co-defendants but really his

5    close family, really should guide the Court's analysis of his

6    intent and his awareness of his wrongdoing.  With them, he is

7    clear and open about what he is doing and why he's doing it.

8    And so to the extent that he speaks——he is speaking in 2018

9    about his fraudulent conduct——the government submits that that

10    is representative of his intent and his practices over the

11    preceding time of his commercial relationship with Amazon, and

12    we would submit that it's corroborated by the overshipping and

13    the——the overshipping that goes all the way back to 2017 and

14    the beginning of the charged period.

15            THE COURT:  So when was that text sent about the six

16    years; is that 2018?

17            MS. KAMAL:  I believe so, your Honor, because——and I

18    would have to go back and look at the date of the particular

19    text.  It should be——it's in the government's submission.

20            THE COURT:  Right.

21            MS. KAMAL:  But yes.  And that simply reflects the

22    fact, your Honor, that, you know, when the government only got

23    access to the defendant's devices via the seizure of his

24    cellphones and a search thereof.  And so what we had were the

25    communications available on the device, because WhatsApp is an

O951ABRS

encrypted messaging app.  What we were able to access at that

particular time, that did not cover his communications for the

entire course of conduct, but it described what he had been

doing and how he had been defrauding Amazon throughout his

time.

THE COURT:  So just walk me through that a little bit

more.

MS. KAMAL:  Sure.

THE COURT:  Do you have any of his WhatsApp—I'm going

to use the wrong word, I'm going to say WhatsApp text or

WhatsApp message or whatever it is—from 2017, before he filed

the purchase agreements?

MS. KAMAL:  I want to—

THE COURT:  The vendor agreements.

MS. KAMAL:  I need to pause for a moment here, your

Honor, because our—the evidence available to the government of

his communications with his brothers using WhatsApp are limited

by the time period of the search warrant.  So were there texts

prior to 2017 when he was reviewing the vendor agreements, or

discussing his—how he engaged with Amazon with his

co-defendants?  There may be.  But those were closed off from

the government's view.  So from the government's point of view,

we have, and we rely upon as our evidence here, his text

messages from the relevant period.  But I do believe, your

Honor, because I have this memory of having to adjust the dates

O951ABRS

1  viewable to the government, I have the memory that there are

2  date——there are text messages that predate 2017.  I just don't

3  remember whether that was within the period authorized by the

4  government's search warrant.

5          THE COURT:  Such that you were able to review it.

6          MS. KAMAL:  Exactly.  So we obviously tried to——we

7  comply with our search warrants.

8          THE COURT:  No, no.  Of course.  Okay.

9          All right.  So Ms. Harris, do you want to respond to

10 any of that?  And then I have a few questions for you.

11         MS. HARRIS:  Just briefly, your Honor, because

12 obviously some of these issues touch upon bigger themes that I

13 can talk about at greater length.

14         With respect to chart 6A and the math problems, the

15 repeated revisions, you know, we started out with one version

16 of the chart; after we raised objections and corrections, we

17 have another version, it went down by 2 million, or close to

18 3 million, our position——and I'm happy to expound upon this at

19 the right time——is that the errors that we pointed out——some of

20 them are math errors, some of them are issues about whether or

21 not the conduct was fraudulent——go to the reliability of all of

22 that data.  And I have reasons and other arguments around that,

23 but I can circle back to that at the right time.

24         The issue with respect to time frame, your Honor, I

25 think is important, and it's one of the issues sort of I zeroed

O951ABRS

in on to come to court here today.  And what our paralegal did

just before court was to filter the POs that——on all these

spreadsheets that we're talking about that were produced in

discovery and filter them for the earliest possible date; what

was the first PO that was at issue here, relating to the

entities that our client was associated with from vendor——as a

vendor.  And the earliest PO we found was from January 2018, in

the government's discovery.

Now the invitation to become a vendor dates back to

2017, July 2017.  I think our client remembers having dealings

in late 2017 with Amazon.  So there may be some late 2017

vendor dealings with Amazon.  But the time period here from

when they started as a vendor couldn't have been before July

2017, because that's when there's clear——that's when they were

invited to be a vendor.  From 2013 on——

THE COURT:  All right.  And the date that the first

vendor——

MS. HARRIS:  The first PO, the first purchase order

that shows up in——

THE COURT:  Yeah.  January 2018, is that what you're——

MS. HARRIS:  That's what we found.  I'm noting we

might be wrong because our client remembers having some

dealings toward the end of 2017 as well, but we're in a time

period so I'm going to say late 2017.

THE COURT:  I thought I had seen some at the end of

O951ABRS

1    2017.  But I'll confirm that.

2            MS. HARRIS:  I'm conceding.  We're saying like it's

3    either late 2017 or early 2018.  I don't think there's a huge

4    difference, right, between——our client was, prior to that,

5    beginning in his very early 20s, your Honor, and we describe

6    sort of how he——he came to this.  He was a seller for Amazon

7    and operated multiple seller accounts and used the platform to

8    sell items.  There is not a shred of evidence that's been

9    presented in this case with respect to illegal conduct.  I

10   mean, there were things said by the government just now about

11   like fraud and counterfeit and this and that and the other.

12   There's no evidence in the record about criminal conduct

13   associated with the seller accounts.  And that's not part of

14   this case.  And it's not before your Honor as a sentencing

15   factor because it just——there's no evidence presented, there's

16   nothing in the PSR about it.  So for us, your Honor, and I

17   think from our perspective, it is significant, and the evidence

18   is consistent with the fact that this is not——this is barely a

19   year.  This is from late 2017 to November 2018 when the conduct

20   that the government complains about is at issue.

21           Now with respect to the WhatsApp chats, your Honor,

22   this, as I understand it——and I know this case is a long time

23   span at this point, but they seized the entire chat.  It's a

24   group family chat.  There were other brothers involved in this

25   chat.  The chat covered a variety of personal matters separate

O951ABRS

and apart from anything connected to Amazon.  It was dated back
to 2010.  They obviously had a warrant and produced responsive
materials that were within the bounds, as Ms. Kamal indicated,
within the bounds of the warrant, and we have the stack of
WhatsApp chats that were produced, that they begin in 2018,
that were responsive to their warrant, as I understand it.  So
I don't know, I don't think we have before us today whether
there was a time——I would imagine that the warrant would have
been coextensive with the indictment, i.e., that it might have
covered the span charged in the indictment, 2017, 2019, or
whether it was only limited to 2018, or that was the only——that
was when there were responsive chats that related to the
offense conduct that began in 2018.  Regardless, we have a lot
about the chats.  Our client, again, was in his early 20s, has
a very particular personal background, educational challenges,
and is deeply ashamed at some of the language he used, and is
ashamed of his conduct in this case.  But I think the evidence
of those, it's a bunch of brothers in their 20s talking, you
know, a lot of——

          THE COURT:  How to defraud Amazon and wishing, you
know, not just out of greed but out of a desire to harm Amazon
and Jeff Bezos.  I think that's what the chats make clear, and
you're not going to convince me otherwise.

          MS. HARRIS:  Understood, your Honor.  And I'm not
trying to minimize them, but I'm also saying, they have to be

O951ABRS

1    lined up with the actual conduct, and so they can talk about

2    six years and what happened over six years, but there's no

3    evidence of any criminal conduct other than their role as

4    vendors, which, at the very earliest——because that's when the

5    vendor agreement was signed and entered into——was in July of

6    2017.

7                THE COURT:  Yes, please.

8                MS. KAMAL:  Very briefly, your Honor.  I can direct

9    the Court to Exhibit 4A, column M, which is confirmation date,

10   time.

11               MS. HARRIS:  Can I just ask, is it possible to put it

12   up on all the screens?

13               THE COURT:  Please.  Thank you.

14               MS. KAMAL:  So this is the overage spreadsheet.  And

15   these are the vendor accounts.  And I have now sorted column M

16   up here.  I sorted it from oldest to newest, right?  And the

17   earliest vendor order is February of 2017.  And respectfully, I

18   could also expand this to 2016.  Because there are orders.  Now

19   understanding that's outside the date of the charged period,

20   your Honor, but for the purposes of determining when the

21   defendant opened a vendor account and when he began engaging in

22   this conduct and as a vendor, I can sort this again, and we can

23   all take a look.

24               And this shows April of 2016 is the first——is when he

25   first confirmed and began to ship under the vendor code for YSA

O951ABRS

1    sales.

2              THE COURT:  So a vendor agreement was signed in

3    July 2018.  Was there a different vendor agreement signed

4    earlier?

5              MS. KAMAL:  Many vendor agreements, over a long period

6    of time.

7              THE COURT:  Okay.

8              MS. KAMAL:  And if the Court wants to ask questions of

9    counsel for Amazon, they are here and present, but it's my

10   understanding, your Honor, that in order to even open an

11   account—so before this YSA Sales can be confirming a purchase

12   order on April 2016, he has set up an account online, he has

13   agreed, he has received a vendor agreement, he has returned it,

14   it has been confirmed, he has received, as we all know, the

15   terms and conditions that come with engaging on a third-party's

16   online platform, and that is really when the commercial

17   relationship with Amazon, the vendor relationship that is

18   supposed to be guided by the vendor agreement and the vendor

19   manual, that's when it is beginning.

20              And so while I understand the Court's questions and I

21   understand the defense pointing to the fact that these

22   communications are later in time in 2018, I think the Court

23   should really be guided here by the defendant's own words.  "I

24   have been engaging in commerce with Amazon for at least six

25   years."  This is the mix of deceptive practices I'm engaged in

O951ABRS

right now, and as we see from the underlying evidence here,

which is the vendor code associated with purchase orders and

payments made thereunder, that began in or around 2016.

MS. HARRIS:  Your Honor, could I just——while we have

this chart, I just want to note a couple things.

One is, if you look at these first entries in 2016 and

2017, there is essentially no overshipping recorded in these

transactions.  You see amount, you can just see the title.

Sorry.  If the government could, with the headers.

No, no.  The header.  Just go back up.  You adjusted it down

slightly.

MS. KAMAL:  Sorry.

MS. HARRIS:  So——and the amount ordered, we get

shifted slightly to the right.  Yeah, the amounts ordered and

received are the same.  The overage cost is 00000.  There is no

criminal there, no overshipping in these.  And the very first

time that there starts, exactly.  We were about to point out,

the very first time that we——there's——any overshipping

indicated is in September of 2017, which is consistent with my

client's recollection that I just proffered to the Court that

it started happening in late 2017.  Prior to, there was a

vendor.  The only time the vendor agreement was signed, as we

understand, and what the record issues, to our understanding,

is July 2017.  There was a system to be quote——something called

Vendor Express, which is like outside of the vendor platform

O951ABRS

1    and vendor central, and there's no overshipping even feasibly

2    possible under that system.  So again, you can——there are

3    entries here, but the first entry where there's any overage

4    costs, and it's very small, I would note, it's the kind

5    of——exactly the kind of de minimis overshipping, at least bare

6    minimum that the policy——that we can all agree that the Amazon

7    policies would contemplate.  I think if you keep scrolling

8    down, I'm seeing the same, not significant overage costs really

9    until later in 2017 and going into 2018.

10        So again, I maintain very firmly, your Honor, that

11    we're not minimizing the conduct.  We're not trying to say it

12    was all an accident.  It's all wrong.  Even though we have a

13    legal dispute about some of it, he admits, we admit that it's

14    wrong.  At bare minimum, it's unethical and it shouldn't have

15    been done, and he's going speak to that.  I'm going to speak to

16    that further.  But in terms of the extent of the conduct, to

17    even think of it as a multi-year scheme or a six-year scheme

18    certainly is simply wrong, and not supported by the evidence.

19        THE COURT:  In any event, the indictment covers 2017

20    through 2019.  So it's——

21        MS. KAMAL:  Certainly, your Honor.

22        THE COURT:  Okay.  All right.  So as I see it, there

23    are three main disputes regarding the guidelines range and

24    applicable enhancements: one, the use of intended loss instead

25    of actual loss; two, whether defendant's overshipping conduct

O951ABRS

1    should go towards the loss amount; three, what spreadsheets to

2    rely on in calculating loss; four, whether there's sufficient

3    evidence of counterfeit and gray market goods, and whether

4    counterfeit goods fall within defendant's offense of

5    conviction; and five, whether the sophisticated means

6    enhancement applies.

7              So I've obviously read your briefs, so don't feel like

8    you need to reiterate anything in particular, but if you want

9    to be heard further on any of those issues or if I'm missing

10   something with respect to the guidelines calculation, why don't

11   I hear you out now, and then, as I said, we'll take a short

12   break and then I'll rule on that calculation, and then I'll

13   hear the parties with respect to what sentence is appropriate.

14             MS. HARRIS:  Just for clarification?  I'm sorry.

15             THE COURT:  Yes.

16             MS. HARRIS:  It was five or six items?

17             THE COURT:  I had five, but I think my No. 4 was

18   lengthy.

19             No. 4 is whether there's sufficient evidence of

20   counterfeiting gray market goods and whether counterfeit goods

21   fall within defendant's offense of conviction.  So it's all

22   about counterfeit goods and gray market goods.

23             MS. HARRIS:  Thank you.

24             THE COURT:  All right.  Who would like to be heard

25   first?  Does the government want to be heard?

O951ABRS

1              Why don't I actually hear from defense counsel,

2   because you're really making the objections to the presentence

3   report and the calculation proposed by the government.  And

4   then—

5              MS. HARRIS:  And would it be okay if I started with

6   overshipping, your Honor?

7              THE COURT:  Yes, absolutely.

8              MS. HARRIS:  It makes a lot of sense because, frankly,

9   the intended loss issue is different.

10             THE COURT:  Understood.

11             MS. HARRIS:  And your Honor, just as a preliminary

12   note, I know that a lot of the sentencing proceeding is going

13   to be taken up with these legal issues, with questions about

14   loss and spreadsheets, and I don't want it to detract from what

15   I think is probably the most important driving force of the

16   sentencing, which is that Yoel has accepted responsibility

17   fully and taken—is holding himself accountable for his

18   conduct.  And I just want to say two words about that.  I know

19   I'll talk more about it later.

20             He pled guilty to the indictment here, as your Honor

21   knows, to every charge, and he factually does not dispute the

22   core bones of what happened here.  Unlike other kind of *Fatico*

23   hearing situations, where we're trying to actually figure out

24   what happened in the case, this is not what his position is.

25   He admits to all of his conduct.

O951ABRS

1          He's also forgone——even though we are here after

2     multiple amounts of briefing, we want to note, like his

3     brothers, he's forgone significant litigation in the case.  He

4     withdrew his motion to suppress WhatsApp messages.  As your

5     Honor knows, they gained access to the phone through a warrant

6     of seizure at the border, a significant issue which was

7     recently addressed in the Eastern District.

8          But more than just an agreement about the facts, I

9     think it's important to flag just how much Yoel Abraham is

10    holding himself accountable.  And I mentioned this a minute

11    ago, that even as to overshipping, he's not here to rationalize

12    or justify it or say it was okay.  Even though we have legal

13    disputes about whether or not it constitutes wire fraud under

14    the statute, we're not here seeking a blessing from the Court

15    that this was an okay or a permissible practice to engage in.

16         We're going to talk about it later, but I think the

17    core of the sentence——and no matter what the guidelines

18    ultimately are——should focus on how much he has worked to

19    better himself over the last number of years.  He has steady

20    employment.  He's engaged in a variety of charitable activities

21    and I think, most importantly, has really turned inward through

22    therapy, through the evaluation that we had one of the——a

23    doctor do with spiritual advisors, to improve himself and the

24    way he thinks about his choices in life and the way he orients

25    himself in the community.  Simply put, he has grown up, and he

O951ABRS

```
 1    is a changed person.  So I don't want to lose——we've dug into

 2    this, and I don't want to lose sight of that, because at the

 3    end of the day, no matter what the guidelines are, there are

 4    significant grounds for a very substantial variance in this

 5    case and for a noncustodial sentence.

 6         But I want to address the Court's questions first

 7    because I know those are important starting places.

 8         With respect to overshipping, I just want to note,

 9    before we dive into the legal issues, I think it's clear that

10    there's no actual loss associated with overshipping, or none

11    that's been proffered certainly to the Court.  As the

12    government has conceded in its June 5th submission, Amazon did

13    receive certain goods and was able to resell them in many

14    instances.  So all of the supplemental——the government for

15    guidelines purposes is arguing about intended loss with respect

16    to overshipping, and Amazon, in its victim impact statement, is

17    limiting its restitution claim to what they claim are actual

18    losses associated with product substitutions.  So when we're

19    talking about overshipping——and I can break down the numbers

20    and show you some slides about it——there's not——there's no

21    actual loss.

22         But the key issue for us is legal.  Was there

23    deception or was there a false statement that would satisfy the

24    requirements of wire fraud under the *Connolly* decision in the

25    Second Circuit.  Paragraph 27 of the PSR makes it clear, the
```

O951ABRS

1    Abraham brothers invoiced Amazon for those goods in the

2    quantities they shipped.  That's part of the PSR.  They

3    submitted invoices that truthfully told Amazon exactly what the

4    quantity was that they shipped.  And I'm now talking about here

5    overshipping, because of course he's accepted that product

6    substitution, when you manipulate products listings and deceive

7    Amazon about what the product is that you're actually shipping

8    them, whether you do that with respect to the product or the

9    units, that's fraud.  But with respect to just pure

10   overshipping, they asked for 20 toothbrushes and you send them

11   2,000 toothbrushes, when the invoice says——

12           THE COURT:  Can I just back up for just one second.  I

13   just pulled up his allocution, and his allocution is all

14   focused in 2018.  He says, "In 2018, I agreed with another

15   person how to obtain money from Amazon by making false requests

16   from Amazon.  I received purchase orders from Amazon for

17   certain products.  I then requested that Amazon change its item

18   information to a different product for a better customer

19   experience.  This was false.  By doing so, I obtained certain

20   money from Amazon for products that were not the products they

21   ordered.  After I received the money from Amazon, I transferred

22   some of it between accounts that I held in my own name at

23   different banks.  The amounts exceeded $10,000.  I knew what I

24   was doing was wrong, and I deeply regret my actions."

25           So just to your point about accepting responsibility,

O951ABRS

1    is that all he's admitting that he did that was illegal, just

2    in 2018, that limited conduct?

3        MS. HARRIS:  Yes, but there's a colloquy that follows,

4    your Honor, where I make clear that he's also factually——he

5    factually agrees that he overshipped, and I represented that

6    and he agreed, I think in response to the Court's question,

7    that there's no dispute about the fact of overshipment, and I

8    make clear that at sentencing we were going to be doing

9    precisely what we're doing now, which is request a legal ruling

10    from the Court.  So what we agreed was a legal basis for the

11    plea was the fact that he changed product listings in a way

12    that was deceptive vis-à-vis Amazon and——excuse me.

13        And yeah, in fact, Mr. Biale is correcting, or

14    supplementing my information.  I think if the allocution goes

15    on in response to questions, it's actually not just me who gave

16    you that statement but he then also allocutes——

17        THE COURT:  You're right.  He says, "I overshipped

18    products to Amazon.  What I mean by overshipped is that Amazon

19    ordered and reordered certain items on a regular basis, and I

20    sent them those exact items but in amounts exceeding what they

21    ordered.  I then accurately invoiced Amazon for the amounts I

22    shipped, including overshipped items, and Amazon paid for some

23    of those purchase orders.  Again, I deeply regret my actions."

24        MS. HARRIS:  Exactly, your Honor.  So factually, we

25    agree, and that's consistent with the PSR.  His statement that

O951ABRS

the invoices——and I think there's no dispute, the invoices did

accurately list exactly the quantities of the items that were

shipped.  And Amazon did not pay until there was proof of

delivery and they had the invoice.  So there is no deception

about the quantities that they received.  And without

deception, I mean, it could be sharp business practices, it

could be unethical, it could be wrong, but *Connolly* is very

clear that the federal criminal statutes don't reach all

dishonest or despicable I think behavior.

         And I think when you talked about the time frame, your

Honor, a minute ago with respect to 2018, he wasn't trying to

be like minimizing, or limit the extent of his conduct.  The

product substitution conduct, which was what we believe to be

the core criminal conduct here, that did begin in 2018.  The

overshipping, as I just noted and as we represented to the

Court, did begin in late 2017, in September, but that is why

that particular date was in the allocution.

         THE COURT:  Okay.

         MS. HARRIS:  So, your Honor, we have a lot of

back-and-forth, and there's a lot of ink spilled about was

there some other deceptive conduct that would have been——that

could be a basis for a criminal violation here.  You know, we

all agree that the invoice accurately stated the quantities.

         The government makes much, like——talks a lot about the

purchase order, what does it mean when the defendants in the

O951ABRS

1    vendor portal system accepted a purchase order, what does it

2    mean when they signed the vendor agreement.  Both of those I

3    think are red herrings, for the following reasons:  The sample

4    POs that we attach——and these were only the ones that we

5    received in discovery, because our client didn't have access to

6    the vendor central program anymore——are attached as Exhibits A

7    and B to our July 10th letter, when you see them——and I can

8    pull them up on the screen——they actually have a separate line

9    for items received.  So there is what they ordered, the

10   purchase order, what was accepted, and then there's a separate

11   line item.  I think we have the——

12            THE COURT:  I have it, but you should put it on

13   anyway, if you have it available.

14            MS. HARRIS:  Okay.  We're good.

15            This is just an example.  It shows a slightly

16   different amount received.  It's not a huge overshipping

17   example.  But it shows that the purchase order, which they're

18   not static documents, they can be updated, and we confirmed,

19   even after being initially accepted, but it has a separate line

20   item that tracks the amount received as an amount that can be

21   different from the amount submitted and the amount accepted.

22   And in fact, the vendor agreement itself says that the "terms

23   specified in the purchase order confirmations are not binding

24   unless agreed to in writing by both parties."  So this purchase

25   order doesn't make any representations about the amount.  Like

O951ABRS

it's not——it doesn't represent any kind of legal promise or
statement about the amount that will actually be shipped.  The
way the form itself is configured contemplates that the amounts
received——*i.e.*, the amounts shipped——could be different, and in
this example are different by a small amount, than the amount
accepted.

        And in fact, the policies in the vendor manual and
policy——and the policy called the chargeback policy——the vendor
manual was Exhibit 3 to the government's sentencing submission,
and the chargeback policy was Exhibit H to our
submission——actually contemplates——this is a direct quote from
the vendor manual.  It says, "In case you are shipping more
quantities than the ones you actually confirmed, a chargeback
for overage will be incurred.  Can also lead to ASN and receive
challenges, resulting in short payments."  The whole system was
set up in a way that contemplated that when you accepted a PO,
you might not ship the exact amount that's listed in the PO.
And there's no promise or representation, and there's no
contract that says you have to.  In fact, the vendor agreement,
the only thing in this case that could be construed as a
contract or legal agreement, says nothing about the quantity of
goods.  It contains no representation, no promise, I will only
ship the amount specified in the PO that I accept.  Rather, the
only provision——and this is in the section——I'm sorry.  There's
nothing in the representations, warranties, and covenants,

O951ABRS

          1    which is paragraph 3, but in paragraph 2——I'm sorry.  This is

          2    Exhibit 2 to the government's sentencing submission.  In

          3    paragraph 2, there's a provision that directs the vendors not

          4    to substitute goods; not to change units, not to substitute

          5    goods.  And many of the examples that the government gave when

          6    they were defending that this was illegal conduct, many of the

          7    examples they gave were in fact product substitution examples,

          8    which we admit is criminal, it is deceptive.  But just shipping

          9    200 toothbrushes or 2,000 toothbrushes instead of 20, when your

         10    invoice says, Dear Amazon, I just shipped you 2,000

         11    toothbrushes, please pay this amount, and then Amazon pays it,

         12    that is not wire fraud and should not be construed as wire

         13    fraud.

         14          The second, you know, the other argument, central

         15    argument that the government makes is essentially a fraudulent

         16    inducement, sort of fraudulent breach of contract argument that

         17    somehow at the time——I think there is a case in the Second

         18    Circuit that suggests you can use breach of contract to

         19    establish fraud if there's proof of contemporaneous intent, at

         20    the time you enter into the contract, that you're never going

         21    to abide by the contract.  First, as I just mentioned, there is

         22    no contract here that is breached.  There's no representation

         23    or promise that has been breached, whether or not it was

         24    entered into at the outset, whether——no matter what the state

         25    of mind was at any point in time.

O951ABRS

 1            THE COURT:  You mean with respect to overshipping.

 2            MS. HARRIS:  Exactly.  Exactly.  Again, we concede

 3    that product substitution is a fraud.

 4            Second, even if you were to look at the vendor

 5    agreement, which was entered into in July of 2017, there has

 6    been nothing in the record suggesting that they entered into

 7    that vendor agreement with the intent to overship.  For

 8    whatever reason, the WhatsApp messages we have are from 2018.

 9    There simply isn't that contemporaneous—the kind of evidence

10    that would be contemporaneous intent to breach the vendor

11    agreement at the time they're entering into it.  Again, the

12    vendor agreement doesn't say anything about overshipping, and

13    I'm here only litigating the overshipping point.  To the extent

14    they breached the vendor agreement with respect to product

15    substitution, they breached it, it was deceptive, it's fraud.

16    We're not arguing about that.

17            THE COURT:  Are you familiar with the circuit's

18    decision in the *Murtha* case?  I mean, in *Murtha*, the Second

19    Circuit rejected a defendant's argument there was insufficient

20    evidence to conclude that he had fraudulent intent from the

21    outset of his agreement, in that case it was with the victim,

22    and that his subsequent conduct involving mere breaches of

23    contract was not sufficient to establish this fraudulent

24    intent.  I'm just quoting what defendant's argument is.  It's

25    Case No. 19-3492, docket 31 at 77.  In any event, the Second

O951ABRS

1    Circuit nonetheless considered the defendant's conduct that

2    occurred later in time, and in lights of that conduct, the

3    court found that there was sufficient evidence to infer

4    fraudulent intent at the commencement of the arrangement with

5    the victim, and noted, among other things, that there's rarely

6    direct proof of fraudulent intent.

7            And so why can't I infer that from circumstantial

8    evidence in this case?

9            MS. HARRIS:  Your Honor, I don't think I'm saying you

10   could never look at subsequent conduct whenever a court or any

11   fact-finder looks for state of mind, obviously, it's almost

12   always circumstantial.

13           But here, first of all, again, with respect to

14   overshipping, there is no contract that he is breaching, right?

15   There is no fraudulent inducement of a contract because there

16   was no representation with respect to overshipping that he

17   entered into and that Amazon relied upon.

18           THE COURT:  Okay.  I just want to be clear.  I think I

19   didn't give a cite that was very helpful.  It's 803 Fed. App'x

20   425 at 427.  In any event, I hear your point.

21           MS. HARRIS:  I think, obviously, I can look at the

22   specific evidence, you know, in that case and we could compare

23   and contrast, but I'm not prepared to do that right now.

24           THE COURT:  Yes.  That's not necessary.  Thank you.

25           MS. HARRIS:  The other issue——there's a second legal

O951ABRS

1    reason, your Honor, and that's sort of third――it's more our

2    argument about why it is not sufficient to establish

3    overshipping, is not――doesn't constitute wire fraud, is that

4    under the *Shellef* and *Regent Office Supply* line of cases, your

5    Honor, that as to overshipping, Amazon essentially got the

6    benefit of the bargain.  It paid for 5,000 toothbrushes――it

7    paid for 200 toothbrushes, it got 200 toothbrushes.  There's

8    no――there has to be, under that line of cases, an intent to

9    deprive the victim of property, sort of the mirror image.  The

10   defendant has to intend to get property, cheat.  It's not just

11   about getting property; it's about fleecing or cheating the

12   victim.  Here, where there's an invoice that says, we're

13   shipping you 2,000 toothbrushes, you get 2,000 toothbrushes,

14   and you pay for 2,000 toothbrushes, there's no actual

15   deception, and no property that's been wrongfully taken from

16   the victim.  So that's independent ground to find that it's

17   insufficient to conclude that that conduct is wire fraud.

18           THE COURT:  Do you want to respond to the government's

19   argument that if Amazon wanted to purchase a vastly higher

20   quantity of goods, it could have negotiated a lower price?

21           MS. HARRIS:  So your Honor, you know, I looked at that

22   argument before coming, and I think it's premised on an

23   assumption, which is a false assumption in this case, an

24   argument.  For that argument to work, it's that Amazon was

25   duped somehow, that it didn't know that it was paying for

O951ABRS

1    2,000.  But, I mean, what some of the correspondence——and it

2    comes up in some of the WhatsApp chats later——is that sometimes

3    they demanded proof, they demanded proof of delivery, there had

4    to be proof of delivery before they would actually pay on an

5    order, because they were worried sometimes about undershipment,

6    right?  So they were demanding proof of delivery.  They were

7    getting the invoice with the actual amounts indicated.  So it's

8    hard to understand that they then paid——that they were——didn't

9    know what they were paying for.  I know that's the whole

10   premise of the government's theory in this case, that the

11   government argument, somehow they were tricked, right, into

12   paying for something they didn't want, and in quantities they

13   didn't want, and I have yet to understand, despite having the

14   discovery in this case, how they were tricked, how they were

15   deceived.

16        THE COURT:  Because they didn't catch it doesn't mean

17   that they weren't tricked.

18        MS. HARRIS:  But they have systems.  They're

19   demanding, as I just noted——and this is referenced in a

20   WhatsApp chat and it's referenced in their policies——a proof of

21   delivery.  They want to know what has been delivered, the

22   quantity that's been delivered.  And I don't understand, if

23   Amazon is only paying once they're invoiced and the invoice

24   says how much is in the box, so to speak, metaphorically, I

25   don't understand how a business is run that doesn't know that.

O951ABRS

1    That doesn't make sense to me.  And there's been actually no

2    factual proffer in this case about how they were deceived in

3    that circumstance.  Like, it was told to them, this is what

4    we're shipping.  And the POs have lists for what's received and

5    what's shipped.  And they paid that amount, and then ordered

6    more, of the same item sometimes.  So I think the government's

7    premise and the victim's premise that this deceived and tricked

8    Amazon is missing an important component, which is how they

9    were deceived.

10        And the benefit of the bargain issue, which I

11    understand──like I understand, okay, if you could buy 2,000,

12    maybe you'd buy from a different supplier that would have a

13    lower price, but that assumes they didn't know that that's what

14    they were paying for, and there's nothing in the record, other

15    than Amazon's say-so, that they were somehow deceived, that

16    that explains how they were deceived, given the facts that I've

17    just explained, and that, frankly, are not disputed.  It's in

18    the PSR.

19        So your Honor, that's our argument about overshipping.

20    It may make sense to do it in turn a little bit.  I'm happy to

21    answer questions, or if you want me to go on to the next piece.

22        THE COURT:  That's fine.

23        Does the government want to respond about

24    overshipping?

25        MS. KAMAL:  I do, your Honor.  And briefly, though,

O951ABRS

1    because the government did address most of this in its multiple

2    submissions.

3              I mean, look, your Honor, Ms. Harris began by saying

4    that the defendant, you know, is not here to, you know—he's

5    not trying to avoid responsibility, he's not trying to say that

6    it's okay.  He is, your Honor, trying to say that his deceptive

7    practices and his deceptive conduct were okay.  And it was—

8              THE COURT:  I think he's suggesting they were

9    unethical but not illegal is what I heard.

10             MS. KAMAL:  Well, your Honor, what I heard Ms. Harris

11   say was that there was no deception here.  And to be clear,

12   Ms. Harris and the defense have focused solely on whether there

13   was deception in the invoices themselves, but that is to miss

14   the forest for the trees.  Everybody here knows, the

15   defendant's text messages with his co-defendants and brothers

16   reflect they all knew Amazon's systems were flawed.  There

17   was—it was processing a tremendous volume of goods.  The speed

18   and the efficiency and the ease of that processing was the

19   value-add for customers and for vendors who entered into

20   long-term commercial relationships pursuant to contracts and

21   terms and conditions and vendor manuals, which are incorporated

22   by reference into the vendor agreement, and that was the basis,

23   that was the context in which the defendants were submitting

24   these invoices.

25             Now I can't speak to the screenshot that Ms. Harris

O951ABRS

1    showed where it reflected, you know, after the fact that this

2    amount was shipped and it was in fact in excess of the purchase

3    order.  What I can say and what the evidence reflects is that

4    when the Amazon worker in the warehouse received a

5    shipment——and recall one purchase order could be sent over

6    multiple shipments, and the defendants did that intentionally

7    to try to disguise the volume of goods that was coming in,

8    right?  When that occurred, that warehouse worker did not have

9    the benefit of——the system was not set up so that they had the

10   purchase order in front of them.  They would scan the barcode

11   item, they would see that the good in the box reflected the

12   good on the screen, and that was the basis for accepting the

13   payment.

14         Now Ms. Harris also made reference to the fact that

15   she doesn't understand how Amazon could have been confused or

16   defrauded here because, you know, they would send some items

17   into the proof of delivery channel, where payments were held up

18   because the delivery hadn't been approved.  Well, the very

19   reason Amazon sent those items into POD was because it was

20   receiving multiple shipments under stale purchase orders or

21   multiple boxes and different——and shipments at different times

22   for the same purchase order.  I mean, that's a reflection of

23   the fact that the defendants were intentionally trying to

24   further confuse Amazon's systems so that they could get their

25   goods received and issue payment.

O951ABRS

1          So that is just a little color I wanted to add on the

2     defense's claim that there's no deception here involved in

3     overshipping.

4          THE COURT:  Could you respond to the argument that the

5     vendor agreement doesn't make any promise with respect to

6     overshipping, that it addresses that you're not allowed to

7     substitute product but it doesn't say you're not allowed to

8     overship.

9          MS. KAMAL:  Certainly, your Honor.  And to help that

10    discussion, I'm going to ask Ms. Gavin just to hook us up,

11    because there's a relevant paragraph there that will help.

12         So as the Court can see, this is Exhibit 2 to the

13    government's first sentencing submission.  This is the vendor

14    terms and conditions.  And the first paragraph here is purchase

15    orders and pricing.

16         Okay.  There we go.  I'm just going to wait until

17    we're all on the same screen.

18         THE COURT:  While we're doing that, I have to tell

19    you, I have very short in-custody conferences at 4 and 4:30, so

20    we may need to take a break just so we don't keep the Marshals

21    and everyone waiting for that.  I apologize for that.  I didn't

22    realize this would go quite so long.

23         MS. KAMAL:  So your Honor, actually, if the Court and

24    counsel has Exhibit 2 in front of them, the vendor agreement,

25    or can pull them up.  I think we all have our copies with us,

O951ABRS

1    even if we can't get everyone on the screen——ah, okay.  No.

2    Now we have it.

3            So turning back now to Exhibit 2, which everyone is

4    now looking at on the screen, here, this first paragraph under

5    Vendor Terms and Conditions reflects Purchase Orders and

6    Pricing.  And this means that this agreement governs our

7    purchase of products from you.  And that sentence follows a

8    colon from Purchase Orders and Pricing.  So this paragraph

9    basically says, Purchase Orders and Pricing:  "This agreement,"

10   meaning the purchase order, "governs our purchase of products

11   from you."

12           And then it also——so the government submits that that

13   construction in this agreement makes clear, in conformity with

14   common sense, that the purchase order, which says the number of

15   goods and the price of the goods, controls the terms of the

16   transaction.

17           And then it says later, right towards the end of the

18   paragraph, four lines up, "The PO provides product prices and

19   payment terms and may include discounts or rebates."  And then

20   it says later, "Co-op, allowances, discounts, rebates, and

21   other funding, to the extent not reflected in the PO, will be

22   set forth in program policies or separate agreements, each of

23   which is incorporated into this agreement.  And prices include

24   any commissions or other charges unless otherwise noted."

25           Two things here, your Honor.  The first one is that

1    the construction of this paragraph reflects that the agreement,

2    the agreement that governs the purchase of products is the

3    purchase order.  It's not the invoice.  The invoice is just

4    reflecting what happened after the fact.  And second, it makes

5    express notice that when it comes to issues such as pricing,

6    there are program policies and separate agreements, such as the

7    vendor manual, that are incorporated by reference here.  And

8    all of this, your Honor, comports with the common-sense notion

9    that the purchase order has that—why bother having a purchase

10   order at all if the defendant was free to charge and ship to

11   Amazon any amount of goods that it wanted?

12        And that brings me directly and very briefly to the

13   benefit of the bargain argument.  Your Honor, there is no

14   benefit here to this bargain.  To be sure, Amazon may have

15   gotten 7,000 toothpastes, or toothbrushes, but the price that

16   Amazon paid for those 7,000 toothbrushes is not the same price

17   it's going to pay for 48 toothbrushes.  And that, again, your

18   Honor, is common sense here.  It destroys the economics of

19   these transactions when the defendant inflates the numbers and

20   then ships vast quantities beyond what the defendant wants.

21        And I would finally just say, on this particular

22   point, whether it's the *Murtha* case or the *Shellef* case, given

23   the course of the commercial relationship between the parties

24   here, given Mr. Abraham's long familiarity with Amazon, the

25   fact that he was aware of its policies, the vendor manual was

O951ABRS

1    found—which expressly states, "You may not edit product

2    pages," and "you have to conform to quantities in the purchase

3    order," all of that was found on his device.  He was well aware

4    of this, and his communications with his co-defendants well

5    established this.

6            So the government submits it's really not a close

7    call, that in this context, the way it was practiced by these

8    defendants overshipping was fraud.

9            THE COURT:  All right.

10           MS. HARRIS:  Just very briefly, your Honor.  Two

11   things.

12           The reference to the purchase order containing the

13   payment terms, when we go back and look at the payment terms on

14   those purchase orders, they refer to the invoice.  They say

15   payment method, invoice, and then provide terms like discount

16   if paid within a certain amount of days and net due within a

17   certain amount of days.  There's nothing that's linked to the

18   purchase order, and the payment terms actually seems to

19   incorporate by the face of it the invoice.

20           The second thing is the manual, and I think this is

21   critical.  To the extent there is an incorporation of the

22   manual, which is really just a collection of policies, the

23   manual contemplates overshipping, contemplates that there will

24   be shipments different in quantity than the amount in the

25   purchase order.  I quoted the language already, but just to

O951ABRS

1    remind the Court, it begins, "In case you are shipping more

2    quantities than the ones you actually confirmed, a chargeback

3    will issue," etc.  And that goes to our central point that we

4    made in one of our submissions.  This was a contemplated event

5    that could happen under the terms of the contract, and the

6    terms of the contract provided for economic remedies that

7    Amazon could use to account for whatever costs would be

8    associated with that overshipping.

9              And the irony here is, your Honor—and this is a very

10   important point that goes to the heart of what is an

11   appropriate punishment here—is that they did use those

12   remedies.  They issued chargeback after chargeback.  They

13   withheld payments.  And they not only—they ended up receiving

14   $10 million worth of goods which they never paid for.  And

15   based on the amount they have left in inventory, we have every

16   reason to assume were sold, and if they were sold at cost,

17   they're up $10 million, and if they sold with any profit, that

18   number only increases.

19             So this contractual arrangement expressly prohibited

20   unit substitution.  That is fraud.  It did not—it contemplated

21   there would be shipments—no one can ship the exact amount,

22   your Honor, that's in the exact PO.  If you say, I want two,

23   someone's going to ship a case of peanut butter instead of just

24   two because who's going to order two jars of peanut butter?  I

25   mean, it wasn't forbidden in the arrangement, and there was no

O951ABRS

1    deception in Mr. Abraham's conduct with respect to

2    overshipping.

3            Ultimately, your Honor, the issue about scanning the

4    barcode and they didn't know, there was nothing in the record

5    to that effect.  The presentence report, in paragraph 27, the

6    factual findings before the Court are that they paid on the

7    invoice, that the Abraham brothers submitted invoices that

8    accurately describe the quantity and Amazon paid on those

9    invoices.  If there is other evidence somehow that there was

10    some payment system set up that they didn't even look at the

11    invoice and that there is evidence that the Abraham brothers

12    knew they didn't look at the invoice, then it's not before the

13    Court.  And we would need that evidence.  And we've

14    obviously—I don't want—I'm not suggesting we should adjourn

15    for that evidence because here we are after many months and

16    many years.  That evidence isn't before the Court.  There's

17    nothing to make that kind of finding, and no basis to conclude

18    that that conduct constitutes wire fraud.

19            THE COURT:  Okay.  I'll just say, I thought this

20    issue, overshipping, was the most difficult one.  Do you want

21    to be heard on any of the other issues that I raised or

22    anything regarding the guidelines?  I mean, again, I have read

23    your submissions very carefully, but I'll also give you the

24    opportunity to be heard if you want to be heard.

25            MS. HARRIS:  Your Honor, there is another sort of

O951ABRS

1    significant issue, but it sort of depends on where your Honor

2    comes out with respect to overshipping, right?  Because if your

3    Honor finds that overshipping is not part of the offense

4    conduct, then we have a question of, okay, what's the loss

5    amount, what spreadsheet should we look at, and what's the

6    appropriate loss amount?

7         THE COURT:  So if you want to be heard on that, why

8    don't you go ahead.

9         MS. HARRIS:  Okay.  Your Honor, with respect to the

10   question of unit and product——

11        THE COURT:  And assume that I'm going to rule that it

12   does, that overshipping conduct does fall within the scheme to

13   defraud.

14        MS. HARRIS:  Okay.  If I assume that, your Honor, then

15   I would like to jump to a separate point, which is that then

16   the loss amount here is 0.  And I want to talk about intended

17   loss versus actual loss.  Because with respect to

18   overshipping——and I'm sorry.  Maybe I'll start——let's do this.

19   If I could have one moment, Judge, because I'm jumping around.

20        THE COURT:  Sure.

21        MS. HARRIS:  Your Honor, there have been a lot of

22   different numbers in this case, and I think one place to start,

23   your Honor——and this goes to sort of the reliability of the

24   Amazon's numbers generally, but I think it goes to the point

25   that there are multiple different ways we can demonstrate that

O951ABRS

1    there was zero loss, and we're only going to do a few of them,

2    just to give sort of different ways to analyze the problem.

3            But if we start by looking at Amazon's impact

4    statement——oh, okay.  Sorry.  The dashboard shows that at the

5    time——this is essentially at the time that his accounts were

6    shut down.  He had receivables, Amazon owed him $17 million.

7    Okay?  That's an important and undisputed fact.  Now I

8    recognize some of that may relate to shipments that relate to

9    unit substitution and some of them may relate to overshipping,

10   but they owed $17 million.

11           With respect to——if we look at Government Exhibit——at

12   Exhibit 1——

13           THE COURT:  Can we just take a break.  So I understand

14   everyone is here for my 4:00.  I'm sorry to do this.  I just

15   didn't realize it would take two hours.  So you can leave your

16   items on the table.  If we can just break for a minute.  And

17   this will be quick.  And then I'll hear you out further.

18           MS. HARRIS:  Okay.  Thank you.

19           (Recess)

20           THE COURT:  All right.  Ms. Harris, do you want to

21   continue your argument with respect to intended loss.

22           MS. HARRIS:  I appreciate the five minutes to reorient

23   myself.

24           THE COURT:  Absolutely.  And I'm sorry about the

25   back-and-forth, but I just didn't want to keep the Marshals

O951ABRS

1      waiting.

2                MS. HARRIS:  I appreciate it, and thank you for your

3      patience and thoroughness.

4                I think that we do have some slides prepared for this,

5      because I think it is a little more complicated, or complex,

6      anyway.

7                So I think everyone agrees that——I want to make sure,

8      Ms. Luevanos, you're ready to go?  Okay.  ——that Yoel

9      invoice——and I use his name Yoel, your Honor, because there are

10     multiple Abraham brothers.  I don't mean to be informal.

11               THE COURT:  No.  Understood.

12               MS. HARRIS:  But he invoiced approximately $25 million

13     to Amazon as a vendor for all the goods across the time period.

14     That's the number offered by the government.  And so I'm just

15     using these numbers because I think they're agreed to by the

16     government.  We subtracted from that $25 million.  We just

17     assumed the 6 million is essentially the total of 6A right now,

18     6,089,861.  We disagree with that number for a lot of reasons,

19     but for this purpose, we're going to say, okay, let's take out

20     of the equation the bad goods, you know, that they paid for and

21     that our client shipped.  So that leaves $19 million of

22     nonsubstituted goods, based on the record that we have.  It's

23     agreed that the amount Amazon paid to Yoel was——again, we think

24     it might actually be less, but taking the slightly bigger

25     number, the 9,033,745.  So they paid that amount to Yoel.  That

O951ABRS

1    means they had, at the time that the accounts were shut down,

2    over $10 million of goods that they received and never paid

3    for.  These aren't controversial numbers, I believe, because

4    they're based on figures that the government and Amazon have

5    agreed to.

6         So what does it mean that they had $10 million worth

7    of goods that they never paid for?  In their submission, in

8    their victim impact submission, their May 1st letter, Amazon

9    says that it had remaining in inventory 200,000 units of items.

10   And as the Court knows, we had issued a subpoena to Amazon, a

11   court-ordered subpoena, because we were trying to figure out,

12   what's happened here?  You know, Amazon is one of the biggest

13   online retailers in the world.  They got more than they asked

14   for.  Did they really, you know, go to waste?  I mean, aren't

15   they built to sell, sell, sell, sell, sell?  Isn't that in fact

16   what they were able to do, even though it might have cost them?

17   More goods take up warehouse space, it took them longer,

18   there's some costs associated with it, and it was fraudulent,

19   certainly, if it was unit substitution, but weren't these items

20   sold?  And in response to our subpoena, they told us that they

21   could not verify, they couldn't trace a product through its

22   system to say yes, this product was at the warehouse and this

23   product left the warehouse and it was sold.  However, what they

24   could do and what they did give us was a spreadsheet that

25   indicated how much inventory remained from the shipments

O951ABRS

1    involved in this particular case, in their custody and control,

2    in their warehouses.  And that's Exhibit B to our ECF 199,

3    which I believe is our June 14th letter.  And in fact, the

4    spreadsheet that we received in response to the subpoena is

5    close to that 200,000.  It's a little bit more, I think, but

6    it's close to that 200,000-unit number that Amazon represented

7    in its May 1st letter.

8         So what we were then able to do——and we have a few

9    slides that can sort of demonstrate, through the work

10   process——is to say, we could take the spreadsheet, which had

11   ASIN numbers associated with the actual products that were

12   still in their custody, still maintained and held by Amazon,

13   and we could cross-reference them with a master sheet,

14   spreadsheet 11B, the master sheet of all the orders, all the

15   ASIN numbers.  And we did this with respect to our client's

16   orders.  And when we did that, we were able to assign a

17   per-unit value to every item that was no longer in Amazon's

18   inventory, essentially what was the value of the item that we

19   presume they had sold.  And when we did that——and so it's not

20   that useful, your Honor, but I want to——these are screenshots

21   from the spreadsheets that show what Amazon gave us, like the

22   units received and the quantity on hand.  And so if we search

23   for the same ASIN number in the spreadsheet and it didn't

24   exist, then it was reasonable to conclude that it had been

25   sold.  And because we had the per-unit value of each of those

O951ABRS

1    ASIN numbers, we were able to quantify the value of the items

2    that Amazon had received from our client but no longer had in

3    its possession.  And when we did that value, we reached a

4    total——sorry.  We're trying to get something.  We reached the

5    total——you can just show the total number——the total of

6    $18 million worth of products.  So that's just the cost, your

7    Honor, per-unit cost——this is not assuming they sold it at any

8    profit——that they don't have in their possession anymore.  The

9    government in one of its submissions concedes that they were

10   able to sell many of the products that they had on hand, that

11   they were able to sell of Yoel's products close to 600,000

12   units, worth $18 million, which is close, frankly, to

13   the——sorry.  Excuse me.  One minute, your Honor.

14        So your Honor, this actually, I mean, more than shows

15   that they didn't lose any money.  This shows that they came out

16   ahead by many millions of dollars, that they're not out of

17   pocket with respect to any actual money.

18        There's another way to prove this point.  I mean, this

19   is one way to do it.  But even looking simply at Amazon's

20   victim impact statement, your Honor, Exhibit 1, I think it is,

21   to the government's sentencing submission, and if we look at

22   the chart on page 5, which is their initial summary of the

23   total amounts paid, the total amounts ordered, a couple of

24   things I want to note.

25        First of all, with respect to Yoel Abraham, the cost

1    of products Amazon ordered, that's actually off by

2    $1.1 million.  And the government corrects that in a subsequent

3    submission.  So this is in their initial victim impact

4    statement.  They don't accurately reflect the total amount

5    ordered for Yoel Abraham.  When you add in that 1.1 and make it

6    the 3.915——903 that the government agrees is the cost of the

7    items that Amazon actually wanted and actually received, the

8    total for all defendants is $7,459,996.  The government's

9    June 5th letter seeks restitution of $17 million, but the

10   government actually lowers that amount and seeks restitution of

11   14,292,000.  That suggests that——I mean, it proves that there's

12   no loss associated with overshipping, your Honor, because they

13   are claiming that they lost $14 million in connection with unit

14   and product substitution as to all four defendants.  And they

15   actually ordered over $7 million of goods as to all four

16   defendants and they, in total, paid $21 million as to all four

17   defendants.  That only leaves $14 million, your Honor, the rest

18   of which they claim is captured or traceable to unit and

19   product substitution.

20          So the fact of the matter is——and if your Honor were

21   happy to do these calculations with the magistrate judge, which

22   I know is something your Honor contemplated, we don't object to

23   that, but we do think it's important for sentencing purposes

24   that at the end of this transaction, these series of

25   transactions, their nine months, their year of dealing with the

O951ABRS

1  Abraham brothers and dealing with Yoel——I'm here for Yoel

2  Abraham only, obviously, but——Amazon wasn't out of pocket.

3  They had at their disposal, because of all the remedies that we

4  described in the vendor agreement, in the vendor manual, that

5  they could recoup, they could withhold payments, they did

6  withhold payments, and they did receive enormous value of

7  goods, that they were able to financially take care of

8  themselves and recoup their losses, in a variety of different

9  ways.  And while for loss guidelines, there's a technical

10  analysis that may not take that into account, for purposes of

11  the 3553(a) factors, for purposes of what was the impact, what

12  was the harm that was actually created here and what's the

13  appropriate sentence, so not just a question of restitution for

14  the magistrate judge but a question for your Honor about what

15  the appropriate sentence is, it's important to us that that

16  fact be presented and understood by the Court.

17           THE COURT:  All right.  Thank you.

18           Does the government want to respond?

19           MS. KAMAL:  Yes, your Honor.  And, you know, look,

20  this is with respect to Ms. Harris and to the defense team for

21  the number and variety of arguments they've tried to make,

22  slicing and dicing various spreadsheets, but that entire

23  presentation is the reason why the guidelines say that the loss

24  need only be a reasonable estimate.  There are so many

25  assumptions that are baked into how the numbers get sliced and

O951ABRS

1    diced for the purposes of calculating loss here that to try to

2    do it on a per-unit basis or based on total payments or to

3    assume that overshipped products are totally distinct and

4    overshipped losses are somehow totally distinct from product

5    manipulation and product substitution losses, I mean, it is,

6    respectfully, your Honor, a fool's errand to try to slice and

7    dice it on these facts.  It's very complex.  And it is not what

8    the standard of a reasonable estimate requires the Court to do,

9    and it's not what the defendant is entitled to.

10         Here, the simple fact is, the defendant tricked, tried

11   to trick Amazon into issuing $21 million to him for goods of

12   dubious value, because we've seen the economics of the deals

13   are distorted when overage occurs, and dubious provenance.

14   We've seen that there are gray market and counterfeit goods

15   that have been sold.  And again, I have to reiterate, the 48

16   examples of product substitution that were identified by Amazon

17   and researched laboriously by one of their in-house managers

18   who spent an entire week just on those 48 transactions, I mean,

19   those are just the largest overage of shipments.  That is not

20   to suggest that the other overage transactions here didn't also

21   have price manipulation or unit manipulation.  There are 7,000

22   transactions.  I mean, neither the government nor the victim

23   has engaged in that, and that's not what's required here.

24         Here, the fraudulent conduct is tricking Amazon into

25   taking, accepting items it did not want and had no use for once

O951ABRS

1   it realized their provenance.  And to try to suggest that

2   because there's some good in a warehouse or they received

3   something that they never wanted, that should not be reducing

4   the loss here.

5        And importantly, when Amazon discovered at the end of

6   the scheme that it had these tremendous numbers of goods and

7   had been invoiced for all these goods and that there were these

8   invoices outstanding, it sent cease and desist letters to

9   Mr. Yoel Abraham and the other co-defendants saying, please,

10  come and take back your goods.  We do not want them.  Right?

11  The defendants resisted efforts to take back those goods.  So

12  to suggest that the defendants here somehow should be given the

13  benefit of the bargain or that Amazon should be saddled with

14  goods of dubious provenance and value and have that discounted

15  and say that that is not a loss to the company, I think that is

16  wrong-headed and I do not think that is what the standard here

17  requires.

18        To be sure, when it comes to calculating restitution

19  and forfeiture, the slicing and dicing will matter.  There will

20  be extrapolation.  But there are calculations of net profit,

21  net proceeds, and the like that will require digging in, and

22  respectfully, your Honor, the figures put forward here with

23  respect to loss and restitution and forfeiture by the

24  government already reflect and take into account the difficulty

25  of making these calculations.  And rather than criticizing the

O951ABRS

1  government for continually going back and triple-checking its

2  calculations, I would have thought that the defendant would

3  have welcomed the opportunity to hash this out, As opposed to

4  simply saying, in fact, no, there's no loss here.

5          So with respect to——at bottom, the presentation from

6  the defense with respect to losses from overshipping requires

7  so many built-in assumptions about which overshipping

8  transactions actually provided Amazon with something of value,

9  something of value that is reflected in the cost they actually

10  paid, and then separately, what the status of outstanding goods

11  in their warehouses means, all of that, your Honor, suggests to

12  me that the government actually can't rely on that

13  presentation, and that the more straightforward, easily

14  reliable, reasonable estimation of the loss here is the

15  intended loss.  Amazon intended to buy X amount of goods from

16  the defendant, Amazon in fact was invoiced for Y amount.

17          And to the extent that the Court or the defense wants

18  to——well, let's start with the defense.

19          To the extent the defense wants to then argue that

20  overrepresents the loss here, that shouldn't guide the Court's

21  assessment at sentencing, fair enough, and to the extent the

22  Court wants to reach that conclusion, fair enough.  But the

23  facts and the assumptions that the defense is asking the Court

24  to rely upon here is effectively an invitation to the Court to

25  say that the defendant should be entitled to hold onto the

O951ABRS

1    proceeds of the fraud.

2            MS. HARRIS:  Just briefly, your Honor.

3            And I think the assumptions we were making, I

4    mean——and I don't even want to characterize them as

5    assumptions, but the simple slide we presented about the total

6    amount invoiced, subtracting the number that Amazon has

7    presented relating to substituted goods, is a simple math

8    estimate, is a reasonable estimate of whether or not Amazon, at

9    the end of its nine months of dealing with Yoel Abraham, was

10   out any money.  And the evidence that we have that's been

11   presented——and I don't think I hear the government saying

12   otherwise.  She's simply saying it's too difficult to assume.

13   Like, she doesn't have enough facts.  You're not able to rebut

14   it.  But the facts that the Court has before it is that there's

15   $10 million.  Even if it was half of that, your Honor, even if

16   it was $5 million worth of goods that they had never paid for,

17   and that they had sold $9 million and not $18 million, then it

18   still came out as a wash.

19           So, you know, it's the government's burden here to

20   prove the loss enhancement.  It's the government's burden to

21   establish what the facts are that——and certainly the Court can

22   make a reasonable estimate.  But because we're taking the

23   position that only actual loss should be used here, there is no

24   proof of any actual loss, and our position is, for the loss

25   guidelines, that the loss should be zero.

O951ABRS

1          Now as I said, I understand that the Court may come

2     out differently on intended loss, and I should probably address

3     some of the intended loss issues now.  But regardless of how

4     the Court lands on intended loss, again, the fact that Amazon

5     had remedies available at its disposal, used those remedies,

6     and came out at the end without having lost any money is very

7     significant for purposes of what the appropriate sentence is.

8          I do want to address——maybe now is a good time to

9     address intended loss.

10          THE COURT:  The other conference is now ready.  Sorry

11    to send you back and forth, but it will also be quick.  And

12    then I'll hear you out on that, and then I'll——

13          MS. HARRIS:  Thank you.

14          THE COURT:  ——complete the sentencing.  Thanks.

15          (Recess)

16          THE COURT:  I'm ready to proceed whenever you are, and

17    I apologize for all the delays due to other proceedings.

18    Thanks for your patience.

19          MS. HARRIS:  No.  Thank you, your Honor.

20          So this is my intent of how I'm going to proceed, but

21    if you prefer something different, just please let me know.  I

22    was going to address intended loss now.

23          THE COURT:  Sure.

24          MS. HARRIS:  I think with respect to the counterfeit,

25    unless the Court has specific questions with respect to

O951ABRS

1  counterfeit issues and sophisticated means, we are prepared to

2  rest on our papers, unless there are specific questions.

3          THE COURT:  No.  Thank you.

4          MS. HARRIS:  And then obviously, I do want to talk

5  about the 3553(a) factors, when the time is right, but I do

6  want to just note, your Honor——and I meant to do this at the

7  outset——as your Honor may recall, your Honor granted permission

8  for Rabbi Bryski from the Aleph Institute to speak briefly.  He

9  has a very short statement prepared.  He has been here.  He

10 actually has a meeting with pretrial services and didn't

11 realize the proceeding would go past 5.  So with our direction,

12 he's gone to do that now and will be back in 20 minutes so

13 could speak right at the end, if that's appropriate.  But I did

14 want to flag that for your Honor.

15         THE COURT:  That's fine.  Let's just ask him to keep

16 it short.

17         MS. HARRIS:  Yes, yes.

18         THE COURT:  I have read all the materials so I'm not

19 sure that he has much to add, to be honest.

20         MS. HARRIS:  I understand.

21         With respect to intended loss, your Honor, we

22 recognize that *United States v. Rainford*, the case that was

23 sent to your Honor by the government, does hold that the

24 commission's interpretation of loss as intended loss is

25 appropriate.  We preserve our objection and argue and believe

O951ABRS

1    that loss is not ambiguous and the interpretation by the

2    commission is therefore not reasonable, but I don't think we

3    need to belabor it, given the Second Circuit's holding.

4            THE COURT:  Agreed.

5            MS. HARRIS:  However, it's important——and we've done

6    this a little bit in iterative steps in our submissions, and I

7    apologize for that, but we have a second piece of the argument

8    that relies on the Supreme Court's recent decision in *Loper*

9    *Bright*.  As the Court knows, that case, of course, was about

10   *Chevron* deference and ruled that the court should not defer to

11   an agency's interpretation of a statute.  But when that case

12   was taken together with the case that we sent to the Court,

13   which we did not cite in our papers but sent to the Court

14   before——or handed up, rather——*United States v. LaBonte*, if the

15   Court should still evaluate whether the sentencing guidelines

16   appropriately implement the Congress's intent in the sentencing

17   statute, 28 U.S.C. 994.  And here, with respect to

18   Mr. Abraham's case, there are two provisions of the sentencing

19   statute that we don't think is consistent with the loss

20   guidelines, and certainly not with intended loss.  That's

21   28 U.S.C. 994(c)(3).  And this is set out in large part in our

22   July 10th letter, your Honor.  That directs that the commission

23   based the guidelines on "the degree of harm caused by the

24   offense."  It talks about the kind of property involved.  And

25   994(j), that directs that noncustodial sentences are generally

O951ABRS

1    appropriate for first-time offenders where the offense is not a

2    crime of violence or otherwise serious offense.  *United States*

3    *v. LaBonte* is relevant because, looking at 994(h), with respect

4    to the career offender guidelines, it held that the commission

5    must bow to the "specific directives of Congress" if there's a

6    guideline that's inconsistent with Section 994.

7            And so here, your Honor, we just want to make the

8    point that Amazon, as we've stated, and I think there's been

9    some—well, I don't want to put words in the government's

10   mouth.  So as we've stated, Amazon did not actually lose

11   anything.  It didn't actually suffer pecuniary harm.

12   Mr. Abraham is a first-time offender.  This is not an otherwise

13   serious offense.  That term has to be interpreted and

14   understood in its context and should at least constitute some

15   kind of harm that's equivalent to a crime of violence.  There

16   are cases that we've cited—*Yates v. United States* and *Fischer*

17   *v. United States*—that make that point.  Here, because the

18   sentencing statute directs that a probationary sentence is

19   appropriate, generally appropriate for first-time offenders,

20   and here, because there is no actual harm, we would ask, no

21   matter what guidelines range, we would ask—excuse me—that the

22   Court disregard the intended loss guidelines as not a fair

23   implementation of congressional will in the sentencing statute.

24           The last point with respect to intended loss, your

25   Honor, is the point that we made in our opening submission, and

O951ABRS

1    I think that even the government sort of acknowledged would be

2    an appropriate argument, and that's, namely, that any intended

3    loss figure the Court were to find here would vastly overstate

4    his culpability.  In our submission, we cite, you know, both

5    cases and articles about criticism from judges and jurists

6    about the effectiveness of the loss table generally to measure

7    culpability and assess culpability and that those problems are

8    exacerbated when intended loss is the basis for that

9    calculation——especially here, where we believe there's actually

10   evidence that Amazon ended up ahead with money in its pocket.

11   The government says it's too difficult to ascertain.  Certainly

12   an intended loss figure in the amounts the government is

13   talking about of $21 million vastly overstates his culpability,

14   and, again, is a conduct that took place when he was in his

15   early 20s, between what we believe the record establishes is

16   roughly a year's worth of time.

17            I'm happy to move on to implementation of the

18   appropriate sentence, but since this is——

19            THE COURT:  Why don't I rule on the guidelines issues.

20   You'll have a sense of my rulings, and then I'll give you each

21   the opportunity to speak.

22            So first of all, I just want to say that I thought the

23   advocacy was outstanding on both sides, so thank you all for

24   that.

25            I'm going to begin with defendant's arguments

O951ABRS

regarding the use of intended loss as opposed to the actual loss amount when determining whether a loss enhancement applies.

I find that it's appropriate to use the intended loss amount. Pursuant to guidelines provision 2B1.1(b), a defendant's offense level is increased where "loss" exceeds certain enumerated figures. The commentary to 2B1.1 explains that "loss is the greater of actual loss or intended loss." Indeed, where the intended loss is greater than actual loss, "the larger intended amount is a better measure for the defendant's culpability than is the actual loss." *United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012). "Intended loss" means the pecuniary harm that the defendant purposely sought to inflict. U.S.S.G. § 2B1.1 App. Note 3(A)(ii).

In *Stinson v. United States*, the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Several years after *Stinson*, however, the Supreme Court decided *Kisor v. Wilkie*. In *Kisor*, the Supreme Court clarified when courts should defer to an agency's interpretation of its own regulations, in what is often called the *Auer* deference. Pursuant to *Kisor*, "a court should not afford *Auer* deference unless the regulation is

O951ABRS

generally ambiguous." *Kisor v. Wilkie*, 588 U.S. 558, 574
(2019).  If it is, "the agency's reading must still be
reasonable," *id.* at 575, and "a court must make an independent
inquiry into whether the character and context of the agency
interpretation entitles it to controlling weight," *id.* at 576.
This includes whether the interpretation is the "agency's
authoritative or official position," *id.* at 577, whether it
"implicate[s the agency's] substantive expertise," *id.*, and
whether it "reflect[s] fair and considered judgment." *Id.* at
579.

There is a Circuit split as to whether *Kisor* applies
to the commentary in the Sentencing Guidelines, or if courts
should instead follow *Stinson*.  The Second Circuit, however,
recently addressed the issue in *United States v. Rainford*.
There, the Circuit held that it "adhere[s] to *Stinson* and
defer[s] to the [loss] application note for two reasons."
*United States v. Rainford*, 110 F.4th 455, 475 n.5 (2d Cir.
2024).

First, "the Supreme Court has not overruled *Stinson*.
*Id.*  And second, "the guidelines commentary would meet the
*Kisor* standard in any event," given that the commentary
"reflects the Commission's authoritative, expertise-based,
fair, or considered judgment," and because "the guidelines and
the commentary operate together as a reticulated whole."  *Id.*
The court in *Rainford* thus held that "the application note

O951ABRS

1    defining loss is neither inconsistent with nor a plainly

2    erroneous reading of the guideline.  The term 'loss' in § 2B1.1

3    has no one definition and can mean different things in

4    different contexts, so the guideline does not contradict the

5    understanding expressed in the commentary that 'loss'

6    encompasses intended loss."  *Id.* at 475.

7          Although Defendant points to the Supreme Court's

8    decision in *Loper Bright Enterprises v. Raimondo, Rainford* was

9    decided after *Loper Bright*.  *See Loper Bright Enterprises v.*

10   *Raimondo*, 144 S. Ct. 2244 (2024).  Accordingly, I'm bound by

11   *Stinson* and *Rainford*, and the loss enhancement under 2B1.1 may

12   thus be based on intended loss.

13         Turning next to Defendant's arguments regarding

14   overshipping, I find that his overshipping conduct does fall

15   within his scheme to defraud Amazon, and may thus go towards

16   the loss amount.

17         Pursuant to 18, United States Code, Section 1343, it

18   is a federal crime to use interstate wire communications to

19   execute "any scheme or artifice to defraud, or for obtaining

20   money or property by means of false or fraudulent pretenses,

21   representations, or promises."  18 U.S.C. § 1343.  "The

22   essential elements of mail and wire fraud are (1) a scheme to

23   defraud, (2) money or property as the object of the scheme, and

24   (3) use of the mails or wires to further the scheme."  *United*

25   *States v. Weaver*, 860 F.3d 90, 94.  "Because the mail fraud and

O951ABRS

1  the wire fraud statutes use the same relevant language,

2  [courts] analyze them the same way." *Id.*  "[T]he gravamen of

3  the offense is the scheme to defraud." *United States v.*

4  *Greenberg*, 835 F.3d 295, 305.  "In order to prove the existence

5  of a scheme to defraud, the government must also prove that the

6  misrepresentations were material. . . and that the defendant

7  acted with fraudulent intent." *Weaver*, at 94.  "A statement is

8  material if the misinformation or omission would naturally tend

9  to lead or is capable of leading a reasonable person to change

10  his conduct." *Id.*

11        The Second Circuit has "drawn a fine line between

12  schemes that do no more than cause their victims to enter into

13  transactions they would otherwise avoid——which do not violate

14  the mail or wire fraud statutes——and schemes that depend for

15  their completion on a misrepresentation of an essential element

16  of the bargain——which do violate the mail and wire fraud

17  statutes." *United States v. Shellef*, 507 F.3d 82, 108.  There

18  is no scheme to defraud where the "false representations [are]

19  not directed to the quality, adequacy or price of goods to be

20  sold, or otherwise to the nature of the bargain." *United*

21  *States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1179 (2d Cir.

22  1970).  Rather, the contemplated harm to the victim "must

23  affect the very nature of the bargain itself," which is

24  "apparent where there exists a discrepancy between benefits

25  reasonably anticipated because of the misleading

representations and the actual benefits which the defendant

delivered, or intended to deliver."  *United States v. Starr*,

816 F.2d 94, 98 (2d Cir. 1987).

   To properly understand Defendant's scheme, it must be

analyzed with regard to Amazon's broader practices.  "A

business that seeks to sell wholesale to Amazon must apply to

become a vendor. . . and then register an online vendor account

with Amazon."  PSR ¶ 18.  "When Amazon purchases goods from one

of its Vendors, it does so pursuant to a purchase order issued

by Amazon that the Vendor must accept and confirm before a sale

can be initiated."  *Id.*

   The vendor must thus confirm the purchase order's

"terms, which include the product(s), the [product's

alphanumeric identifier], the unit price, and the number of

units ordered."  PSR ¶ 20.  "After the goods purchased by

Amazon arrive at an Amazon warehouse, a Vendor must fill out

and submit an invoice form through their vendor account that

must include, among other things, the [alphanumerical

identifier] and the reference number associated with the

purchase order."  *Id.*

   Defendant created multiple vendor accounts with

Amazon, and his scheme included (1) overshipping goods and (2)

substituting the goods——either by changing the product entirely

or by altering the number of units per package.  With regard to

Defendant's overshipping conduct, he would typically receive a

purchase order for a small quantity of goods.  Instead of
shipping the agreed quantity, however, he would ship vastly
higher quantities.  He would then "invoice[] Amazon for those
goods in the quantities [he] shipped," after which he would
often "receive[] payment for the submitted invoices to Amazon"
for goods "which Amazon had not agreed to purchase."  PSR ¶ 27.

18 U.S.C. § 1343 covers "false or fraudulent
pretenses, *representations*, or *promises*."  18 U.S.C. § 1343.
Defendant's scheme is replete with material false
representations and promises, which include Defendant's false
promises to comply with the Vendor Agreement and his
confirmations of the individual purchase orders, which I find
by a preponderance of the evidence.

While the Defendant sent Amazon invoices which
reflected the overshipped quantity of goods, it is clear from
the Vendor Agreement that it is the terms of the purchase
orders which govern the sale of goods to Amazon, not the
invoices.  The Vendor Agreement states, for example, that the
vendor "will not substitute Products or combine or consolidate
POs without [Amazon's] consent," and that the "[t]erms
specified in PO confirmations or other communications sent by
[a vendor] to [Amazon] are not binding unless agreed to in
writing by both parties."  Vendor Agreement, Gov. Ex. 2, at 1,
¶ 1.  Moreover, the Agreement states that Amazon "may return or
dispose of at [the vendor's] expense, and [the vendor] will

O951ABRS

accept and reimburse [Amazon] for any Product that. . . was not

ordered in the applicable PO." Vendor Agreement at 2, ¶ 4.

Although vendors "may use standard business forms or other

communications (such as *invoices*, confirmations or shipping

documents)," "use of these forms is for convenience only and

*will not alter or supersede* the provisions of this Agreement."

Vendor Agreement at 5, ¶ 10(C) (emphases added).  And the

Agreement further specifies that "[p]ayment of an invoice does

not limit [Amazon's] remedies."  Vendor Agreement at 2, ¶ 4.

It is thus clear from the Vendor Agreement that the purchase

orders controlled, and that vendors were not to overship goods.

I'll also note that this is consistent with the Vendor

Manual, which states that vendors should "[e]nsure that all

terms of the Purchase Order[] are met, including" that

"[e]xactly the same items. . . are being shipped in the same

quantities that were ordered and confirmed."  Vendor Manual,

Gov. Ex. 3, at § 1.1.  Similarly, the Manual provides that

"[s]hipped products that were never ordered are subjected to

disposal, or if received, subject to a chargeback fee and may

result in liquidation from inventory.  This includes product

that was ordered on the PO but [Amazon] received a quantity in

excess of expected quantity."  Vendor Manual at § 1.2.

Defendant's continued reliance on the purported

accuracy of his invoices is thus misplaced.  If anything, the

invoices themselves were misleading, in that they did not

O951ABRS

reflect the purchase orders.

With regard to Defendant's argument that breach of contract is not a fraud, the Second Circuit has explained that "where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016); *see also id.* at 660 ("Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract."). There is ample evidence of Defendant's intent to defraud Amazon, and I find by a preponderance of the evidence that Defendant had fraudulent intent at the time of the execution of the contract.

"[F]raudulent intent is rarely susceptible of direct proof, and must instead be established by legitimate inferences from circumstantial evidence." *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, at 659. Fraud cannot be proven "based on inferences arising solely from the breach of a contractual promise." *U.S. ex rel. O'Donnell,* at 659. That said, "the course of the parties' dealings is often a crucial source of evidence of fraudulent intent," and "fraudulent misrepresentations made in the course of performance or to feign performance under the contract may show the requisite intent." *United States v. Murtha*, 803 F.App'x 425, 427 (2d

O951ABRS

1   Cir. 2020).

2           Defendant's conduct here was egregious.  With regard
3   to the product substitution conduct, certain individual
4   transactions intended hundreds of thousands of dollars in
5   losses.  *See* Gov. Ex. 6A.  The same is true with regard to the
6   overshipping, there being countless instances where Defendant
7   received a purchase order for 48 goods, and then shipped
8   thousands in return.  *See* Gov. Ex. 4A.

9           As I said a moment ago, fraud cannot be "based on
10  inferences arising *solely* from the breach of a contractual
11  promise."  *U.S. ex rel. O'Donnell,* at 659 (emphasis added).
12  But here, we have far more than just the breach itself.
13  Defendant's text messages, for one, clearly demonstrate his
14  intent to defraud Amazon—not only with regard to his broader
15  scheme, but also overshipping in particular.  For example,
16  Defendant texted his brothers in a group chat:  "I'm so in the
17  mood to fuck Amazon," and asked, "Did anyone try to *overship*
18  and make a million profit a week?"  Gov. Letter, July 2, 2024,
19  Ex. 8, Dkt. 209-3 at 1 (emphasis added).

20          Defendant also texted:  "[A]mazon are lowlifes and we
21  need to rip them off big time."  Gov. Letter, July 2, 2024, Ex.
22  8, Dkt. 209-3 at 5.

23          And when speaking about Jeff Bezos, the Defendant
24  said:  "I hope he trips on he's own shoe laics and chokes on a
25  banana, and dies a terrible slow death."

O951ABRS

1          In response to one of his co-defendants asking "come

2     in how to do it," he answered:  "I guess you just ship in, it's

3     like throwing noodles at the wall and seeing what sticks[.]

4     Some they approve and some goes into POD," meaning Proof of

5     Delivery.  "You just send in enough to make a profit."  Gov.

6     Letter, July 2, 2024, Ex. 8, Dkt. 209-3 at 1.

7          Additionally, in the group chat, the brothers

8     "discussed Amazon's increased review and enforcement of vendor

9     accounts that was going to compel [them] to cease the Fraud

10    Scheme."  PSR ¶ 39.  Defendant texted, "This shit is massed

11    [sic] up, looks like will have to build a legit business."  *Id.*

12    Another text included:  "Would love to have a business, but not

13    a business that makes $300,000 a year, I'm trying to make

14    money, lottery [meaning overshipping] will do just fine for

15    now!"  Gov. Letter, July 2, 2024, Ex. 8, Dkt. 209-3 at 6.

16         The brothers also "discussed new ways to evade

17    detection by Amazon and how to continue the Fraud Scheme."  PSR

18    ¶ 39.  Defendant, for example, texted:  "Open account under

19    dummy names and they can go look for no one."  *Id.*  Similarly,

20    Defendant advised his brothers on how to avoid detection,

21    texting:  "Guys don't open more the one vendor on your computer

22    they are linking accounts big time."  PSR ¶ 40.

23         I am unpersuaded by Defendant's reliance on the fact

24    that he sent the text messages after he entered into the

25    original Vendor Agreement.  The Second Circuit has explained in

O951ABRS

the *Murtha* case that, "[a]s fraudulent intent is rarely
susceptible of direct proof, and must be established by
legitimate inferences from circumstantial evidence, the course
of the parties' dealings is often a crucial source of evidence
of fraudulent intent." *United States v. Murtha*, 803 F.App'x
425, 427 (2d Cir. 2020). "In particular, fraudulent
misrepresentations made in the course of performance or to
feign performance under the contract may show the requisite
intent." *Id.*

In *Murtha*, as I think I noted earlier, the Circuit
rejected the defendant's argument "that there was insufficient
evidence to conclude that he had fraudulent intent from the
outset of his agreement with [the victim] and that his
subsequent conduct, involving mere breaches of contract, [was]
not sufficient to establish this fraudulent intent." *Id.*
Although the promise at issue was made in 2015, the Circuit
nonetheless considered the defendant's conduct that occurred in
2016. And, in light of that conduct, the court found that
there was "sufficient evidence to infer fraudulent intent. . .
at the commencement of [the defendant's] arrangement with [the
victim]." *Murtha*, 803 F.App'x at 427.

Here, it's true that the text messages were sent
months after Defendant entered into the Vendor Agreement, and
there may not be direct evidence of Defendant's intent at the
time of his signing of the agreement. But, as I said earlier,

O951ABRS

```
1    there is "rarely" direct proof of fraudulent intent.  *Murtha*,

2    at 427.  To the contrary, fraudulent intent must often "be

3    established by legitimate inferences from circumstantial

4    evidence."  *Id.*

5         That is what we have here.  The conduct alone is

6    egregious.  These were not overshipments of five or ten items.

7    Defendant was overshipping items in the thousands.  Moreover,

8    he had already started his overshipping conduct months before

9    he sent the text messages.  He also confirmed hundreds of

10   purchase orders where overshipping occurred after he sent the

11   text messages.

12        In addition to Defendant's conduct, we have the

13   clearest possible evidence of Defendant's intent in his text

14   messages——and these displayed not just an intent to defraud

15   Amazon, but to harm it.  Nor is there any evidence to suggest

16   that he ever intended to anything *but* what is suggested in his

17   text messages.

18        Additionally, a text message we discussed earlier

19   today——which the Government has represented to be true to the

20   best of its knowledge——includes the following:  "Amazon didn't

21   change today, they keep changing for the past 6 years that I'm

22   doing it, so far we figured out some good shit, I'm not

23   worried."  And again, that was a statement of the Defendant.

24   Given Defendant's reference to having committed this conduct

25   for six years, this text clearly suggests that he had
```

O951ABRS

1    fraudulent intent both before and at the time of his signing of

2    the agreement.

3            In light of Defendant's conduct, his

4    misrepresentations, and the unambiguous text messages, I find,

5    by a preponderance of the evidence, that the Defendant had

6    fraudulent intent at the time of the contract execution.

7            Defendant also made other misrepresentations, which

8    included false assurances to Amazon and reshipments on the same

9    purchase order, even after Amazon had returned the products to

10    him.  For example, "when Amazon detected a large overshipment

11    from one of [the] vendor accounts controlled by [Defendant], he

12    shared the information on" the group chat with his brothers.

13    PSR ¶ 38.  His brother then "dictated to [Defendant] a false

14    response to use to claim the overshipment was an error," *id.*,

15    which included: "promise I will make sure this is not happening

16    again."

17            And when Amazon contacted one of Defendant's brothers

18    to notify him that it was terminating his account, Defendant

19    advised his brother "to draw them along longer, the longer you

20    draw them along the more money they will give you back, and you

21    want to get as much money as you can, push it off push it off,

22    maybe in the end they will take it back, but draw them along

23    longer."  Defendant then explained what happened when Amazon

24    had returned products to him:  "I took back 14 pallettes of

25    toilet seats, so what did I do?  I took it back and sent it

O951ABRS

back on the same PO [meaning 'purchase order'].  They don't

realize everything, they only realize once in a while how much,

so I sent it back on the same PO."

        The Government has represented these text messages to

be true.

        Such misrepresentations enabled Defendant to carry out

the scheme longer and induced Amazon to sustain further losses.

        Defendant's misrepresentations and overshipping

ultimately "affect[ed] the very nature of the bargain itself,"

given that there was a "discrepancy between benefits reasonably

anticipated because of the misleading representations and the

actual benefits which the defendant delivered." *United States*

*v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  Indeed, the bargain

was for a specific quantity of goods, Defendant misrepresented

that he would comply with the purchase orders, and his

misrepresentations led Amazon to pay the submitted invoices,

which included vastly overshipped goods that Amazon never

ordered.

        Defendant's scheme worked to take advantage of

Amazon's processes.  As Defendant himself explained in a group

chat to his brothers: "btw ['by the way'] most of the time

they," meaning Amazon, "don't realize that you over shipped,

you can see when they do they are contacting you. . .  They

probably can't stop the invoicing for some reason."  Gov.

Letter, July 2, 2024, Ex. 8, Dkt. 209-3 at 7.

O951ABRS

1          Aside from the fact that Defendant's

2   misrepresentations caused Amazon to pay for goods that exceeded

3   bargained-for quantity, thus defrauding Amazon of money, I also

4   find that the misrepresentations caused Amazon to overpay for

5   such goods.  If Amazon wanted to purchase a vastly higher

6   quantity of goods, it very likely could have negotiated a lower

7   price.  Indeed, some examples of Defendant's overshipping

8   include receiving a purchase order for 48 items, but then

9   shipping Amazon over five or six thousand items on the same

10  order.  *See* Gov. Ex. 4A.

11          Defendant's reliance on *United States v. Connolly* and

12  *United States v. Shellef* is misplaced.  In *Connolly*, the

13  defendants "were charged with conspiring with others to commit

14  wire fraud and bank fraud. . . by inducing co-workers to submit

15  to the British Bankers' Association. . . false statements that

16  could influence LIBOR rates, in order to increase their

17  employer's profits. . . on existing derivatives contracts."

18  *United States v. Connolly*, 24 F.4th 821, 824 (2d Cir. 2022).

19  The bank was directed to submit to the British Bankers'

20  Association "the rate at which it could borrow funds, were it

21  to do so by asking for and then accepting inter-bank offers in

22  reasonable market size." *Id.* at 835.  The government, however,

23  "failed to produce any evidence that any [of the bank's] LIBOR

24  submissions that were influenced by the bank's derivatives

25  traders were not rates at which [the bank] could request,

O951ABRS

receive offers, and accept loans in [the bank's] typical loan

amounts." *Id.* at 842-43. Accordingly, the "government failed

to show that any of the trader-influenced submissions were

false, fraudulent, or misleading." *Id.* at 843. The Second

Circuit thus vacated the defendants' convictions. *Id.*

Here, by contrast, as previously discussed, Defendant

made several false misrepresentations and promises. *Connolly*

is thus inapposite.

As is *Shellef*. There, the defendant misrepresented

where he was going to sell the products he was purchasing, and

the indictment alleged that the "misrepresentation induced [the

seller of the products] to enter into a transaction it would

otherwise have avoided." *United States v. Shellef*, 507 F.3d

82, 109 (2d Cir. 2007). It did not allege, however, a

"discrepancy between benefits reasonably anticipated and actual

benefits received." *Id.* The Second Circuit thus found the

alleged theory of liability to be insufficient, given that

"[t]he jury. . . might have erroneously convicted [the

defendant] even though it concluded that [he] did not

misrepresent an essential element of the bargain, but rather

made simple fraudulent inducements to gain access to [the

seller's] products. *Id.*

Here, however, the misrepresentations were not simple

inducements to gain access to Amazon as a purchaser. Rather,

Defendant engineered an elaborate scheme to defraud Amazon of

O951ABRS

money.  His misrepresentations went to essential elements of the bargain, and there was a discrepancy between the benefits anticipated and the benefits received.

Accordingly, his overshipping conduct falls within his scheme to defraud Amazon.

All right.  So next I'm going to address calculating the intended loss amount.

In determining the loss amount, where intended loss is greater than actual loss, "[t]he relevant loss amount is the pecuniary harm that was intended to result from the offense. . . including intended pecuniary harm that would have been impossible." *United States v. Ravelo*, 370 F.3d 266, 273 (2d Cir. 2004).  A "district court's factual findings relating to loss must be established by a preponderance of the evidence." *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009).  Accordingly, the court's "findings must be grounded in the evidence and not derive from mere speculation." *United States v. Coppola,* 671 F.3d 220, 249 (2d Cir. 2012).  "Such evidence need not, however, establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information." *Id.* at 249-50.

I've reviewed the materials in this case, and I find Government Exhibit 4A to be reliable.  The Second Circuit has held that "[a] district court may make a reasonable estimate by

O951ABRS

extrapolating the average amount of loss from known data and

applying that average to transactions where the exact amount of

loss is unknown." *Uddin*, at 180.  Here, I find that using

Exhibit 4A to determine intended loss is far more precise than

extrapolating average amounts of loss.

In particular, Exhibit 4A reflects (1) the amount of

goods Amazon originally ordered from Defendant, (2) the amount

of goods Defendant shipped, and (3) the cost

differential——which is calculated by subtracting the amount

Amazon ordered from the amount Defendant shipped.

The commentary to the Guidelines provides that the

loss amount should be reduced by "credits against loss," which

includes "services rendered[] by the defendant. . . to the

victim before the offense was detected."  U.S.S.G. § 2B1.1 App.

Note 3(E)(i).  I find that subtracting the amount of goods

Amazon ordered from the amount shipped provides credits for the

services rendered.

I do not, however, find that any other credits are

appropriate here.  *See*, for example, *United States v. Mitan*,

from the Third Circuit, in which the court held that

"perpetrators of fraudulent schemes are not entitled to credits

against loss for payments that were made to perpetuate their

schemes." *United States v. Mitan*, 499 F.App'x 187, 194 (3d

Cir. 2012).

I note that Exhibit 4A does not take into account what

O951ABRS

Amazon actually paid Defendant.  So although I find this Excel

Sheet to be reliable with respect to Defendant's intended loss,

I'm not relying on it to show actual losses to Amazon.

I'll also note that the Excel Sheet takes into account

instances where defendant shipped *less* than the ordered amount.

This actually works in Defendant's favor, given that these

instances work to decrease the overall cost differential.

The total cost to Amazon comes to $21,816,204.62.  I

find, by a preponderance of the evidence, that this figure is a

reasonable estimate of Defendant's intended loss.

Although Defendant argues that Amazon received more

products than it paid for, I don't find it appropriate to

discount Defendant's intended loss for those products.

Defendant intended to defraud Amazon through his overshipments.

As previously discussed, he stated in a text message to his

brothers that "[A]mazon are lowlifes and we need to rip them

off big time."  He similarly stated that "most of the time they

don't realize that you over shipped. . .  They probably can't

stop the invoicing for some reason."

Moreover, the Vendor Agreement provides that "for any

Product that. . . was not ordered in the applicable PO," Amazon

"may return or dispose of [it] at your expense, and you will

accept and reimburse us for" such products.  Vendor Agreement,

Gov. Ex. 2, at 2, ¶ 4.  Accordingly, rather than the

overshipments being something that was beneficial to Amazon,

O951ABRS

1    Defendant was fully aware that his overshipped products could

2    have been disposed of.

3          If anything, the additional goods Defendant sent

4    Amazon were costs he incurred to perpetuate his scheme. *See*

5    *Mitan*, at 194.

6          In any event, I'll note for the record that this

7    dispute over overshipping with regard to intended loss is

8    academic to a certain extent.

9          Government Exhibit 6A demonstrates the costs due to

10   Defendant's product substitution conduct, and includes two

11   relevant metrics: under the column titled "Amount Amazon Paid

12   Defendants," it shows both the amount Defendant invoiced, which

13   is the first line item, and the amount Amazon actually paid

14   Defendant, which is included as a second line item where it

15   differs from the amount invoiced.

16         Given that I've found that the loss amount may be

17   based on intended loss, I find that using the *invoiced* amount

18   is appropriate here.  Looking at the amount invoiced, the

19   spreadsheet calculates loss by subtracting the value of the

20   items received from the amount Defendant invoiced Amazon.

21   Frankly, I find any subtraction here to be generous to

22   Defendant, given that I find that there's ample evidence to

23   demonstrate that Defendant did not intend to confer any benefit

24   to Amazon——which is especially the case with regard to his

25   product substitution conduct.  Moreover, where Defendant wholly

O951ABRS

substituted products——for example, by agreeing to ship

disinfectant spray and instead shipping individual toothbrushes

at the same price, *see* PSR ¶ 28——I don't see how Defendant

provided *any* service to Amazon.

I've independently added up the relevant figures in

Exhibit 6A, including calculations regarding the value of the

items received and the sum of the invoiced amount.  If only the

amount invoiced is used (*i.e.*, no reduction for the value of

the items received), the intended loss would come to

$8,728,076.81.  And if Defendant is given the benefit of the

value of the goods being subtracted from the amount invoiced,

then the total would come to $8,247,479.89.

Although Defendant argues that Amazon may not have in

fact paid for some of the listed products, I find Exhibit 6A

reliable——at a minimum——with regard to Defendant's *intended*

loss.  Indeed, a district court need only "make a reasonable

estimate of the loss given the available information."

*Coppola*, at 250.  Courts have relied on victim impact

statements and financial records to calculate loss.  *See, e.g.,*

*United States v. Swartz*, 758 F.App'x 108, 110 (2d Cir. 2018).

Exhibit 6A is rooted in discovery and Amazon's victim impact

statement.

If only the intended loss from the product

substitutions was used, Defendant's offense level would be

increased by 18 levels, given that the intended loss would be

O951ABRS

more than $3.5 million but less than 9.5 million, pursuant to

2B1.1(b).  This would be true even if the Court discounted the

product substitution loss by almost $800,000, as Defendant

suggests in his July 10th letter.

My finding that his overshipping conduct goes towards

the loss amount thus increases the enhancement by only one

category——the increase in offense level being by 20 levels,

instead of 18, since the intended loss is more than $9,500,000

but less than 25 million.  I'll also note for the record that I

find wholly unpersuasive Defendant's contention that the

appropriate loss amount here is $1.2 million, given that it's

based on alleged *actual* losses and only captures a subset of

the relevant transactions.

Accordingly, in effect, what we're dealing with here

is a two-level difference in an offense level that's going to

be increased either by 18 or 20 levels, based on intended loss,

notwithstanding other potential increases due to other

enhancements.

With that said, in sum, I find Defendant's intended

loss amount to be $21,816,204.62, and his offense level should

thus be increased by 20 levels, pursuant to 2B1.1(b)(1).

Now I'll turn to the disputes over the counterfeit and

gray market goods.  With regard to the Gillette razor blades, I

don't find sufficient evidence here that Defendant knew that

they were gray market goods.  The text messages provided by the

O951ABRS

1    Government at most demonstrate that these were samples being

2    shipped overseas.  The fact that a product is being shipped

3    overseas is, alone, insufficient.

4            I do, however, find sufficient evidence that defendant

5    knew the Anastasia products were counterfeit goods.  Although

6    Defendant argues that the metadata shows that he did not alter

7    the purported letters from Anastasia, his possession of

8    facially false letters that purport to confirm the authenticity

9    of the products——in addition to the confirmation by Anastasia

10   that the products were counterfeit——establishes Defendant's

11   knowledge by a preponderance of the evidence.

12           The Court is also unpersuaded by Defendant's arguments

13   that he was not charged with this conduct.  Rather, the Court

14   agrees with the Government that Amazon ordered brand-specific

15   products from Defendant, and he substituted counterfeits for

16   the higher-value, authentic products he had promised to

17   provide.  Indeed, the indictment charges him with "accept[ing]

18   and confirm[ing] purchase orders for specific goods," and then

19   "ship[ping] and invoic[ing] [Amazon] for different goods."

20           Defendant also argues that some of the Anastasia

21   products were received in 2017, and that, with regard to his

22   allocution statement, Defendant stated that "In 2018, [he]

23   agreed with another person how to obtain money from Amazon by

24   making false requests from Amazon."  Plea Hearing Tr. at 24-25.

25   In turn, Defendant argues that anything sold in 2017 was

1    outside the offense of conviction.

2              Notwithstanding that the indictment——to which he pled

3    guilty——charges conduct beginning in 2017, some of the

4    Anastasia products were, in any event, also received by Amazon

5    in 2018.  The Court thus rejects Defendant's argument.

6         But with that said, given that the $9.5 million

7    threshold has been reached regarding intended loss, it doesn't

8    affect my guidelines calculation.

9              Now I'll briefly turn to the parties' arguments

10   regarding sophisticated means.

11             Pursuant to 2B1.1(b)(10), if "the offense. . .

12   involved sophisticated means and the defendant intentionally

13   engaged in or caused the conduct constituting sophisticated

14   means," the offense level should be increased by two levels.

15   "Sophisticated means" is defined as "especially complex or

16   especially intricate offense conduct pertaining to the

17   execution or concealment of an offense."

18             I find that the sophisticated means enhancement

19   applies here.  On numerous occasions, the Defendant edited

20   product pages after confirming a purchase order in order to

21   carry out his scheme to defraud.  The Defendant argues that

22   such conduct is not sophisticated, suggesting that every vendor

23   is required to make changes to product pages upon request.  I

24   disagree.  As an example of Defendant's conduct, he "confirmed

25   one purchase order and agreed to ship Amazon one case

1    containing 12 cannisters of a particular disinfectant spray

2    with a particular [alphanumeric identifier] at a cost of $94.03

3    per pack."  PSR ¶ 28.  Instead of doing so, Defendant

4    "manipulated Amazon's invoicing system by shipping and then

5    invoicing Amazon for 7,000 individual toothbrushes, bearing

6    [the same alphanumeric identifier], at $94.03 each."  *Id.*

7    Defendant's conduct was intricate and complex.

8           In any event, "even if each step in the scheme was not

9    elaborate, the total scheme was," at a minimum, "sophisticated

10    in the way all the steps were linked together so that

11    [Defendant] could perceive and exploit different

12    vulnerabilities in different systems in a coordinated way."

13    *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003).

14           Indeed, his editing of product pages also worked in

15    tandem with his creation of multiple vendor accounts.  As he

16    advised his brothers, "Have one account that your straight 100%

17    1 account you do whatever the fuck you want with make money."

18    PSR ¶ 36.  Additionally, Defendant's "offense conduct, which he

19    perpetuated for. . . years, was the sort of repetitive

20    conduct. . . that demonstrates that more than routine planning

21    was involved."  *United States v. Regensberg*, 381 F.App'x 60, 62

22    (2d Cir. 2010).

23           So the sophisticated means enhancement thus applies,

24    and Defendant's offense level is increased by two levels.

25           I am going to reduce his offense level by three points

O951ABRS

for acceptance of responsibility, pursuant to 3E1.1(a) and (b).

So just to summarize, Counts One through Three are grouped, pursuant to 3D1.2.

The base offense level is 7, pursuant to 2S1.1(a)(1) and 2B1.1(a)(1).

Defendant's intended loss is $21,816,204.62. His offense level is thus increased by 20, pursuant to 2B1.1(b)(1)(K), given that the loss amount is more than 9.5 million but less than 25 million.

The offense level is further increased by two pursuant to 2B1.1(b)(10), due to sophisticated means enhancement.

It's increased further by one level pursuant to 2S1.1(b)(2)(A), due to Defendant's conviction under 18, United States Code, Section 1957.

The offense level is decreased by two pursuant to 4C1.1, an adjustment for zero-point offenders.

And it is further decreased by three points for acceptance of responsibility.

So his total offense level is 25.

And Defendant argues that the Court should consider the offense level to be two levels less due to his pleading without an agreement. I'm not going to lower the offense level but will consider that argument when determining the 3553(a) factors.

He has no criminal history points. He is in criminal

O951ABRS

1    history category I.

2              I thus find Mr. Abraham's criminal history is I,

3    offense level is 25, and the recommended guidelines sentence is

4    57 to 71 months.

5              I just want to make sure that I said that for

6    acceptance points, it's decreased by three and not increased.

7    So to the extent I misspoke, I apologize.

8              Defendant's objections to the PSR regarding (i)

9    whether overshipping constitutes fraud, (ii) intended loss,

10   (iii) sophisticated means enhancement, and (iv) guidelines

11   range, are thus overruled.

12             I'm also overruling the objection to paragraph 46,

13   which I don't think I mentioned earlier.

14             Okay.  All that said, the guidelines are advisory.

15   Courts can impose a sentence outside of that range based on one

16   of two legal concepts——a departure or a variance.

17             A departure allows for a sentence outside of the

18   advisory range based on some provision in the guidelines

19   themselves.

20             I understand that neither party is seeking a departure

21   here.

22             Nonetheless, I've considered whether there's an

23   appropriate basis for departure from the advisory range within

24   the guidelines system, and conclude that no such grounds exist.

25             But that said, I also, of course, have the power to

O951ABRS

1    impose a nonguidelines sentence based on what we call a

2    variance.

3              And with that, I'll hear from the parties.

4    Ms. Harris.

5              MS. HARRIS:  Thank you, your Honor.

6              And just before I start, I want to acknowledge——and

7    obviously we preserve our objections to the factual arguments

8    we made about the PSR, about the contract, about the Vendor

9    Agreement.  But I also want to say——and this starts where I

10   started earlier, which is that at no point, despite our legal

11   arguments, which were premised on very specific claims about

12   misrepresentations and deceit, at no point, and at no point do

13   we nor our client seek to minimize the wrongfulness of his

14   conduct, right?  Whether it was technically a crime or not, we

15   were at no point trying to justify his behavior; nor does he.

16   He understands it's serious.  He understood and quickly

17   understood that it was wrong, and did at the time.

18             So we in no way seek to detract from that or minimize

19   the seriousness.

20             Nonetheless, we do think that the sentencing factors

21   here do not require a term of incarceration; certainly not, if

22   your Honor is contemplating one, a lengthy term of

23   incarceration.

24             First and foremost, I think that Yoel's tremendous

25   efforts to really shift and reorient his life and thinking is

O951ABRS

1    real evidence that a jail sentence is not needed to achieve

2    individual deterrence, to prevent recidivism or protect the

3    public.  And the record shows that I think in a number of

4    different ways.  First is the extent to which he's worked very

5    hard to give back to his family and reengage with his community

6    in a very healthy and positive way.  And in a way I think that

7    goes beyond the norm or what your Honor often sees at

8    sentencings in this courtroom.

9            After his real estate investment collapsed, Yoel

10   worked basically full time for his father's synagogue, without

11   pay but just volunteering, overseeing and helping the

12   renovation of the top floor so there would be rental income for

13   the struggling congregation.  It was a very important gesture

14   and I think meaningful in a number of different ways.  First,

15   his father was going through health problems.  He had heart

16   problems and various procedures that he had to undergo.  Yoel,

17   because he was the unmarried son and he was the one who often

18   took his father to the appointments, and despite their

19   difficult personal history——which I think is explained at

20   length in the psychological report from Dr. Gaines——this time

21   together and Yoel's attempt to give back and reconnect with his

22   father was really a healing time for both him and his father

23   and that relationship.

24           He has also been volunteering with the organization

25   Bikur Cholim and delivering kosher meals to observant Jews who

O951ABRS

1    are visiting loved ones or need to stay near the hospital and

2    don't have access to the diet and meals that they need.

3            He has been volunteering with one of his brothers,

4    Nuchem, who is here, in an emergency services organization.

5            There's a letter from Mr. Meyer Appel, who is the

6    chair of a multicultural organization, that commends Yoel for

7    his work at weekly clothing drives for migrants in New York

8    City, for new migrants.

9            There are smaller things that are noted in the

10   letters, your Honor——organizing a menorah celebration; chipping

11   in and helping out at various junctures.

12           It's also important, though, to emphasize that his

13   good deeds and the kindness and consideration that he shows to

14   others goes back years.  It's not just——obviously he's worked

15   hard to try, in the last couple years, to make amends and

16   shift——whenever there's an arrest, post-offense rehabilitation

17   is obviously significant, but it's also important what record

18   there is, what evidence there is of his character before the

19   arrest, right, who is he as a person.

20           And your Honor has obviously read and cited——and it's

21   in the record——the very ugly text messages that were exchanged

22   between the brothers in connection with this offense conduct,

23   and we're going to——I'm going to speak about those and he's

24   going to speak about those in his statement, your Honor.  He

25   recognizes and they are vulgar, wrong, certainly showed intent

O951ABRS

1    to defraud.  We admit he engaged in fraud.  He pled guilty to

2    fraud.  But they are also the product of uneducated, impulsive,

3    compulsive engagement, somewhat compulsive behavior of a young

4    20-something-year-old with ADHD who was, you know, using——I

5    know, for everyone who's had a teenager, you know, the way

6    people communicate on texts can be problematic but doesn't tell

7    the whole story of who someone is.

8         And I think it's significant that the 27 letters from

9    friends and family that we have attached are uniform in

10   different ways, uniform in praising his kindness and

11   generosity, but each has a different story to tell about how

12   they feel about him and why they admire who he is and how he

13   conducts himself.

14        Miriam, one of his sisters, talks in a very heartfelt

15   way just about how he's always the person who volunteered to

16   drive someone home, even if it's an hour out of his way, 20

17   minutes out of his way, even if it's late at night, or to pick

18   someone up, to get everyone——to get the family together.

19        Shiye Freund, a member of his local congregation,

20   notes the small ways that she sees him always stay around to

21   help clean up, right?  He's not doing that for the record, he's

22   not doing that for court.  He's the one who always picks up,

23   who helps finish and makes sure that everyone's taken care of.

24   He looks out for the elderly in the congregation.  He ensures

25   that they're comfortable.  You know, he looks out for everyone

O951ABRS

1    else before he takes care of himself.

2           Many of the letters talk about that when he did have

3    money, he was very generous.  If someone needed a loan, someone

4    needed money for their business, that they were struggling,

5    there's one letter that talks about a $20,000 loan; another

6    person talks about discussing $5,000.  Obviously, I understand

7    in context, how he got that money is problematic, but I want to

8    paint a picture of who he is in his community and his

9    day-to-day life that is at odds, I admit, at odds with the text

10   messages that sound crass and vulgar and express sort of

11   compulsive greed that he was, frankly, lost to during this time

12   period.

13          These good deeds that I described, they obviously

14   don't erase——I'm not saying they take care or they erase the

15   bad ones.  They don't excuse it.  There's no causal explanation

16   that I'm offering here.  But they do speak volumes about his

17   day-to-day life and who he is, and who he has become since the

18   time six years ago when his accounts were shut down.  And that

19   evidence of his fundamental character, we ask, and we hope,

20   should guide the Court in determining what kind of punishment

21   is actually needed, how to structure punishment that is

22   sufficient but not greater than necessary to achieve the

23   statutory purposes of sentencing.

24          His efforts to make amends are not just evident from

25   his deeds and his conduct, your Honor.  He has also done quiet

O951ABRS

1   work, internal work, which is sometimes more difficult than

2   showing up at a clothing drive every week.  But to look inward

3   and to confront his own responsibility and hold himself

4   accountable for what he did.  You know, I want to——it's

5   remarkable to me the number of letter writers who volunteer

6   essentially in their letter that he has spoken to them about

7   his remorse and his regret for what he did.  It's not always a

8   fact that people in this situation are able to process that and

9   share their shame and their remorse with the people close to

10  them.  And it's something he has done even on a personal and

11  family level, repeatedly.

12          He also, through therapy and through his meetings with

13  Dr. Gaines, has opened up about very difficult childhood

14  traumas and difficult aspects of his personal history.  Again,

15  we're not offering this as an explanation or as an excuse for

16  his conduct, but I think it's relevant in a very particular

17  way.

18          It's notable——this was very difficult for him to do, I

19  just want to note.  Like, during the presentence report, for

20  someone who has a very calm demeanor, he had tears streaming

21  down his face when he was discussing these experiences, and I

22  think talking about it with counsel and with Dr. Gaines was

23  really one of the first times in his adult life that he had

24  processed those experiences orally.

25          But why this is relevant I think to your Honor's

O951ABRS

1   decision is that in talking about this experience and

2   understanding his childhood, he was able to reflect upon why he

3   had turned to this quick-money kind of scheme, the sort of

4   lottery aspect of, oh, look what I can get away with, look at

5   this money, and given the very strict deprivations of his

6   childhood, look how I can fix this all—me, uneducated, not

7   even allowed to go to secular classes at his yeshiva by his

8   very strict religious upbringing, I can get power, I can make

9   my way in the world; that he understood, looking back through

10  this therapy and through this inward thinking, what it was

11  inside of him that had led him to make those choices.  And that

12  he has that understanding.  That's the point for your Honor.

13  And that's the point.  Not like—again, you have many

14  defendants who come before your Honor with difficult

15  experiences, but the fact that he's understood how those

16  experiences or how things that have happened in his life led

17  him to make those poor choices and that awareness has given him

18  power to change, and that power to change has been borne out by

19  his activities and the way he's conducted himself over the last

20  couple years.

21          And then as your Honor knows, he's undertaken intense

22  spiritual work.  He personally meets with Rabbi Teitelbaum,

23  who's been here—who's still here, I think—to learn and

24  reflect about his choices through the study of Talmud, which is

25  very important, obviously, to reflect upon his bad choices, not

O951ABRS

1    just in a therapeutic setting but in a religious setting.  And

2    I think it's powerful what Rabbi Teitelbaum had said in his

3    letter, that he had sort of witnessed——not incidentally, it

4    wasn't pure coincidence, but he overheard Yoel speaking to

5    someone else and telling them, Don't do what you're thinking of

6    doing, that's terrible, that's wrong, don't do it; that he

7    heard him counsel somebody else to stay out of illegality and

8    to do the right thing.  And when he brought it up with Yoel

9    later, Yoel said that it's his duty and responsibility, given

10   what he has gone through and given what he has done, to make

11   sure that others don't fall into the same trap he did, that

12   others don't make those shortcuts and don't take the easy way

13   out.

14        All of that is to say, your Honor, that Mr. Abraham,

15   Yoel, has grown up.  You know, he's not——I know he wasn't 19,

16   but when he started selling with Amazon, he was in his early

17   20s.  He's only 32 now.  The conduct stopped.  The accounts

18   were closed in 2018.  It's now six years later, believe it or

19   not.  So a lot of time has passed, but he's grown up, he's

20   matured, and he simply is not the same person that he was at

21   the time that the offense was committed, at the time that those

22   messages were sent.  And he not just has changed but has

23   changed with profound understanding about how he came to be

24   that person who committed the crime and how he has grown now to

25   be a totally different person, who can contribute to his

O951ABRS

1    community, and the fact that all these people are here in court

2    today is testament to the healthy ways that he's reconnected

3    with his community and, frankly, developed an entirely new

4    identity that he is rightly proud of.

5            We recognize, obviously, that——actually, before the

6    next section, I want to mention, with respect to the

7    guidelines, your Honor, we do ask that your Honor

8    consider——this goes to the seriousness of the offense and

9    whether the guidelines measure the culpability appropriately.

10    We preserve arguments we said already about intended loss, but

11    beyond that, the two points which are really technical.  I

12    don't know what else to call them.  They're sort of technical

13    enhancements based on whether or not there's a 20-year max,

14    10-year max at base level 6, base level 7, and then the extra

15    point because he pled open.  Those two points I don't think are

16    meaningful points with respect to measuring culpability.  And

17    so while I understand, as a technical matter, they apply, we

18    ask that the Court discount the——sort of thinking about varying

19    downward from the guidelines, I certainly would include a

20    two-point discount, which would bring it down to level 23, if

21    you were to do that as a hypothetical starting point of 46 to

22    57 months.  So we ask that the Court consider that as an

23    additional ground for variance and an additional basis for

24    concluding that the guidelines range, based on intended loss

25    and those additional points, overstate his culpability.

O951ABRS

1          But the final point, your Honor, that I want to make

2      is that, you know, look, when we're in this situation at the

3      defense table and we're at sentencing, it often has the effect

4      of sounding like we're asking for a pass, right, when we ask

5      for a noncustodial sentence, that we're asking for no

6      punishment to be imposed.  And I want to state out clearly,

7      that's not what I'm asking for.  We recognize that when someone

8      commits a crime, when someone does something wrong, there is a

9      need for accountability, there is a need for punishment,

10     beyond——

11          THE COURT:  It's not just that, but there's a need to

12     deter not just him but others, I think particularly in the

13     white collar context.

14          MS. HARRIS:  There is, your Honor, though——so I was

15     going to address both general deterrence and sort of the

16     seriousness of the offense.

17          With respect to general deterrence, I believe we cite

18     this literature, but I'm sure the Court is familiar with it,

19     that empirically, there's very little to no literature that

20     suggests the length of a sentence has any general deterrent

21     effect, that it's most commonly that arrest itself and the

22     quote-unquote certainty of being caught that deters

23     white-collar offenders particularly.

24          Moreover, frankly——and I think general deterrence,

25     there's often immediacy to the notion of general deterrence,

O951ABRS

right?  Press release, someone's arrested, what the result is.
To the extent that there is any general deterrence achieved by
a jail sentence or by a longer sentence in incarceration, we
would submit that the value of that has dissipated over time,
with the passage of time.  Again, these accounts and the
conduct stopped six years ago.  The indictment was four years
ago.  To sentence someone to jail six years after something
happened, a person who is no longer the same person they were
six years earlier, I don't know if it──the need for punishment
or the need for general deterrence I think is less, frankly,
given the changes wrought by the passage of time.

          Moreover, here, there has been ample punishment
already imposed and will be imposed.  There may be significant
financial penalties.  $1.9 million of his assets have been
already frozen, and he's been subject to restrictions on his
liberty for the past four years.  And of course, probation, as
the Supreme Court has recognized, is a form of punishment, and
your Honor can, and I'm sure will, and should, impose
additional conditions on supervised release.  That could be
very strict terms of home confinement that will allow him to
continue his job that has meant so much to him, where he's
earning $20 an hour, working for a real estate management firm,
which he says is rewarding because he's helping low-income
tenants, people who remind him of his own family background and
the struggles that he had as a child, that allow him to

O951ABRS

continue to work and continue taking his GED classes, continue

the nightly religious studies, continue his therapy, and

continue to rehabilitate in the community.  Your Honor can

impose community service requirements and direct that he

continue his therapy and his GED classes.

Moreover, the other point here, your Honor, is that

where someone like Yoel, who has made so much progress, has

really turned things around and started a whole new path and

has built himself up in so many different ways, that

interrupting that and taking him out of the community and

putting him——isolating him in jail could be counterproductive

to the public interest.  As many of the letters write, and

certainly Dr. Gaines's report makes clear, Yoel is someone who

over time has struggled with feeling out of place, of feeling

different and disconnected from his community.  He was bullied

and stigmatized as a child and often felt sort of on the

outside of what was happening around him, not being married,

being skipped in order for marriage purposes.  And to isolate

him from the community for any prolonged time period, just as

he has worked so hard to reconnect in such healthy ways and in

meaningful ways, would be not just harmful to him but I think

would set his rehabilitative efforts back and therefore not

serve the public interest.

Before I conclude——and I know Mr. Abraham is prepared

to speak to the Court——if the Court were to impose a term of

O951ABRS

1    supervised release, it and the probation department will have

2    an important ally in supervising Mr. Abraham.  As we described

3    in our submission, the Aleph Institute, with which Mr. Abraham

4    has already been working regularly, doing classes with Rabbi

5    Bryski and other community service projects, they will

6    supervise Yoel in those activities and structure a strict and

7    intensive alternative to incarceration program and monitor his

8    progress and report to the Court directly.

9            All of this is to say, these are ways to make

10   Mr. Abraham, to make Yoel do amends in an active way.  Jail

11   imposes, you know, suffering, but it's a very passive state.

12   Someone is locked up for a period of time and isolated from

13   their loved ones.  We can structure punishment differently.  We

14   can make it a real burden.  We can make them work hard for the

15   community in a way——in the community.  And that's what we, with

16   the help of the Aleph Institute, are asking your Honor to

17   consider.

18           So I think at this point, your Honor, I would ask for

19   the Court's indulgence for Rabbi Bryski to make a short

20   statement about Yoel's progress.  Thank you.

21           THE COURT:  Okay.

22           RABBI BRYSKI:  Good evening, your Honor.

23           THE COURT:  Good evening.

24           RABBI BRYSKI:  Thank you for the opportunity to

25   address the Court in this very important matter.

O951ABRS

1          Aleph assists people of all faiths, and our pro bono

2     services are extended to anyone who wants to turn their life

3     around after committing a non-violent crime.  And someone who

4     has no priors is usually vetted, mostly to see if there's

5     sincere remorse, which is the case here.

6          We have come to know Yoel over many months.  I flew

7     out to New York to meet with him before accepting him into our

8     program.  I know that Rabbi Teitelbaum has been studying with

9     him more regularly, and he was here today as well.  This is the

10    son of the Grand Rebbe of Satmar.

11         And together with a lot of the other classes he's been

12    taking with me and the counseling services that we provided, I

13    believe that he has made tremendous, tremendous strides.

14         When I sit here and hear about the offense conduct,

15    it's abhorrent, it's terrible, and yet it reminds me of how far

16    he has come.  When I met with him, he already was a person who

17    was suffering, a person who was determined to fix things up.

18    And it's not always easy to know that somebody is going to do

19    so prior to sentencing.  After sentencing—which we're

20    committed to working with him post-sentencing—it's not always

21    easy to see if someone's going to actually progress and grow,

22    especially when you know that the person is usually very

23    downtrodden, very depressed, very upset about what they're

24    going through.

25         But I can say that he has already been punished to a

O951ABRS

great extent.  The Aleph Institute is at the forefront of

running prevention campaigns in our insular communities and

beyond, in broader communities as well, going to schools, to

individuals who are young, 20-year-olds, going out into the

world, needing to apply all their religious rules and

religious——religiosity into making it manifest into their

everyday life when they make decisions in the secular world.

        I've used this example to others.  We've had programs

with hundreds of people listening, and when I tell someone that

an individual here, all his friends are married behind him, an

individual here, his life is on hold for all these years, I

believe that accomplishes some bit of general deterrence when

people realize that that's going to happen to them as well.

        The community service that we have suggested and that

he's complied with in our program is designed to have him

reflect on his behavior.  This is not just mechanical labor.

This is him getting in contact with people who earn an honest

living, work hard, and don't cut corners.

        So we most definitely are committed to working with

him.  We're the ones that asked counsel to get him the psych

eval so we can have a better understanding of the underlying

issues that may have played a role in the commission of his

offense.  And as counsel mentioned, this is not meant to be an

excuse but rather a path forward for Yoel.  I personally

witnessed the change, the growth, the self-refinement that has

O951ABRS

1    taken place, and he's not the same person who committed the

2    offense years ago.  He has excelled in our program more so than

3    many others.  He takes initiative, he asks us, what should I do

4    next, and he's an incredible asset to his community and

5    society.

6          Our programs are expected—people in our program are

7    expected to perform this rigorous work, as an alternative to

8    lengthy incarceration, hoping that perhaps some of the period

9    of incarceration can be swapped out for meaningful punishment

10   and meaningful rehabilitation.  So we commit to overseeing his

11   work and sending regular reports to the Court or to the

12   probation department, and we believe the Court will be pleased

13   with the progress and results.

14         Thank you very much, your Honor, for the opportunity

15   to address this Honorable Court.

16         THE COURT:  Thank you.

17         Mr. Abraham, is there anything you'd like to say

18   today?  And then I'll let the government finish.  I know we did

19   a little out of order, just not intentionally.

20         THE DEFENDANT:  Your Honor, thank you for the

21   opportunity to address the Court today.  Today is a very

22   important day of my life, and will shape my future.

23         First and most important thing, I must directly

24   apologize to the Honorable Court, the prosecution, to my

25   friends and family that I've put through so much shame, but

O951ABRS

most important to me is to apologize to Amazon.  They've given
me opportunities that most will describe as the American dream.
But that wasn't enough for me.  I took advantage of them, their
systems, and their policies.  I know that it was unethical,
inappropriate, and wrong.  I'm truly remorseful, and I'm full
of shame.  And I'm deeply sorry that I have conducted myself so
poorly instead of being grateful for the opportunities Amazon
has given me, my family, and countless others.

        The way I conducted myself, the actions I took, the
way I spoke, the messages I sent, and the language I used, are
the opposite of how I was taught growing up.  I was taught to
behave better than that, and to conduct myself better.  The
person I am today at the age of 32 doesn't recognize the person
I was at the age of 24.  Looking back, all I can say is, I was
truly lost and blinded by materialistic things and the lust for
money.  Not one good thing has come out from my actions.  Every
aspect of my life that could go wrong did.  My life has been
shattered to pieces and feeling so tired and defeated.  While I
smile to every person I meet, I do my best to brighten their
day, my inner self is full of shame and sadness.

        The consequences of my conduct has been a living
burden for me every day, and the only one to blame for this
reality is my own self.  This is all my own doing, a sad
creation of my poor behavior and improper conduct.  Despite
feeling shameful about myself constantly, I feel and exercise

O951ABRS

1  my duty to explain to others and make them aware to only

2  conduct themselves ethically, legally, and with integrity.

3          I have been praying every day since I've been 18 years

4  old to get married.  The most important thing to me is to find

5  the right partner in life and raise a righteous family

6  together.  When I conducted myself so foolishly six years ago,

7  I diminished my chances of getting married, and I'm living with

8  the consequences.

9          The past four years has been brutal for me, but also

10  very important.  All that I've gone through and the teachings I

11  have learned has been a blessing from the sky.  I surrounded

12  myself with good and honest people, that are looking out for me

13  and my well-being.  And I'm seeking guidance from spiritual

14  leaders who are showing me and are teaching me how to conduct

15  myself the right way.  As a result, I feel my life today is a

16  complete 360 from where I was just four years ago.  The

17  progress I've made, my way of thinking today, is all thanks to

18  the right guidance I've received and continue to follow.  This

19  traumatic experience has taught me that a person could truly

20  change.

21          Your Honor, I'm standing before you right now as a

22  changed person.  The person I am today is not the person I was

23  when I engaged in this conduct.  I pledge to you, your Honor, I

24  will always do the right thing.  I will lead a life as a

25  law-abiding citizen, and I will make you proud.

O951ABRS

1          I humbly ask you, give me a second chance.  By

2     believing in me, let me prove to you that I'm worthy and

3     deserving of a second chance.

4          Thank you, your Honor, from the bottom of my heart.

5          THE COURT:  Thank you, Mr. Abraham.

6          Would the government like to be heard?

7          MS. KAMAL:  Yes, your Honor, briefly.

8          So your Honor, I'd like to start where the defendant

9     began, which is when he mentioned his request for a second

10    chance.

11         As an initial matter, a sentence of incarceration is

12    serious, but it is not the end.  And as Mr. Abraham's conduct

13    before and after he was apprehended for this crime, as that

14    reflects, he has remained close with his family, close with his

15    community, both before and after.  And so whatever sentence the

16    Court imposes, however long it may be, the defendant will go

17    back to that same family and that same community at the end of

18    that sentence when he is released, and the government

19    respectfully submits that an incarceratory sentence here is

20    vital to serve the interests of deterrence and to reflect the

21    seriousness of the offense.

22         Your Honor, the defendant has tried to have it both

23    ways for years now.  First he negotiated a plea agreement over

24    many years, only to step back from it at the last minute.  That

25    is his right.  Then he claims he accepts responsibility for his

O951ABRS

actions, and yet he asks the Court to find that there was no
loss caused and that he should remain at liberty.  The
defendant is asking the Court—

THE COURT:  I'm not going to blame him for his
lawyer's zealous advocacy.

MS. KAMAL:  And I'm not asking the Court to, your
Honor, but what I'm saying is that this pattern of delay and
deflect, to try to have it both ways, reflects the offense
conduct, where he tried to string the victim along by claiming
this was an error and claiming that he was not engaging in
misconduct, and as a way to ultimately hold onto the proceeds
of the scheme.  And here, your Honor, he was given multiple
second chances by Amazon, each time it contacted him about a
nonconforming shipment.  He had the opportunity over and over
and over again to turn away from this, and he did not.

And to be clear, your Honor, the defendant was not
alienated from his family at that time.  He was not taken out
of his community at that time.

I truly believe defendant really reflects, under the
3553(a) factors, the reality that we all contain multitudes.
He was clearly a wonderful brother and a deeply tied member of
his community.  There's no suggestion that that has ever been
otherwise, and yet that's the same person who was able to
engage in this scheme, which was not impulsive, was not a
momentary lapse; it went on for years.  And it is the

O951ABRS

 1    seriousness of the offense, and the need to deter both this

 2    defendant and others, that this conduct will be taken

 3    seriously, no matter how long it takes for you to be brought to

 4    justice, justice will be imposed.  And here specifically, there

 5    is no suggestion that a sentence of time served here would

 6    accomplish the specific deterrence that the sentence needs to

 7    reflect.

 8           To date, we are now four years after the offense.  We

 9    are many months after the defendant pled guilty.  Still, the

10    defendant has not been transparent with probation about his

11    financial assets.  There have been representations by counsel,

12    to be sure, and I do not question counsel's advocacy, or

13    representation or candor.  But there has been no independent

14    third party, anything that is verifiable by probation to

15    suggest that his assets are what they are and that he has in

16    fact paid his taxes or filed his taxes.

17           Simply put, your Honor, the defendant's crimes were

18    not committed against his family or his community, and it is

19    admirable that in his time of distress, he has continued to

20    find meaning and to move forward by serving that community and

21    serving his family.  But there is nothing in the defendant's

22    actions in the past four years that suggest that he has been

23    specifically deterred from victimizing others who are not part

24    of his family and who are not his friends, such as the victim

25    here.  And I realize, your Honor, that Amazon is a large and

O951ABRS

1   wealthy corporation.  It is not a sympathetic victim.  But that

2   is the very reason why a sentence here has to reflect that

3   white-collar crimes like this, even against a corporation as

4   large as Amazon, are serious and they bring serious

5   consequences.  As a result of his actions, other vendors were

6   not given the opportunity, other small business owners were not

7   given the opportunity to work with Amazon and develop and grow

8   their businesses——people who would have appreciated having a

9   300,000 or a $400,000 business.  Those opportunities matter.

10  They matter in American society.  And the Court, in sentence

11  here, needs to reflect the seriousness of this offense.

12          I would just also like to note, your Honor, here that

13  probation has recommended a sentence at the low end of the

14  guidelines.  While the government here is not taking the

15  position that the guidelines calculation overrepresents the

16  defendant's culpability, to be sure, I was forecasting an

17  argument that I anticipated that the defense would and has

18  made, the government nevertheless does submit that a sentence

19  at the low end of the guidelines would be appropriate here.

20          And unless the Court has any further questions, I will

21  rest on my submission.  Thank you.

22          THE COURT:  Thank you.

23          MS. HARRIS:  Your Honor, may I just briefly?

24          THE COURT:  Yes.

25          MS. HARRIS:  I would ask that the Court not

O951ABRS

1    consider——I think the Court is not going to consider, but——any

2    of the government's arguments with respect to the plea

3    negotiations, the motions, the litigation.

4          THE COURT:  I already noted that.  I think there's

5    been zealous and, as I said earlier, outstanding advocacy on

6    both sides.

7          Look, I understand the government's point that you

8    shouldn't benefit from this being years later, to the extent

9    that that came from the defense side, but again, I'm not going

10   to weigh and I'm not going to rely on that at all.  And I

11   really wasn't going to.

12         MS. HARRIS:  I don't want to have a whole

13   back-and-forth about why it's four years.  I don't want the

14   blame to be at my client's side at all.

15         THE COURT:  It won't be.

16         MS. HARRIS:  Okay.

17         MS. KAMAL:  I just have to add for the record here,

18   your Honor, the government would not have raised those

19   particular arguments but for the Defense's suggestion that the

20   government had been inconsistent in its positions with respect

21   to calculating loss.  So to the extent that the defendant has

22   relied on arguments about the government's changing positions

23   over time, which it did most recently in its last submission,

24   the government just has to stress here that it had to respond

25   to those arguments to ensure that the Court understands that

O951ABRS

1    the government is being candid.

2            THE COURT:  I think the lawyers, as I said, are

3    outstanding on both sides and that you're all acting in good

4    faith, and that wasn't going to weigh in at all into my

5    determination.

6            MS. HARRIS:  Thank you, your Honor.

7            The only other thing I just want to say, and I just

8    worry that it wasn't clear in my earlier presentation, is just

9    that it's not that there's been a big continuum in how—I mean,

10   yes, he's still part of the same large Hasidic family, he still

11   lives in the same community, but there's been a real shift in

12   terms of what he does with his time and who he spends time

13   with.  You know, when he was doing this, he was working 15

14   hours a day compulsively, you know, shipping goods to Amazon

15   and not engaging in the community, the many beneficial

16   community activities that I've just described.  He was not

17   going to weekly study sessions and lectures.  He was not

18   working with a rabbi.  So this notion, I just—I do, because

19   I—it's so at odds with the record and with what our client has

20   done, I did want to just note that.

21           THE COURT:  Look, I read all of the letters submitted

22   on his behalf.  I recognize he's made real efforts towards

23   rehabilitation, and I fully appreciate the argument you were

24   making.  I really do.

25           MS. HARRIS:  Thank you, Judge.

O951ABRS

1          THE COURT:  All right.  So I'm required to consider

2     the advisory guidelines range of 57 to 71 months as well as

3     various other factors that are outlined in a provision of the

4     law, 18 United States Code, Section 3553(a), and I've done so.

5     Those factors include, but are not limited to, the nature and

6     circumstances of the offense and the personal history and

7     characteristics of the defendant——because every defendant must

8     be considered individually as a person.  Judges are also

9     required to consider the need for the sentence imposed to

10     reflect the seriousness of the offense, promote respect for the

11     law, provide just punishment for the offense, afford adequate

12     deterrence to criminal conduct, protect the public from further

13     crimes of the defendant, and avoid unwarranted sentencing

14     disparities, among other things.

15          So as discussed at length today, Mr. Abraham and his

16     three brothers participated in an elaborate and brazen scheme

17     to defraud Amazon.  He intentionally and extensively

18     overshipped items on purchase orders, at times in the

19     thousands, causing Amazon to pay for goods that it had never

20     ordered.  Just one example that I mentioned earlier with

21     respect to the substitution of products, just to give a sense

22     of this, is that instead of shipping one case of 12 cannisters

23     of a disinfectant spray that cost a little over $94 per pack

24     consistent with the purchase order, he shipped and then

25     invoiced Amazon for 7,000 individual toothbrushes at $94 per

O951ABRS

toothbrush.  So just with regard to this example alone, he

fraudulently invoiced Amazon for over $650,000.

So his conduct was intricate, it was complex, it

involved editing product pages and manipulating Amazon's

invoicing system so that the lower-value items matched the

alphanumeric identifiers included in the purchase orders.

And as I said earlier, he was motivated by greed, and

it appears he was motivated by a real desire to harm Amazon,

and I'm not going to read the texts again about wanting to

"fuck Amazon" or wanting Jeff Bezos to die or, you know,

intending to make a million dollars profit per week, but, you

know, they say a lot about what his intent was and what he

tried to do and what this crime was really all about.

I understand that he now regrets those texts.  I'm

sure he does.  But once caught, most people regret leaving

smoking gun proof of their criminal behavior for all to see.

That doesn't mean, however, that he's not regretful or that

he's not remorseful.

I've considered all of the arguments that counsel so

eloquently made, including, you know, that now he's in his

early 30s, he's a different person, he has no other criminal

history, you know, he began his involvement in this conspiracy

at the age of 24, he now has gainful employment, he's seeking

his GED, and he's doing a lot to really make strides towards

rehabilitation and be a positive member of his community.

O951ABRS

1          I read about various difficulties he's faced in his

2     life with respect to education and limited financial means, and

3     I've considered all of those arguments.

4          But while I have to and am considering his personal

5     history and characteristics, I also have to be sure to impose a

6     sentence that reflects the seriousness of the offense, that

7     promotes respect for the law, that provides just punishment,

8     and that deters both him and others from engaging in similar

9     conduct.

10          He engaged in this scheme for years, and the intended

11     loss here was over $20 million.  So in my view, I have no doubt

12     that a prison sentence is warranted here, given the

13     egregiousness of the conduct at issue and the importance

14     particularly of deterrence in a case like this.

15          I've also considered the need to avoid unwarranted

16     sentencing disparities, not only relative to Mr. Abraham's

17     co-defendants but other defendants in this district and

18     nationwide who have been found guilty of similar conduct and

19     with similar records.

20          Nonetheless, I also agree with defense counsel that

21     the guidelines range here in my view is too high.  Indeed, many

22     courts have found as much where the guidelines range is largely

23     based on intended loss.  See, for example, Judge Underhill's

24     concurrence in the *Corsey* case and Judge Rakoff's opinion in

25     *Gupta*.

O951ABRS

1            That said, I don't agree with defense counsel about

2       the degree to which I should focus on the actual, ultimate harm

3       to Amazon.  As the Second Circuit noted in the *Lacey* case,

4       where the intended loss is greater than the actual loss, as we

5       have here, "the larger intended amount is a better measure for

6       the defendant's culpability than is the actual loss."  And

7       that's what I think is the case here.

8            In any event, I've considered all the arguments,

9       including——not faulting the government for the plea

10      negotiations, but recognizing the fact that the defendant chose

11      not to plead guilty pursuant to an agreement and how that

12      affected the guidelines.  I'm cognizant of all of that.  And I

13      am ready to impose sentence.

14           So Mr. Abraham, could you please rise for the

15      imposition of sentence.

16           It is the judgment of this Court that you be committed

17      to the custody of the Bureau of Prisons for a term of 30

18      months, to be followed by a term of supervised release of three

19      years.  That's the sentence on each of the three counts, and

20      it's to run concurrently with one another.

21           I believe that this sentence is sufficient but not

22      greater than necessary to comply with the purposes of

23      sentencing set forth in the law.

24           And you can be seated if you'd like.

25           I want to note a couple things for the record.

O951ABRS

1          First, I want to note that I would have imposed the

2    same sentence even if I agreed with defendant's argument that

3    his overshipping should not go towards the loss amount.  As I

4    discussed earlier, even without including that, the intended

5    loss amount would nonetheless have resulted in an increase of

6    18 levels under 2B1.1(b)(1).  So the guidelines range would

7    have thus been 46 to 57 months, given an offense level of 23

8    and a criminal history of I.  So I'll just note, and I'll add,

9    that I would have imposed the same sentence regardless of the

10   actual loss, if any, to Amazon.  I mean, for me, that is not

11   the most compelling factor here.  It is the nature of the

12   crime, the intentionality, the egregiousness of it, the

13   brazenness of it, the seriousness of it, for a lengthy period

14   of time.

15          I'll also note that I believe that this sentence is

16   consistent with other sentences imposed in this district,

17   according to a search that I did on the Sentencing Commission's

18   publicly-available Interactive Data Analyzer.

19          That data indicated that, for offenses where 2S1.1 is

20   the primary guideline, and where the defendant had a criminal

21   history category of I, the average length of imprisonment in

22   this district in 2023 was 35 months, the median was 34; then

23   there was then an average supervised release of 34 months, and

24   a median of 36 months.  So that data comes from 61 separate

25   cases that were reported to the Sentencing Commission from this

O951ABRS

 1    district.

 2            And if you'd like to be seated, I'm going to read the

 3    conditions of your supervised release.

 4            So all the standard conditions of supervised release

 5    shall apply.  They are on page 39 to 40 of the presentence

 6    report.  Do you want me to read them out loud or do you waive

 7    their public reading?

 8            MS. HARRIS:  Waive the public reading, your Honor.

 9            THE COURT:  And with respect to the mandatory

10    conditions, do you also waive their public reading?

11            MS. HARRIS:  Yes, your Honor.  We'll provide a written

12    copy to defendant.

13            THE COURT:  That's also on page 39.

14            I am going to talk about the special conditions

15    proposed by the probation department out loud.

16            So the first one is that you must provide the

17    probation officer with access to any requested financial

18    information.  I am going to impose that condition in light of

19    the nature of the crime.  And I'm going to talk about

20    forfeiture and restitution in a minute, but that there may be

21    financial penalties as part of the forfeiture and restitution

22    orders.

23            You must not incur new credit card charges or open

24    additional lines of credit without the approval of the

25    probation officer unless you're in compliance with the

O951ABRS

1    installment payment schedule.

2            And you shall submit your person, any property,

3    residence, vehicle, computer, other electronic communication,

4    data storage devices, cloud storage, or media and effects to a

5    search by any United States probation officer and, if needed,

6    with the assistance of law enforcement.  The search is to be

7    conducted when there's a reasonable suspicion concerning a

8    violation of the condition of supervision, or unlawful conduct

9    by the person being supervised.  Failure to submit to a search

10   may be grounds for revocation of release.  You shall warn any

11   other occupants that the premises may be subject to search

12   pursuant to this condition.  Any search shall be conducted at a

13   reasonable time and in a reasonable manner.  And I think that

14   that is very appropriate here in light of the nature of the

15   crime and how it was carried out, both in terms of how it was

16   carried out online but also, to the extent he's in a business

17   going forward where he is storing particular items, I think for

18   a host of reasons, that's appropriate here.

19           I'm not going to impose a fine because the probation

20   office has reported that it would be difficult for you to pay

21   one.

22           I am imposing a mandatory special assessment of $300,

23   as I must.

24           So with respect to forfeiture and restitution, I'm

25   ordering restitution, but I'm reserving judgment on the amount.

O951ABRS

I'm also ordering forfeiture of all property, real or personal,

that constitutes or is derived from proceeds traceable to the

commission of the offenses in Counts One and Two, but I'm

similarly reserving judgment on the amount.  As explained by

the Second Circuit in the *Papas* case, Federal Rule of Criminal

Procedure 32.2 "permits a district court to withhold judgment

on the amount of forfeiture owed by a defendant pending

post-sentencing briefing and/or argument from the parties."

*United States v. Papas*, 715 F.App'x 88, 90 (2d Cir. 2018).  "In

this scenario," the court went on, "the court must include the

forfeiture when orally announcing the sentence, and must also

include the forfeiture order. . . in the written judgment."

*Id.*  A district court can thus "compl[y] with Rule 32.2 by

pronouncing orally at sentencing, and in the subsequent written

judgment, that the court [is] entering a forfeiture order, and

that an amended forfeiture order would be issued once the

parties agreed upon (or submitted full briefing concerning) the

amount of money and the property to be forfeited."

So I raised this matter, as you know, with the parties

by order of August 22nd, and I stated that this was what I

intended to do, but asked if you had any objections, that I'm

ordering forfeiture as I just did, but I'm reserving judgment

on the amount.  I'm going to refer that to a magistrate judge

for a recommendation.  So the government didn't object.

Defense counsel stated that they "have no objection to

1   referring the calculation of any restitution and forfeiture to

2   the Magistrate Judge," but requested that the referral be

3   deferred "until sentencing," which I have done.  So my

4   understanding is that there's no objection to that.

5           I think the only question is, does either party

6   believe that I need to issue a physical forfeiture order beyond

7   what I just said or something in the judgment indicating that

8   I'm ordering forfeiture in an amount to be determined?

9           MS. KAMAL:  If I may, your Honor.

10          THE COURT:  Yes.

11          MS. KAMAL:  Yes, the government would request simply

12  that the judgment itself reflect that the Court is ordering

13  both restitution and forfeiture but in an amount to be

14  determined by the magistrate.

15          THE COURT:  Right.

16          MS. KAMAL:  The only——

17          THE COURT:  I'm going to sign off on it.  So the

18  magistrate judge is going to make a recommendation to me; it's

19  ultimately going to be determined by me, just to be clear, the

20  proposed calculation, and the parties can make objections.

21          MS. KAMAL:  Understood, your Honor.

22          The only other issue I wanted to raise is that——and

23  this is only because scheduling has been an issue in this

24  matter——it's my understanding that restitution must be ordered

25  within 90 days, and so I just wanted to sort of put the Court

O951ABRS

and the parties and any magistrate who may be reviewing this

transcript on notice that the restitution order——if the

judgment is in fact imposed today, we have 90 days to finalize

restitution.

THE COURT:  I'm going to read from you from the *Dolan*

case.  My understanding is that if I order restitution within

90 days, that if I say I'm going to do it, I can still go past

the 90 days to determine a particular amount.  If you disagree,

we'll get it done within the 90 days.  But in the *Dolan* case,

560 U.S. 605, 608, the Supreme Court said, "We hold that a

sentencing court that misses the 90-day deadline nonetheless

retains the power to order restitution at least where, as here,

the sentencing court made clear prior to the deadline's

expiration they would order restitution, leaving open for more

than 90 days only the amount."

And then in *Avenatti*, the Second Circuit said, "In

sum, because the district court made clear at sentencing that

the question of restitution was still very much pending, the

defendant cannot claim any prejudice from disturbed

expectations of repose."

If you think it needs to be done in 90 days, tell me,

and I'll advise the magistrate judge of that and we'll build

that into the schedule, but if you all don't think it needs to

be done in the 90 days because I'm officially ordering

restitution today, then we won't be.

O951ABRS

1          But I'm happy to hear you out on that.  And I'm glad

2     you raised it.

3          MS. KAMAL:  Your Honor, at this point I'm satisfied

4     with the precedent cited by the Court.  If I have any issue

5     with that, I will advise the Court by letter.

6          THE COURT:  Okay.  And the same for defense counsel.

7     If you have any objection to that or if you think the

8     restitution needs to be done within the 90 days or there's

9     anything else I need to do on forfeiture at this point in time,

10    I'd like you to let me know.

11         Okay.  So next I'd like to discuss a surrender date.

12    It's usually about 60 days, but I'm happy to be flexible.  I

13    know—yes.

14         MS. HARRIS:  We were going to ask for January 3rd, if

15    that's possible.  It will allow him to be present for this next

16    phase of the proceedings, and as his counsel, it will also

17    allow him to wrap up some affairs and deal with some family

18    issues.

19         THE COURT:  That application is granted.

20         MS. HARRIS:  Thank you.

21         THE COURT:  So January 3rd, Mr. Abraham, you're to

22    surrender for service at the institution designated by the

23    Bureau of Prisons by 2 p.m. on that date, or as notified by

24    either the probation or the pretrial services department.  I

25    mean, you are to surrender to the MDC, but I would rather him

O951ABRS

1    not do that, frankly.  So if he hasn't gotten a designation,

2    please let me know as soon as possible, because I don't want

3    him to surrender to the MDC.  I just don't think that would be

4    in anyone's interest at this point in time.

5            Your conditions of release will continue up to the

6    time you report to begin your sentence.  If you fail to report

7    for your sentence, you may be charged with another criminal

8    offense.

9            Does either counsel know of any legal reason why this

10   sentence cannot be imposed, other than arguments that you've

11   already preserved on the record?

12           MS. KAMAL:  No, your Honor.  Thank you.

13           MS. HARRIS:  No, your Honor.  I do have a designation

14   request.

15           THE COURT:  Sure.  Of course.

16           MS. HARRIS:  Yes.  Your Honor, we would ask——and I may

17   want to send the Court the exact wording, but——essentially for

18   the camp at Otisville, for the minimum security camp at

19   Otisville.

20           THE COURT:  Sure.  Feel free to send the language that

21   you'd like me to use.

22           MS. HARRIS:  Okay.  Thank you.

23           THE COURT:  And I'll do that as soon as possible.

24           MS. HARRIS:  Thank you.

25           THE COURT:  So that's the sentence of this Court.

O951ABRS

1          Mr. Abraham, you have the right to appeal your

2     conviction and sentence, except to whatever extent you may have

3     validly waived that right.  If you do choose to appeal, the

4     notice of appeal must be filed within 14 days of the judgment

5     of conviction.  If you're not able to pay for the cost of an

6     appeal, you may apply for leave to appeal *in forma pauperis*,

7     which simply means that court costs, such as filing fees, will

8     be waived.  If you request, the clerk of court will prepare and

9     file a notice of appeal on your behalf.

10          So he pled guilty to all of the counts with which he's

11     charged.  Are there any underlying indictments?

12          MS. KAMAL:  There are not, your Honor.

13          THE COURT:  Okay.  All right.  So just the last thing,

14     I know it's been a very long afternoon and evening.  I mean,

15     the last thing I want to say is what I often say at sentencing,

16     Mr. Abraham, just because I firmly believe it to be true.  I

17     don't think people need to be defined by the worst mistakes

18     they ever made in life.  Your life will be defined by a lot

19     more than that, and, you know, I've read all of the letters

20     submitted by your loved ones, and they describe you, among many

21     other things, as kind and compassionate and supportive and

22     charitable and responsive and lots of other things.  You're

23     lucky to have so many people in your life——friends, family,

24     that really care about you and are going to be there to support

25     you.  And I hope that you'll continue on the positive path to

O951ABRS

1    rehabilitation that you've started, and that you'll make all

2    the efforts you can to pay back the money that you stole.  But

3    I wish you luck with that journey.

4              Are there any other applications?

5              MS. KAMAL:  None from the government, your Honor.

6    Thank you.

7              MS. HARRIS:  No, your Honor.  Thank you.

8              THE COURT:  Okay.  Thank you.  We are adjourned.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25